Joseph R. Saveri (SBN 130064)
Steven N. Williams (SBN 175489)
Christopher K.L. Young (SBN 318371)
Louis A. Kessler (SBN 243703)
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swillliams@saverilawfirm.com
cyoung@saverilawfirm.com
lkessler@saverilawfirm.com

James R. Swanson (LA. SBN 18455)*
Kerry J. Miller (LA. SBN 24562)*
Benjamin D. Reichard (LA. SBN. 31933)*
C. Hogan Paschal (LA. SBN 38495)*
Monica Bergeron (LA. SBN 39124)*
**FISHMAN HAYGOOD L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
jswanson@fishmanhaygood.com
kmiller@fishmanhaygood.com
breichard@fishmanhaygood.com
hpaschal@fishmanhaygood.com
mbergeron@fishmanhaygood.com

*Motion to Appear Pro Hac Vice to be Filed*

Attorneys for Individual and Representative Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEANDRO CABO, VITOR VOZZA, KYLE RUPPRECHT, WARREN WINTER, SUNIL KAVURI, on behalf of himself and all others similarly situated,<br><br>*Plaintiffs,*<br>v.<br>TEMASEK HOLDINGS (PRIVATE) LIMITED, TEMASEK INTERNATIONAL (USA) LLC, SOFTBANK GROUP CORP., SB GROUP US, INC., SOFTBANK INVESTMENT ADVISERS (UK) LIMITED, SOFTBANK GLOBAL ADVISERS LIMITED, SINO GLOBAL CAPITAL LIMITED, and SINO GLOBAL CAPITAL HOLDINGS, LLC.<br>*Defendants.* | Case No.<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Case No.:

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................2

PARTIES........................................................................................................................................5

JURISDICTION AND VENUE.....................................................................................................9

FACTUAL ALLEGATIONS..........................................................................................................9

    A.     The Rise of FTX..............................................................................................................9

    B.     FTX's Key Players.......................................................................................................... 13

          I.       Defendant Sam Bankman-Fried ....................................................................... 13

          II.     Defendant Caroline Ellison ............................................................................... 14

          III.    Defendant Gary Wang....................................................................................... 15

          IV.    Defendant Nishad Singh .................................................................................... 16

    C.     The Basics of a Cryptocurrency Exchange.................................................................... 18

    D.     The Mechanics of the Fraudulent Scheme .................................................................... 21

    E.     The Fraud's Collapse......................................................................................................28

    F.     FTX Files for Bankruptcy .............................................................................................. 36

    G.    The Crypto Sector is a Hotbed for Illicit Activity and Fraudulent Conduct.................. 42

    H.    The SEC's Approach to Cryptocurrency. ...................................................................... 46

          I.       Overview............................................................................................................ 46

          II.     SEC v. KIK ........................................................................................................ 50

          III.    SEC v. Telegram ............................................................................................... 50

          IV.    SEC v. BlockFi .................................................................................................. 51

          V.     SEC Wells Notice to Coinbase ......................................................................... 52

          VI.    SEC v. Binance.................................................................................................. 53

          VII.   SEC v. Coinbase................................................................................................ 54

    I.      FTX's offer and sale of YBAs, which are unregistered securities.................................. 54

    J.      FTX's offer and sale of FTT Tokens, which are unregistered securities........................ 63

    K.    Using the Deceptive FTX Platform itself necessarily required transacting in unregistered securities. ................................................................................................... 64

    L.     FTX Aggressively and Deceptively Marketed its Platform........................................... 67

M.    The MDL Defendants' Roles in the Fraud ................................................. 75

N.    Material Ties to Florida ................................................................. 86

O.    The Defendants' Roles in the Fraud ............................................ 90

      a.    The Multinational VC Defendants pumped billions of dollars into FTX, and FTX returned the favor ................................... 92

      b.    The Multinational VC Defendant gained awareness of SBF's fraud in the course of investing in, advising, and promoting FTX. ................................................. 95

      c.    The Multinational VC Defendants provided critical assistance in furtherance of the FTX fraud, despite knowing that SBF was misappropriating Class Member funds. ........................104

      d.    The Multinational VC Defendants sought to keep the fraud concealed, and therefore afloat, until FTX could effect an IPO or a private sale. ..........................................120

      e.    Multinational VC Defendants emerged from the fraud relatively unscathed, while Class Members lost everything. ...............123

CLASS ACTION ALLEGATIONS .......................................................... 125

A.    Class Definitions ...................................................................... 125

B.    Numerosity ............................................................................. 126

C.    Commonality/Predominance ................................................... 127

D.    Typicality ................................................................................ 128

E.    Adequacy of Representation ................................................... 128

F.    Requirements of Fed. R. Civ. P. 23(b)(3) .............................. 128

G.    Superiority .............................................................................. 129

H.    Requirements of Fed. R. Civ. P. 23(b)(2) .............................. 129

I.    Requirements of Fed. R. Civ. P. 23(c)(4) .............................. 130

J.    Nature of Notice to the Proposed Class. ................................ 130

CAUSES OF ACTION ..........................................................................131

PRAYER FOR RELIEF .......................................................................... 155

DEMAND FOR JURY TRIAL ................................................................. 156

Case No.:                  ii
CLASS ACTION COMPLAINT

Plaintiffs hereby file this Class Action Complaint and Demand for Jury Trial.

Plaintiffs use the following defined terms throughout:

- "MDL Defendants" collectively refers to all Defendants named in the seven Administrative Class Action Complaints.

- "FTX Insider Defendants" refers to Samuel Bankman-Fried, Caroline Ellison, Gary Wang, and Nishad Singh.

- "Auditor Defendants" refers to Prager Metis CPAs, LLC and Armanino LLP.

- "VC Defendants" collectively refers to Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management, LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global")

- "Multinational VC Defendants" refers to Defendants Sino Global Capital Limited ("Sino Global") and its subsidiary Sino Global Capital Holdings, LLC; Softbank Group Corp. ("Softbank Group"), together with its wholly owned subsidiaries SB Group US, Inc., SoftBank Investment Advisers (UK) Limited, and SoftBank Global Advisers Limited (collectively, "SoftBank"); and Temasek Holdings (Private) Limited ("Temasek Holdings") together with its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek Holdings, "Temasek").

- Law Firm Defendant refers to Defendant Fenwick & West LLP.

- "Promoter and Digital Creator Defendants" or "Brand Ambassador Defendants" refers to Thomas Brady, Gisele Bündchen, Kevin O'Leary, Udonis Haslem, David Ortiz, Stephen Curry, Golden State Warriors, LLC, Shaquille O'Neal, William Treavor Lawrence, Shohei Ohtani, Noami Osaka, Solomid Corporation d/b/a Team Solomid, TSM and/or TSM FTX, Graham Stephan, Andrei Jikh, Jaspreet Singh, Brian Jung, Jeremy Lefebvre, Tom Nash, Erika Kullberg and Creators Agency, LLC.

Case No.:                                                    1
CLASS ACTION COMPLAINT

- "Bank Defendants" refers to Defendants Deltec Bank & Trust Company Ltd. ("Deltec"), Farmington State Bank d/b/a Moonstone Bank ("Moonstone"), and Jean Chalopin.

- FTX Trading LTD and its subsidiaries d/b/a FTX ("FTX Trading") and West Realm Shires Inc. and its subsidiaries ("WRS"), are together referred to herein as "FTX." WRS includes, without limitation, its subsidiary West Realm Shires Services Inc. d/b/a FTX US ("FTX US"). FTX and Alameda Research, LLC and its subsidiaries ("Alameda") collectively make up the "FTX Group."

Plaintiffs, on behalf of themselves and all others similarly situated, sue MDL Defendants for their respective actions, as outlined herein,[1] which contributed to the collapse of the FTX Group, including but not limited to 1) aiding and abetting and/or actively participating in the FTX Group's massive, multibillion dollar global fraud, and 2) promoting, offering, or selling unregistered securities such as FTX's yield-bearing accounts ("YBA") and FTX's native cryptocurrency token ("FTT"), which caused Plaintiffs substantial harm. Plaintiffs, on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon an investigation conducted by and through counsel.

## INTRODUCTION

1. The FTX disaster is the largest financial fraud in US history. Defendant Sam Bankman-Fried ("SBF" or "Bankman-Fried"), FTX Group's founder and former CEO, is on house arrest awaiting his criminal trial scheduled for October of this year. FTX Group's new CEO—who helped wind down Enron—concluded the fraud here was worse than Enron. Billions of dollars have been stolen from investors across the globe.

2. SBF and his FTX Group caused billions of dollars in losses to Plaintiffs, through at least two separate schemes, both of which contributed to the downfall of the FTX Group.

---

[1] At the request of the Court at the June 21, 2023 Status Conference, Plaintiffs have separated their complaint into seven versions, each of which contains a similar set of general allegations and the specific allegations as to a single group of MDL Defendants. Because certain claims, such as civil conspiracy, are pled across multiple groups of MDL Defendants, Plaintiffs hereby incorporate by reference the other versions of the complaint.

3. On one hand, SBF and the FTX Group stole customer deposits and used billions of dollars in customer funds to support the operations and investments of FTX and Alameda, to fund speculative venture investments, to make charitable and political contributions, and to personally enrich SBF himself, all while publicly touting the safety of the investment and the segregation of customer funds. The Deceptive FTX Platform[2] maintained by the FTX Group was truly a house of cards, a Ponzi scheme where the FTX Group shuffled customer funds between their opaque affiliated entities, using new investor funds obtained through investments in the Deceptive FTX Platform, the YBAs, FTT, and/or loans to pay interest and investment withdrawals to the old ones and to attempt to maintain the appearance of liquidity.

4. On the other hand, the FTX Group offered and sold securities without proper registration, thereby depriving Plaintiffs of financial and risk-related disclosures that would have impacted their calculus as to whether to invest in the FTX Group. Rather than heed the myriad warnings from the SEC dating as far back as 2017, the FTX Group chose instead to skirt US regulation through deception.

5. This conduct violates numerous laws, including laws related to the sale of unregistered securities, consumer protection, professional malpractice, the California Unfair Competition Law, the California False Advertising Law, the California Corporations Code, the Florida Deceptive and Unfair Trade Practices Act, the Florida Securities and Investor Protection Act, and various common law causes of action as detailed herein.

6. As outlined herein, MDL Defendants directly perpetrated, conspired to perpetrate, and/or aided and abetted the FTX Group's multi-billion-dollar frauds for their own financial and professional gain.

---

[2] "Deceptive FTX Platform" refers to the various platforms FTX created for investors to access crypto and related markets. It provided an easy way for investors to access an otherwise tech-heavy dominant world of cryptocurrencies, as *The New York Times* described it: "FTX serves as a portal to the crypto world. With the click of a button, a curious investor can turn dollars into Bitcoin, Dogecoin or Ether. It's as simple as buying paper towels from Target." In addition to YBAs and FTT, the Deceptive FTX Platform offered a range of trading products to cryptocurrency investors, including derivatives, options, volatility products, coins, tokens and leveraged tokens.

Case No.:            3

CLASS ACTION COMPLAINT

7. Because of these schemes, the FTX Group imploded, and over $30 billion in value evaporated almost overnight when the FTX Group filed its emergency Chapter 11 bankruptcy petition in Delaware.

8. The FTX Group will be involved in federal bankruptcy proceedings for many years and there is no guarantee that any of the victims will be able to see any recovery from those proceedings. This class action, pending in the Southern District of Florida as a Multi-District Litigation, may be the only avenue for any of the victims to recover any of their damages.

9. FTX's campaign to build public and investor trust relied on significant financial and public support from the Multinational VC Defendants. As alleged herein, the Multinational VC Defendants poured over hundreds of millions of dollars into FTX and not only financed but directly participated in FTX's public campaign to create an air of legitimacy in the Deceptive FTX Platform. The Multinational VC Defendants knew that their investments in FTX would be used to promote the Deceptive FTX Platform as credible and trustworthy. The Multinational VC Defendants also made numerous deceptive and misleading statements of their own about FTX's business, finances, operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets with FTX. They vouched for the safety and stability of the Deceptive FTX Platform, advertised FTX's purported attempts to become properly regulated, and otherwise promoted the fabricated integrity of the FTX Group and SBF.

10. Importantly, FTX told customers that their assets belonged solely to the customer and would not be transferred to FTX. Yet, what is now known, is that the FTX Group was, among other things, engaged in comingling and embezzling billions of dollars of customer assets. Each Multinational VC Defendant has claimed to have conducted the proper due diligence on the FTX Group prior to investing (and throughout FTX's existence), and many of them took positions on FTX's Advisory Board with others formalizing partnerships and engaging in cross partnerships.

11. Accordingly, each Multinational VC Defendant knew or was reckless in not knowing that SBF's entire crypto empire was a sham. Each had ample access to information from their own due diligence process that was not publicly known, including from due diligence in connection with the investments of hundreds of millions of dollars from the FTX Group into some of the Multinational VC Defendants' own funds or partnerships. Without the Multinational VC Defendants, the largest financial

Case No.: 4
CLASS ACTION COMPLAINT

fraud in U.S. history would not have occurred.  And although the Multinational VC Defendants benefited directly from the improper use of customer assets and would have reaped massive windfalls if the fraud was not discovered, Plaintiffs' assets remain missing or unable to be accessed.  As alleged in detail herein, this class action seeks to recover the value of such assets and other applicable damages from the Multinational VC Defendants who participated in or directly enabled the FTX Group and SBF's fraud.

**PARTIES**

12.     **Plaintiff Leandro Cabo** is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Cabo purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Cabo has sustained damages for which MDL Defendants are liable.

13.     **Plaintiff Vitor Vozza** is a citizen and resident of the Federal Republic of Brazil. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Vozza purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Vozza has sustained damages for which MDL Defendants are liable.

14.     **Plaintiff Kyle Rupprecht** is a citizen and resident of the Dominion of Canada. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Rupprecht purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Rupprecht has sustained damages for which MDL Defendants are liable.

15.     **Plaintiff Warren Winter** is a citizen and resident of the Federal Republic of Germany. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Winter purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Winter has sustained damages for which MDL Defendants are liable.

16.     **Plaintiff Sunil Kavuri** is a citizen and resident of the United Kingdom of Great Britain and Northern Ireland. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Kavuri

purchased or held legal title to and/or beneficial interest in any fiat or cryptocurrency deposited or invested through an FTX Platform. As a result of the MDL Defendants' wrongdoing and the specific allegations set forth herein, Plaintiff Kavuri has sustained damages for which MDL Defendants are liable.

17.     **Defendant Temasek Holdings (Private) Limited ("Temasek Holdings")** is a global commercial investment company owned by the Government of Singapore, with a portfolio valued at more than $280 billion. Temasek Holdings operates in North America primarily through its wholly owned subsidiary, **Defendant Temasek International (USA) LLC ("Temasek USA"),** a Delaware corporation with a registered California corporate branch in San Francisco, California.[3] Upon information and belief, Temasek employs nearly 200 people in the United States and has offices in New York, New York, San Francisco, California, and Washington, D.C., which it opened in 2014, 2017, and 2018, respectively. Temasek reports that its "expanded presence in North America reflects the growing investment opportunities in the region" and that the San Francisco office, in particular "serve[s] as a gateway to investment opportunities and facilitate[s] the deepening of relationships within the Bay area and beyond."[4] Temasek's many investment vehicles include Artz Fund Investments Pte. Ltd., through which it invested in FTX and otherwise aided, abetted, assisted, and facilitated the misconduct alleged herein, including FTX's illegal sale of fraudulent unregistered securities. Temasek's other U.S. investments include PayPal, SoFi, and Airbnb.

18.     **Defendant SoftBank Group Corp. ("SoftBank Group")** is a Japanese multinational investment corporation located at 1-7-1, Kaigan, Minato-Ku, Tokyo, 105-7537, Japan. SoftBank Group Corp. is the corporate parent of, and operates **Defendant SB Group US, Inc. ("SoftBank US")**, its subsidiary entity through which it runs its U.S. operations. SoftBank US is a Delaware Corporation with a registered California branch office in Silicon Valley, located at 1 Circle Star Way, 4th Floor, San Carlos CA, 94070.

19.     SoftBank Group invested in FTX through its SoftBank Vision Fund. SoftBank Vision Fund is the largest global technology investing platform with over $150 billion in assets across over 500

---

[3] Collectively, Temasek Holdings and Temasek USA are referred to as "Temasek" herein.

[4]     https://www.temasek.com.sg/en/news-and-resources/news-room/news/2017/temasek-expands-footprint-in-north-america-with-san-francisco-office (last visited August 4, 2023).

portfolio companies. It is comprised of SoftBank Vision Fund L.P. and SoftBank Vision Fund II-2 L.P.[5] Softbank Vision Fund includes SoftBank II Tempest (DE) LLC, the Delaware corporation that served as the investment vehicle to fund and otherwise aid, abet, assist and facilitate the misconduct alleged herein, including FTX's illegal sale of fraudulent unregistered securities (together "SoftBank Vision Fund").

20.     Through the SoftBank Vision Fund, SoftBank Group seeks to invest in "market-leading, tech enabled growth companies, particularly in private companies valued at over $1 billion at the time of investment, colloquially known as 'unicorns.'" Upon information and belief, SoftBank employs more than 300 people in the United States and maintains offices in Menlo Park, California, Miami, Florida, New York, New York, and Washington, D.C. SoftBank has invested billions in dozens of U.S. companies, many based in Silicon Valley, including WeWork, Uber, DoorDash, Nvidia, Fanatics, and Slack.

21.     The SoftBank Vision Fund is managed by **Defendant SoftBank Investment Advisers (UK) Limited ("SoftBank Investment Advisers")** and **Defendant SoftBank Global Advisers Limited ("SoftBank Global Advisers" and, together with Softbank Investment Advisers, "Softbank Advisers")**, direct subsidiaries of SoftBank Group.[6] The SoftBank Advisers both list their main office as 69 Grosvenor Street, Mayfair, London, W1K 3JP, England, United Kingdom. The SoftBank Advisers also have offices and conduct business in California at 1 Circle Star Way, 4th Floor, San Carlos, CA 94070. SoftBank's decision to materially assist and facilitate FTX's fraud was made in part in its California offices.

22.     **Defendant Sino Global Capital Limited ("Sino Global")** is a venture capital firm founded and run by Mathhew Graham. Its headquarters are located at 12/F, Tsim Sha Tsui Centre, Salisbury Rd, Tsim Sha Tsui, Hong Kong and it maintains employees and offices in California, Kentucky and the Bahamas. Sino Global has hundreds of millions of dollars of assets under management including a large equity presence in several California technology companies.  Sino Global invested in the FTX Group and otherwise aided, abetted, assisted and facilitated the FTX Group's fraud and other misconduct. Sino Global has hundreds of millions of dollars of assets under management and, in addition

---

[5] https://group.softbank/en/segments/svf (last visited August 4, 2023).

[6] Collectively, Softbank Group, SoftBank US, SoftBank Vision Fund, SoftBank Investment Advisers, and SoftBank Global Advisers are referred to as "SoftBank" herein.

Case No.:                                              7

to its stake in FTX US, maintains a large equity presence in a number of U.S.-based technology companies. Sino Global invests in California tech startups and has numerous investments in California, including: Evertas (a cryptocurrency insurance company); Impossible Finance; MetaPlex; and Portals. Sino Global's Founder and chief executive, Matthew Graham, extensively touted his relationship with and trust in FTX, including on podcast hosted by Apple in Cupertino, CA. Sino Global has co-invested with Alameda Research in at least 14 separate early-stage investments. Sino Global operates in the United States through a wholly owned Delaware subsidiary, **Defendant Sino Global Capital Holdings, LLC**.

23.     Sino Global started a $200 million crypto investment fund in October 2021 with the "substantial" financial backing of the FTX Group after investing in FTX called the "Liquid Value Fund I" that engaged in crypto trading and investment, including in the unregistered FTX securities alleged herein. The mutual aid and assistance provided between Sino Global and FTX could not be clearer when SBF touted, "We are excited to support the launch of Sino Global Capital′s institutional fund,″ and stated that ″from the very beginning, Matthew [Graham, Sino Global's founder and CEO] and the Sino Global Capital team supported the FTX vision and then worked with us to help make it a reality. The Fund will now provide more opportunities to projects that are pushing crypto and blockchain technologies to the next level." Sino Global traded in and helped churn and prop up FTX's unregistered, unqualified securities with money FTX provided it.  FTX′s illiquid securities can be found on the balance sheet of Sino Global.

24.     The Multinational VC Defendants were more than passive investors with respect to FTX. In addition to supplying FTX with hundreds of millions of dollars in critical capital infusions, they lent their reputation and expertise to aid and assist SBF's scheme. After conducting supposedly significant due diligence on the FTX Group and gaining awareness of the misconduct, omissions related parties and fraud highlighted herein, the Multinational VC Defendants injected hundreds of millions of dollars into the Deceptive FTX Platform, all the while touting the safety and legitimacy of the exchange to the public. Even more, the Multinational VC Defendants advised and monitored FTX's growth, including, in the case of Temasek and Softbank, by serving on FTX's Advisory Board. The FTX Group returned the favor by investing money in return with some of the Multinational VC Defendants.

25.     Each of the Multinational VC Defendants is liable for making deceptive and/or misleading statements, willfully participating in acts that damaged Class Members in violation of the law, and/or aiding, abetting or otherwise materially assisting violations of law as described herein.  In committing the wrongful acts alleged herein, each of the Multinational VC Defendants willfully participated in acts and transactions and/or aided and abetted such unlawful acts and transactions, which promoted the purported trustworthiness, favorable risk profile, and financial stability of the Deceptive FTX Platform and of the FTX Group, thereby deceiving and injuring the investing public.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $1,000,000,000.00 (one billion dollars), exclusive of interest and costs, and in which at least one class member is a citizen of a state different than MDL Defendants.

27.     This Court has personal jurisdiction over Defendants because the Court has jurisdiction over one or more of the co-conspirators of the civil conspiracy alleged herein, and because Defendants regularly conducted business in Florida and/or engaged in continuous and systematic activities within Florida, and committed tortious acts in the state of Florida, including aiding and abetting the fraud, and the other tortious acts, as alleged herein.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because the acts, practices, and courses of business constituting the violations alleged in this Complaint occurred within this District.

29.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### A.     The Rise of FTX

30.     In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX, which, along with various subsidiaries, affiliates and related entities, operated the FTX Platform, which FTX purported to be a centralized digital asset exchange aimed at "the mass market and first-time users" of cryptocurrencies.

31.     FTX portrayed itself as a trustworthy and law-abiding member of the cryptocurrency

industry, focused not only on profits, but also on investor and client protection. In public statements, including in testimony before the United States Senate, SBF stated that FTX had adopted "principles for ensuring investor protections on digital asset-platforms" including "avoiding or managing conflicts of interest," and that "[a]s a general principle[,] FTX segregate[s] customer assets from its own assets across our platforms." SBF spent millions on advertisements to portray FTX as the "safest and easiest way to buy and sell crypto" and "the most trusted way to buy and sell" digital assets.[7]

32.   All the while, however, FTX was doing none of these things. Instead of managing conflicts, the FTX Group actively embraced them, using FTX Trading, FTX.US, and Alameda funds interchangeably to prop up the enterprise. Contrary to SBF's statements, FTX had no focus on investor protection and did not segregate customer funds. Rather, FTX used customer assets as an interest-free source of capital for Alameda's and SBF's private ventures.

33.   FTX was conceived in Northern California before transitioning its headquarters to Chicago, Illinois, and ultimately landing its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

34.   Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

35.   FTX lured Class Members to make such deposits with promises of guaranteed 8% annual percent yield on assets equivalent up to $10,000 USD and guaranteed 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law.

36.   By structuring the rates of returns in this way, FTX targeted nascent investors—i.e., those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates

---

[7] *See United States of America v. Samuel Bankman-Fried a/k/a "SBF"*, S5 Cr. 673 (LAK), Dkt. 115, Superseding Indictment at ¶ 2 (March 28, 2023).

Case No.:                                          10
CLASS ACTION COMPLAINT

of return to lower deposit amounts with "no fees and no minimum balances."

37.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

38.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX does back the principal generating the yield with its own funds and equity." In addition, FTX posted a document on its website entitled "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," which stated that FTX "segregates customer assets from its own assets across our platforms."  The document also represented that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

39.     FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self trades in order to manipulate markets, reported statistics, or cause liquidations."

40.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public

proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (i.e., without any intermediary to hold customer funds):

> A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

41.     FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

42.     More generally, in television commercials, in print advertising, through interviews and spokespeople, on Twitter, TikTok, Instagram, and Facebook, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US President Brett Harrison that "direct deposits from

Case No.:                                    12
CLASS ACTION COMPLAINT

employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

43.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . . I don't want a yacht."

44.     But in truth, SBF did want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds.

45.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion per day and its valuation topped $32 billion within three years of its founding.

**B.     FTX's Key Players**

**I.     Defendant Sam Bankman-Fried**

46.     FTX was founded in 2019 and began as an exchange or marketplace for the trading of crypto assets. FTX was established by SBF, Gary (Zixiao) Wang and Nishad Singh, with operations commencing in May 2019. FTX was purportedly established to build a digital asset trading platform and exchange for the purpose of a better user experience, customer protection, and innovative products. FTX built the FTX.com exchange to develop a platform robust enough for professional trading firms and intuitive enough for first-time users.

47.     Prior to that, the Silicon Valley-born, MIT-educated SBF launched his quantitative crypto

trading firm, Alameda, in November 2017,[8] after stints in the charity world and at trading firm Jane Street.[9] Quantitative trading consists of trading strategies based on quantitative analysis, which rely on mathematical computations and number crunching to identify trading opportunities.

48.     On January 3, 2023, Bankman-Fried pled not guilty to eight criminal charges during a hearing before the U.S. District Court for the Southern District of California in USA v. SBF, 1:22-cr-00673-LAK-1. On February 23, 2023, a superseding indictment was unsealed. It added four more charges, including charges for conspiracy to commit bank fraud and unlicensed money transmitting business, and money laundering. Id., Doc. 80. With his trial scheduled for October 2023, Bankman-Fried faces over 100 years in prison for crimes predicated on his lying to investors and stealing billions of dollars of his customers' money.

## II.     Defendant Caroline Ellison

49.     By 2018, Defendant Bankman-Fried had persuaded Defendant Ellison to join him at Alameda. Defendant Ellison described the recruitment as follows: "This was very much like, 'oh, yeah, we don't really know what we're doing,'" Ellison told *Forbes* magazine in an interview regarding her initial impressions of Alameda.

50.     In late 2018, the headquarters of Alameda was relocated to Hong Kong. The team at Alameda included Defendant Bankman-Fried's close friends (and later co-founders for FTX) Nishad Singh and Gary Wang. Defendant Caroline Ellison was also part of the group and, upon moving to Hong Kong, the group lived like college students and fiercely traded crypto.

51.     After Defendant Bankman-Fried established FTX in 2019, Defendant Ellison began taking more responsibility at Alameda.

52.     In October 2021, Ellison was appointed as co-CEO of Alameda with Sam Trabucco after Bankman-Fried resigned from the firm in an effort to give the appearance of putting distance between the exchange and trading shop he founded. As co-CEO, Ellison helped oversee Alameda's expansion beyond

---

[8] https://www.businessinsider.com/ftx-crypto-king-sam-bankman-fried-rise-and-fall-2022-11 (accessed May 11, 2023).

[9] https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

its initial market-neutral, but relatively low-profit business as a market maker for low-volume cryptocurrencies into riskier trading strategies, according to a Twitter thread detailing that shift. For instance, Alameda traders began exploring yield farming in decentralized finance (DeFi). Ellison became sole CEO in August 2022, following Trabucco's sudden and unexpected departure from the firm, when he shifted his role from Co-CEO to adviser of the company.[10]

53.     Leading up to the collapse of FTX, Ellison lived with nine other FTX or Alameda colleagues in Bankman-Fried's $30 million penthouse in the Bahamas. She reportedly paid SBF rent, and was occasionally in a romantic relationship with him. In 2021, Ellison tweeted about recreational stimulant use. Upon information and belief, Ellison left the Bahamas and moved back to Hong Kong.

54.     "Young people tend to be too risk averse," Ellison said in a more recent Alameda podcast episode.[11]

55.     In December 2022, Ellison pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.

### III.     Defendant Gary Wang

56.     Wang is not like his co-founder Sam Bankman-Fried, who loves fame and putting himself at the center of public attention. In fact, there's little public information about Wang, who has been described as a shady but critical player in the rise and fall of FTX.

57.     Wang met Bankman-Fried at a math camp in high school. Later, they became college roommates at the Massachusetts Institute of Technology, where Wang got degrees in mathematics and computer science and Bankman-Fried received a bachelor's in physics.[12]

58.     Before co-founding Alameda (and later FTX), Wang worked at Google. He claims to have built a system to aggregate prices across public flight data, according to an introduction on the Future

[10] https://www.coindesk.com/business/2022/08/24/co-ceo-of-crypto-trading-firm-alameda-research-sam-trabucco-steps-down/ (accessed May 11, 2023).

[11] https://www.youtube.com/watch?v=zfcb9JAgWBs (accessed May 11, 2023).

[12] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023)

Fund's website.[13] When Bankman-Fried left the Jane Street Hedge Fund to start Alameda in 2017, Wang left the tech giant.

59.     The startup has its beginnings in a three-bedroom Berkeley apartment – the downstairs served as its office. The firm shifted to Hong Kong, in part to take advantage of arbitrage opportunities in Asian bitcoin markets – including the price discrepancy between BTC in Japan and BTC everywhere else.

60.     It's there that Wang and Bankman-Fried funneled funds from Alameda to build its bespoke derivatives exchange. Bankman-Fried told Insider that he is not a good coder: "I don't code. I'm trash. I have not written any of FTX's code base. That's all a lot of other really impressive people at FTX. That's not me at all."[14]

61.     At the age of 28, Wang topped *Forbes*' 2022 list of the world's billionaires under 30 with a net worth of $5.9 billion in April. SBF sent his congratulations to Wang in public, tweeting that "I couldn't be prouder" when the list came out.[15]

62.     In December 2022, Wang pled guilty to criminal charges stemming from FTX's collapse, including conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.

**IV.     Defendant Nishad Singh**

63.     Nishad Singh joined Alameda in the early days, when the five-person trading firm was based in a Berkeley, California, apartment. He went from finding and exploiting arbitrage opportunities in crypto markets to being appointed director of engineering at FTX.

64.     Singh is and was a close confidant of Bankman-Fried, having shared multiple apartments with the FTX founder over the years, including most recently a ten-person luxury penthouse in Nassau, the Bahamas.

---

[13] https://ftxfuturefund.org/about/ (accessed May 11, 2023).

[14]     https://www.businessinsider.com/crypto-trading-billionaire-sam-bankman-fried-ftx-alameda-surprising-facts-2021-12#5-people-often-think-hes-a-programmer-but-hes-not-5 (accessed May 11, 2023).

[15] https://twitter.com/SBF_FTX/status/1511324242612297738?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1511324242612297738%7Ctwgr%5E8e0ce65ea02f827b72be96dde8f9484a3ba3e41c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.usatoday.com%2Fstory%2Fmoney%2F2022%2F04%2F05%2Fcryptocurrency-ceo-donate-charity%2F7272175001%2F (accessed May 11, 2023).

65. He is rumored to be just one of three people who controlled the keys to the exchange's matching engine, and admittedly was informed of a plan to backstop losses at Alameda with FTX customer funds.[16]

66. Although Singh's LinkedIn profile is down and his Twitter account is locked, the University of California, at Berkeley graduate talked about why he left his dream job at Facebook to join Alameda in a FTX podcast.[17]

67. "I spent maybe about a month doing weekends and nights at Alameda," he said, discussing a period of time when his "day job" was as a software engineer working on applied machine learning at Facebook. "At some point, it became obvious that was kind of stupid … so I took some time off and really gave my 100% working at Alameda," Singh said.

68. Singh visited Alameda in the first month of its existence, where he witnessed Bankman-Fried execute a sequence of trades that he described as "super profitable, easy to understand and there were lots available." Feeling inspired, he took a job.

69. After spending one and a half years as a core Alameda engineer, Singh took a role as the head of engineering at the then-newly launched FTX derivative exchange in 2019, where he was allowed to code with "minimal supervision." He has provided code to a number of Bankman-Fried-related projects, including the decentralized exchange Serum on Solana.

70. "Nishad was one of my brother's best friends in high school. He's shown the fastest and most sustained professional growth I've ever witnessed," Bankman-Fried wrote in a company blog.[18] Singh also assisted Wang in building most of FTX's "technological infrastructure" and managed the development team.

---

[16] https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

[17] https://www.youtube.com/watch?v=rl0Rq2cUSIQ (accessed May 11, 2023).

[18] https://blog.ftx.com/blog/raising-the-bar/ (accessed May 11, 2023).

71.     Although pitched as a community-run and- organized exchange, people familiar with the matter told CoinDesk the true power over Serum rested with FTX Group, which then held the program's access keys.[19] A similar relationship may be in place at FTX's core properties.[20]

72.     On February 28, 2023, Nishad Singh, who was one of SBF's best friends, a core Alameda engineer, and head of FTX's engineering, also pled guilty to criminal counts for conspiracy to commit fraud and conspiracy to commit money laundering. He agreed to cooperate with prosecutors' investigation into Bankman-Fried and apologized for his role in FTX's scheme.

## C.     The Basics of a Cryptocurrency Exchange

73.     In many ways, centralized cryptocurrency exchanges, including FTX, are analogous to banks albeit for the cryptocurrency industry. There is a big difference, however, in regard to the way a cryptocurrency exchange and a bank are and should be authorized to utilize customer assets.

74.     More specifically, cryptocurrency exchanges accept deposits of cryptocurrency, and often fiat currency on behalf of their customers. Once that cryptocurrency is received by the exchange then it has dominion and control over those assets.

75.     The exchange then credits the applicable customer account with the appropriate amount of cryptocurrency or fiat assets the exchange received. This credit can be regarded as a liability of the exchange to its customer.

76.     If, for example, cryptocurrency was deposited to the customer's exchange account, the customer could then take that credit received from the exchange, and:

    a)  Trade it for another cryptocurrency

    b)  Trade it for fiat currency

    c)  Leave it as a balance on the exchange account (leaving an open liability of the exchange to the customer)

    d)  Withdraw it (withdrawal could be done prior to or after a trade or conversion)

---

[19]   https://www.coindesk.com/business/2022/11/12/ftx-hack-spooks-solana-defi-community-igniting-revolution-at-alameda-controlled-serum-dex/ (accessed May 11, 2023).

[20]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238?mod=latest_headlines (accessed May 11, 2023).

These things could be done in whole or in part. Ledger entries would (and should) be made internally by the exchange to account for changes in positions and applicable balances.

77. The exchange accounts should very much be regarded as being custodial in nature; FTX certainly professed to do so. *See* Paragraphs 37, 38. This means that the customer does not *control* access to the assets "in" their account. The customer needs to make a request to the exchange to be able to access and send those balances. The exchange then debits the user account and sends the assets. Whether or not such requests are processed are dependent on the willingness, ability, and approval of the exchange.

78. One major factor the affects the exchange's ability to process such requests is whether or not they have the assets and/or capital necessary to do so.

79. For any non-yield-bearing account, this *shouldn't* be a problem, since exchanges *should* have enough assets in custody for the benefit of their customers to cover their liabilities to their customers, and on a 1:1 basis. FTX's terms of service purport to guarantee this, although FTX clearly violated their own terms of service:

**FTX Trading**

Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.[21]

**FTX US**

All cryptocurrencies or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit.

Title to cryptocurrency represented in your FTX.US Account shall at all times

---

[21] https://help.ftx.com/hc/article_attachments/971961779348/FTX_Terms_of_Service.pdf (accessed May 11, 2023).

remain with you and shall not transfer to FTX.US.

FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US.

80.     While FTX violated their own terms of service, it would also have been true that some of these claims would have been demonstrably false to begin with even if there was hypothetically no wrongdoing on the part of FTX. This is because FTX exchange accounts (or any exchange account with any centralized custodial exchange, including Coinbase for example) are custodial in nature. *Id.* This means that the customer does not control access to the assets 'in' their account. The customer needs to make a request to the exchange to be able to access and send those balances. It is very much the exchange that controls the assets, not their customer. However, it should also be noted that the digital assets aren't technically 'in' the account at all. At a technical level, an exchange account cannot hold or store cryptocurrency. The account stores a record of a liability or an IOU to the exchange's customer. When a user purchases cryptocurrency on an exchange, they aren't technically purchasing that cryptocurrency; they are purchasing an IOU for that cryptocurrency. Because this concept of buying and storage can be difficult to understand, it's somewhat common for newcomers to associate such IOUs as being the same as storing cryptocurrency assets 'on' their account, even though it's not technically true.

81.     With any yield-bearing account, it could generally be expected for an exchange to take those customers and leverage, loan or invest them in some way, and hopefully receive enough assets back to be able to pay out their customers back their principal, in addition to yield or interest earned, when applicable customers attempt to redeem or withdraw those funds.

82.     While the existence of such loans associated with assets deposited to yield-bearing accounts was known, the substantial risks associated with such loans, and by extension the yield-bearing accounts in general was not adequately represented.

83.     The main functional differences between banks and cryptocurrency exchanges is such that exchanges are largely unregulated, and that exchanges (and by extension exchange accounts and the users who use them) are subject to a lot of additional risks compared to that of a bank account.

Case No.:                                          20
CLASS ACTION COMPLAINT

84.     Banks are, of course, subject to a variety of capital control requirements to ensure protection of consumer assets. Banks are regulated with regard to the type of assets in which they can invest customer assets in. Banks are subject to regular financial audits. Banks have regulatory oversight to ensure the protection of consumer assets. And of course, bank accounts have FDIC insurance so that bank account holders have coverage in case a bank, despite such measures, becomes insolvent. *Id.*

85.     Exchanges, on the other hand, are not subject to capital control requirements. While almost all exchanges will indicate that they 'securely' store all customer assets 1:1 in 'cold storage,' there is no regulatory requirement in most jurisdictions (including the US) for exchanges to do so, nor is there any requirement for exchanges to offer any transparency regarding their solvency or use of customer assets to regulators or to the general public.

86.     Other than by an exchange's own terms of service (which weren't adhered to in this case), exchanges are not prevented from  investing customer assets elsewhere, and if so, what types of investments they enter into, or loans they provide, regardless of the inherent level of risk. And exchanges have no requirement to have any type of insurance equivalent to FDIC insurance. Customers must therefore rely on the exchange's representations as to the exchange's exposure to such risks and any protections in place to mitigate those risks.

**D.      The Mechanics of the Fraudulent Scheme**

87.     The FTX fraud was straightforward, albeit thoroughly concealed from unsuspecting Class Members.

88.     With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into accounts, including YBAs, on the FTX exchange.

89.     Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX.

90. Under the cloak of this wide-ranging con game, FTX insiders including SBF facilitated the routing of billions of dollars in purported profits of FTX, which were in reality Class Member funds, to the insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Class Member funds were also used to fuel uncapped spending on illicit drugs, naming rights to sports arenas, concert sponsorships, luxury cars, and private jets.

91. Frequently, SBF routed his fraudulent scheme through Alameda, the cryptocurrency hedge that he and Mr. Wang formed two years before launching FTX and owned 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and investment activity.

92. Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

93. Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

94. SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [i.e., SBF] is also the primary shareholder of several related entities which do business with the company."

Case No.:                                    22

CLASS ACTION COMPLAINT

95.     Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive." SBF and other insiders received billions in dollars in purported "loans" from Alameda. None of these "loans" have ever been repaid, nor was there any reason to believe at the time the "loans" were made that they would or could be repaid. The FTX insiders effectively looted the company. Even during the crypto boom, the FTX insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts. In fact, none of these loans were ever repaid, nor upon information and belief was any interest ever paid on the loans.

96.     More often, SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans. For many years, SBF directed that FTX customer funds be wired to bank accounts held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:

Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

97.     SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda

Case No.:                                                        23
CLASS ACTION COMPLAINT

primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." As noted above, Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

98.     SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described in Paragraphs 40, 41, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's—and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it an estimated "line of credit" of $65 billion, collateralized by the customer deposits on the exchange. Alameda lacked any ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

99.     With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a de facto limitless line of credit.

100.     Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

Case No.:                                    24
CLASS ACTION COMPLAINT

101.    The improper relationship between Alameda and FTX was well known to the companies' insiders, and completely concealed from Class Members. As Ellison, former co-CEO of Alameda, told a federal judge in Manhattan when entering her guilty plea:

> From approximately March 2018 through November 2022, I worked at Alameda Research, a cryptocurrency trading firm principally owned by Sam Bankman-Fried.

> From 2019 through 2022, I was aware that Alameda was provided access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr. Bankman-Fried. I understood that FTX executives had implemented special settings on Alameda's FTX.com account that permitted Alameda to maintain negative balances in various fiat currencies and crypto currencies. In practical terms, this arrangement permitted Alameda access to an unlimited line of credit without being required to post collateral, without having to pay interest on negative balances and without being subject to margin calls or FTX.com's liquidation protocols. I understood that if Alameda's FTX accounts had significant negative balances in any particular currency, it meant that Alameda was borrowing funds that FTX's customers had deposited onto the exchange.

> While I was co-CEO and then CEO, I understood that Alameda had made numerous large illiquid venture investments and had lent money to Mr. Bankman-Fried and other FTX executives. I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry. When many of those loans were recalled by Alameda's lenders in and around June 2022, I agreed with others to borrow several billion dollars from FTX to repay those loans. I understood that FTX would need to use customer funds to finance its loans to Alameda. I also understood that many FTX customers invested in crypto derivatives and that most FTX customers did not expect that FTX would lend out their digital asset holdings and fiat currency deposits to Alameda in this fashion. From in and around July 2022 through at least October 2022, I agreed with Mr. Bankman-Fried and others to provide materially misleading financial statements to Alameda's lenders. In furtherance of this agreement, for example, we prepared certain quarterly balance sheets that concealed the extent of Alameda's borrowing and the billions of dollars in loans that Alameda had made to FTX executives and to related parties. I also understood that FTX had not disclosed to FTX's equity investors that Alameda could borrow a potentially unlimited amount from FTX, thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

> I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. I am truly sorry for what I did. I knew that it was wrong. And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX. Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation. I am here today to accept responsibility for

Case No.:                                          25
CLASS ACTION COMPLAINT

my actions by pleading guilty.[22]

102.    *The Wall Street Journal* recently reported that Ellison told Alameda staffers in a video call that she, along with Sam Bankman-Fried, Gary Wang, and Nishad Singh, was aware of the decision to send FTX customer funds to Alameda, to help the fund meet its liabilities.[23]

103.    Similarly, Nishad Singh, head of FTX's engineering and one of SBF's best friends, has admitted that he knew by mid-2022 that Alameda was borrowing FTX customer funds and that customers were not aware.[24]

104.    FTX co-founder Gary Wang likewise explained his knowledge of the companies' interconnectedness in his guilty plea:

> Between 2019 and 2022, as part of my employment at FTX, I was directed to and agreed to make certain changes to the platform's code. I executed those changes, which I knew would Alameda Research special privileges on the FTX platform. I did so knowing that others were representing to investors and customers that Alameda had no such special privileges and people were likely investing in and using FTX based in part on those misrepresentations. I knew what I was doing was wrong. I also knew that the misrepresentations were being made by telephone and internet, among other means, and that assets traded on FTX included some assets that the U.S. regulators regard as securities and commodities.

105.    FTX had a handful of insiders and employees with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers. FTX failed to establish or maintain any semblance of fundamental financial and accounting controls. This is particularly shocking given that at its peak, FTX operated in hundreds of jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users. Board oversight was effectively non-existent. With few exceptions, FTX lacked independent or experienced finance, accounting, human

---

[22]    https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf (accessed May 11, 2023)

[23]    https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (accessed May 11, 2023).

[24] https://www.reuters.com/legal/ftxs-singh-agrees-plead-guilty-us-criminal-charges-lawyer-says-2023-02-28/ (accessed May 11, 2023).

resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function. Some FTX entities did not produce any financial statements. Some were deemed impossible to audit.

106. FTX insiders paid out millions of dollars in hush money to keep whistleblowers from exposing the fraud, money laundering, and price manipulation. FTX even hired the attorneys of these whistleblowers to help keep these complaints from the public.

107. At no time did FTX disclose the foregoing to Class Members, including that:

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda, and his charitable and political contributions;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

108.    Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange and SBF's fraud would not have succeeded. In late 2022, the fraud finally collapsed, and the misconduct was revealed.

### E.    The Fraud's Collapse

109.    The FTX exchange was extremely successful since its launch in May 2019. In 2022, around $15 billion of assets were traded daily on the platform, which represented approximately 10% of global volume for crypto trading. The FTX Group's team grew to over 300 employees globally. Although the FTX Group's primary international headquarters is in the Bahamas, its domestic US base of operations is located in Miami, Florida.[25]

110.    FTX quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency. By the time FTX filed for bankruptcy protection, customers had entrusted billions of dollars to it, with estimates ranging from $10-to-$50 **billion dollars**.

111.    Bankman-Fried got rich off FTX and Alameda, with the two companies netting $350 million and $1 billion in profit, respectively, in 2020 alone, according to Bloomberg.

112.    At his peak, Bankman-Fried was worth $26 billion. At 30, he had become a major political donor, gotten celebrities and industry power players like the Co-Defendants in this action to vociferously promote FTX, and secured the naming rights to the arena where the NBA's Miami Heat play.[26]

113.    Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi temporarily afloat, and FTX engaged in a number of

---

[25]    https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed May 11, 2023).

[26]    https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

114.     Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully close any further investments in FTX, despite many solicitations. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

115.     In early November 2022, crypto publication CoinDesk released a bombshell report that called into question just how stable Bankman-Fried's empire really was.[27] On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its cryptocurrency reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

116.     Prior to the collapse of the FTX Group, Bankman-Fried's cryptocurrency empire was publicly ostensibly broken into two main parts: FTX (his exchange) and Alameda (his trading firm), both giants in their respective industries. But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, which was full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. It shows Bankman-Fried's trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually close.[28]

117.     Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell

[27]     https://www.businessinsider.com/ftx-sbf-crypto-saga-explained-what-happened-what-it-means-2022-11?inline-endstory-related-recommendations= (accessed May 11, 2023).

[28]     https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds. The value of FTT plunged 32%, but rallied once again with Bankman-Fried's surprise announcement on Tuesday, November 8, that Binance would buy FTX, effectively bailing it out.[29]

118.    But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." Binance cited findings during due diligence, as well as reports of mishandled customer funds and the possibility of a federal investigation.[30] In truth, there were always too many issues—issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds, the news of which sent FTT plunging even further — Bankman-Fried saw 94% of his net worth wiped out in a single day.[31] This triggered panic selling of FTT and a run on FTX, thereby ensuring the firm's swift demise.

119.    Bankman-Fried issued a 22-tweet-long explanation of where he believed he and the FTX Group went wrong:[32]

---

[29]    https://markets.businessinsider.com/news/currencies/ftx-6-billion-withdrawals-72-hours-sam-bankman-fried-binance-2022-11 (accessed May 11, 2023).

[30]    https://markets.businessinsider.com/news/currencies/ftx-crash-sec-cftc-probes-asset-liability-shortfall-6-billion-2022-11 (accessed May 11, 2023).

[31]    https://www.businessinsider.com/ftx-ceo-crypto-binance-sam-bankman-fried-wealth-wiped-out-2022-11 (accessed May 11, 2023).

[32] https://twitter.com/SBF_FTX/status/1590709189370081280 (accessed May 11, 2023).

Case No.:                                30
CLASS ACTION COMPLAINT















**SBF** ✓ @SBF_FTX · Nov 10   …
17) All of the stakeholders would have a hard look at FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users--would have a large part to play in how it would be run.

Solely trust.

💬 137        ↻ 198        ♡ 1,878        ⬆

**SBF** ✓ @SBF_FTX · Nov 10   …
18) But all of that isn't what matters right now--what matters right now is trying to do right by customers.  That's it.

💬 144        ↻ 158        ♡ 1,970        ⬆

**SBF** ✓ @SBF_FTX · Nov 10   …
19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

💬 406        ↻ 760        ♡ 2,776        ⬆

**SBF** ✓ @SBF_FTX · Nov 10   …
20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

💬 1,532        ↻ 3,303        ♡ 8,047        ⬆

Case No.: 35
CLASS ACTION COMPLAINT





### F.    FTX Files for Bankruptcy

120.    On November 11th, unable to obtain a bailout, and facing an insurmountable liquidity crisis, the FTX Group filed for Chapter 11 bankruptcy and Bankman-Fried resigned as CEO.[33]

121.    At or around the same time as Bankman-Fried's *mea culpa* tweets and discussions with reporters, an FTX balance sheet was leaked which shows that FTX held approximately $900 million in liquid assets against $8.9 billion of liabilities, with a negative $8 billion entry described as a "hidden, poorly internally labeled fiat@ account."[34]

122.    Later, *The Wall Street Journal* reported that in a video meeting with Alameda employees on November 9, 2022 (the day prior to Bankman-Fried's November 10, 2022 litany of tweets), Alameda CEO Caroline Ellison said that she, Bankman-Fried, and two other FTX executives, Singh and Wang, were aware of the decision to send customer funds directly to Alameda. Ellison even admitted that "FTX

---

[33]    https://markets.businessinsider.com/news/currencies/ftx-bankruptcy-sam-bankman-fried-ceo-crypto-binance-alameda-markets-2022-11 (accessed May 11, 2023).

[34] https://www.bloomberg.com/opinion/articles/2022-11-14/ftx-s-balance-sheet-was-bad#xj4y7vzkg (last accessed February 22, 2023)

used customer money to help Alameda meet its liabilities."[35] Ellison elaborated on these statements on the record when pleading guilty to eight counts of conspiracy to commit wire fraud, securities fraud, and money laundering, among other conspiracies.[36]

123.   The same source explained that FTX's biggest customer was Alameda, which, instead of holding money, was borrowing billions from FTX users using FTX's in-house cryptocurrency, FTT token, as collateral, then trading it. When the price of the FTT nosedived 75% in a day, making the collateral insufficient to cover the trade, both FTX and Alameda suffered massive liquidity crises. *Id.*

124.   On December 13, 2022, the SEC filed a civil action against Bankman-Fried for securities fraud in the United States District Court for the Southern District of New York. *SEC v. SBF*, 1:22-cv-10501, Doc. 1 (S.D.N.Y.) In that complaint, the SEC alleged:

> When prices of crypto assets plummeted in May 2022, Alameda's lenders demanded repayment on billions of dollars of loans. Despite the fact that Alameda had, by this point, already taken billions of Bankman-Fried of FTX customer assets, it was unable to satisfy its loan obligations. Bankman-Fried directed FTX to divert billions more in customer assets to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. *Id.* ¶ 4
>
> Through the summer of 2022, he directed hundreds of millions more in FTX customer funds to Alameda, which he then used for additional venture investments and for "loans" to himself and other FTX executives.

125.   The SEC alleged that "Bankman-Fried diverted FTX customer funds to Alameda in essentially two ways: (1) by directing FTX customers to deposit fiat currency (e.g., U.S. Dollars) into bank accounts controlled by Alameda; and (2) by enabling Alameda to draw from a virtually limitless "line of credit" at FTX, which was funded by FTX customer accounts." *Id.* ¶ 32.

---

[35]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed February 22, 2023)

[36]   https://www.wsj.com/articles/alameda-ftx-executives-are-said-to-have-known-ftx-was-using-customer-funds-11668264238 (last accessed December 16, 2022).

Case No.:                                              37
CLASS ACTION COMPLAINT

126.    The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as FTX's CEO. Mr. Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." Moreover, Mr. Ray uncovered that:

*First,* customer assets from FTX.com were commingled with assets from the Alameda trading platform.

*Second*, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

*Third*, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

*Fourth*, loans and other payments were made to insiders in excess of $1 billion.

*Fifth*, Alameda's business model as a market maker required deploying funds to various third-party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

127.    On April 9, 2023, Ray III filed in the FTX Bankruptcy his First Interim Report to the Independent Directors on Control Failures at the FTX Exchanges. *See In re: FTX Trading Ltd.,* No. 1:22-bk-11068-JTD, ECF No. 1242-1 (Bankr. Dist. Del. Apr. 9, 2023), attached as Exhibit D (the "First Interim Rpt.").

128.    Defining the "FTX Group" as a de facto singular entity comprised of FTX Trading, FTX.US, and Alameda, collectively, Mr. Ray begins by explaining that:

the Debtors have had to overcome unusual obstacles due to the FTX Group's lack of appropriate record keeping and controls in critical areas, including, among others, management and governance, finance and accounting, as well as digital asset management, information security and cybersecurity. Normally, in a bankruptcy involving a business of the size and complexity of the FTX Group, particularly a business that handles customer and investor funds, there are readily identifiable records, data sources, and processes that can be used to identify and safeguard assets of the estate. Not so with the FTX Group.

Upon assuming control, the Debtors found a pervasive lack of records and other evidence at the FTX Group of where or how fiat currency and digital assets could be found or accessed, and extensive commingling of assets. This required the Debtors to start from

Case No.:                                    38
CLASS ACTION COMPLAINT

scratch, in many cases, simply to identify the assets and liabilities of the estate, much less to protect and recover the assets to maximize the estate's value. This challenge was magnified by the fact that the Debtors took over amidst a massive cyberattack, itself a product of the FTX Group's lack of controls, that drained approximately $432 million worth of assets on [November 11, 2022,] the date of the bankruptcy petition (the "November 2022 Breach"), and threatened far larger losses absent measures the Debtors immediately implemented to secure the computing environment.

Despite the public image it sought to create of a responsible business, the FTX Group was tightly controlled by a small group of individuals who showed little interest in instituting an appropriate oversight or control framework. These individuals stifled dissent, commingled and misused corporate and customer funds, lied to third parties about their business, joked internally about their tendency to lose track of millions of dollars in assets, and thereby caused the FTX Group to collapse as swiftly as it had grown. In this regard, while the FTX Group's failure is novel in the unprecedented scale of harm it caused in a nascent industry, many of its root causes are familiar: hubris, incompetence, and greed.

First Interim Rpt., 2-3.

129.    After summarizing the history of the three main FTX Group entities, the current efforts to retain advisors to assist in investigating the FTX Group's available financial records and interview witnesses, Mr. Ray provides a comprehensive review of the FTX Group's control failures that led to its eventual collapse, including (1) lack of management and governance controls; (2) lack of financial and accounting controls; and (3) lack of digital asset management, information security and cybersecurity controls. *Id.*, 11–37.

130.    According to Mr. Ray, "[t]he FTX Group lacked appropriate management, governance, and organizational structure," and the "management and governance of the FTX Group was largely limited to Bankman-Fried, Singh, and Wang. Among them, Bankman-Fried was viewed as having the final voice in all significant decisions." *Id.,* 11. The trio "controlled nearly every significant aspect of the FTX Group," despite being "not long out of college and with no experience in risk management or running a business," and "[b]oard oversight, moreover, was effectively non-existent." *Id.*

131.    The FTX Group also "lacked an appropriate organizational structure. Rather than having an ultimate parent company able to serve as a central point for decision-making that could also direct and control its subsidiaries, the FTX Group was organized as a web of parallel corporate chains with various owners and interest, all under the ultimate control of Bankman-Fried." *Id.,* 8. The FTX Group dd not even have a comprehensive organizational chart until the end of 2021, lacked any tracking of

intercompany relationships and ownership of particular entities, and "did not even have current and complete lists of who its employees were." *Id.,* 8–9.

132. The FTX Group also suffered from a near complete failure to observe corporate formalities, especially when it came to managing the finances of the FTX Group, for instance:

a. Failure to maintain "personnel who were experienced and knowledgeable enough to account accurately for assets and liabilities, understand and hedge against risk, or compile and validate financial reports," *Id.,* 11;

b. Failure to maintain adequate "policies and procedures relating to accounting, financial reporting, treasury management, and risk management," *Id.*;

c. Failure to maintain an accurate and appropriate accounting system, in that 56 FTX Group entities did not produce financial statements of *any* kind, 35 used QuickBooks in conjunction with Google documents, Slack communications, shared drives, and Excel spreadsheets, *Id.,* 12–13;

d. Recordkeeping was so poor that Bankman-Fried described Alameda as "hilariously beyond any threshold of any auditor being able to even get partially through an audit," adding:

> Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history." We sometimes find $50m of assets lying around that we lost track of; such is life.

*Id.,* 14;

e. "Key accounting reports necessary to understand the FTX Group's assets and liabilities, such as statements of cash flows, statements of equity, intercompany and related party transaction matrices, and schedules of customer entitlements, did not exist or were not prepared regularly," *Id.,* 14–15;

f. "Copies of key documentation – including executed loan agreements, intercompany agreements, acquisition and investment documents, bank and brokerage account statements, and contract and account information of all types – were incomplete, inaccurate, contradictory, or missing entirely." *Id.,* 15;

Case No.: 40

CLASS ACTION COMPLAINT

g. the FTX Group "did not maintain reliable lists of bank or trading accounts, cryptocurrency wallets, or authorized signatories," and let "[t]housands of deposit checks . . . collect[] like junk mail," *Id.,* 15;

h. "Although the FTX Group consisted of many, separate entities, transfers of funds among those entities were not properly documented, rendering tracing of funds extremely challenging," including using Slack, Signal, and Telegram with "disappearing messages" enabled, and often approving expenses and invoices on Slack by "emoji," *Id.*;

i. "The FTX Group did not observe any discernable corporate formalities when it came to intercompany transactions. Assets and liabilities were routinely shuffled among the FTX Group entities and insiders without proper process or documentation. Alameda routinely provided funding for corporate expenditures (*e.g.*, paying salaries and other business expenses) whether for Alameda, for various other Debtors, or for FTX DM, and for venture investments or acquisitions whether for Alameda or for various other Debtors. Alameda also transferred funds to insiders to fund personal investments, political contributions, and other expenditures—some of which were nominally 'papered' as personal loans with below-market interest rates and a balloon payment due years in the future." *Id.,* 17;

j. Often times, intercompany and insider transfers were recorded in a manner "that was inconsistent with the apparent purpose of the transfers," for instance, tens of millions of dollars being transferred from Alameda to Bankman-Fried, personally, but recorded in the general ledger as "Investment in Subsidiaries: Investments-Cryptocurrency," often times recorded in a way that intercompany transactions did not balance across relevant entities, nor were they recorded with specificity regarding which digital assets were involved in the transfer and their value when transferred, *Id.*;

k. On both FTX International and US exchanges, Alameda was a customer that traded "for its own account as well as engaging in market-making activities, and, in that capacity, it was granted extraordinary privileges by the FTX Group," such as granting Alameda "an effectively limitless ability to trade and withdraw assets from the exchange regardless of

Case No.: 41

the size of Alameda's account balance, and to exempt Alameda from the auto-liquidation process that applied to other customers," effectively allowing it to borrow and/or withdraw up to $65 billion from the Deceptive FTX Platform, *Id.,* 18–22; and finally

l. There were "extensive deficiencies in the FTX Group's controls with respect to digital asset management, information security, and cybersecurity," which was "particularly surprising given that the FTX Group's business and reputation depended on safeguarding crypto assets," and "[a]s a result of these control failures," which included (i) maintaining the majority of customer assets in "hot" wallets that are easily hacked, (ii) failing to safeguard private keys but storing them in an Amazon Web Services account, (iii) failing to employ multi-signature capabilities or Multi-Party Computation, (iv) failing to restrict FTX Group employee user access to sensitive infrastructure, such as omnibus wallets holding billions of dollars in assets, and (v) failing to enforce multi-factor authentication for employees and other commonsense safeguards to protect customer assets and sensitive data—all of which leads to the irrefutable conclusion that "the FTX Group exposed crypto assets under its control to a grave risk of loss, misuse, and compromise, and lacked a reasonable ability to prevent, detect, respond to, or recover from a significant cybersecurity incident, including the November 2022 Breach." *Id.,* 22–37.

133. Mr. Ray concludes that "[t]he FTX Group's profound control failures placed its crypto assets and funds at risk from the outset." *Id.,* 39.

**G.    The Crypto Sector is a Hotbed for Illicit Activity and Fraudulent Conduct**

134. From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency, see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets." The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by [37] dating back to 2018, all of which

---

[37] https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

Case No.:                                          42

detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.

135.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[38] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[39] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[40] North Korea's brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[41]

---

[38] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[39] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed May 11, 2023).

[40] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

[41] Id.

136.    Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[42] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[43]

137.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-related complaints during 2022 year-to-date.[44] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[45] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have

---

[42] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

[43] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

[44] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

[45] Id.

Case No.:                                                    44

reported losing over $1 billion in crypto to scams – that's about one out of every four dollars reported lost, more than *any* other payment method."[46] The median individual loss was a staggering $2,600.

138.   Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

> Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize.[47]

139.   There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[48]

140.   All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are often hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[49] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing. FTX capitalized on these

---

[46] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed May 11, 2023).

[47] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

[48] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

[49] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

Case No.:                                            45
CLASS ACTION COMPLAINT

concerns, and on the checkered history of crypto, more generally, in promoting the Deceptive FTX Platform as one that customers could trust, unlike any other exchange in the industry.

141.     For those who choose to invest in cryptocurrency, the damages can be overwhelming, as with the FTX fraud. The losses sustained by SBF's victims are staggering. FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished. Many Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy. Unlike MDL Defendants, these Class Members do not have money to burn. They are not "crypto-bros." They are financially vulnerable, and SBF, with the help of his co-conspiring MDL Defendants, exploited their vulnerability for tremendous financial gain. Now, while SBF rests comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

**H.     The SEC's Approach to Cryptocurrency.**

**I.     Overview**

142.     Despite the crypto industry's cries for "regulatory clarity," the SEC's stance on cryptocurrency has been clear and consistent from the beginning. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing; clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

143.     Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

> The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits,** *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a

Case No.:                                    46
CLASS ACTION COMPLAINT

security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)[50]

144.    Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in Superintendent of Insurance v. Bankers Life and Casualty Co.:

> We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

145.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is always considered and affirmed, same as it has been by hundreds of federal courts across the country since the *Howey* decision, which the Supreme Court adopted over 75 years ago.[51] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[52] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

146.    The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in

---

[50] https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed May 11, 2023).

[51] https://supreme.justia.com/cases/federal/us/328/293/ (accessed May 11, 2023).

[52] Id.

cryptocurrency in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[53]

147.    A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[54] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[55] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report so as "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[56]

148.    In 2019, the SEC released a "Framework for "Investment Contract" Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[57]

149.    In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[58] multiple speeches,[59] Congressional testimony,[60] and several official

---

[53] ia_virtualcurrencies.pdf (sec.gov) (accessed May 11, 2023).

[54] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed May 11, 2023).

[55] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 11, 2023).

[56] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed May 11, 2023).

[57] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed May 11, 2023).

[58] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed May 11, 2023).

[59] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 11, 2023).

[60] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 11, 2023).

Case No.:                                          48
CLASS ACTION COMPLAINT

SEC statements[61] and proclamations.[62] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[63] warning that their failure to register with the SEC may violate U.S. securities laws.[64] In one interview, Gensler said:

> The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that.[65]

150.    On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[66] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[67] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[68]

151.    The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[69]

152.    What follows are summaries of five cases that will help inform this litigation.

---

[61] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 11, 2023).

[62] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 11, 2023).

[63] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[64] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler-164215740.html (accessed May 11, 2023).

[65] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 11, 2023).

[66] SEC.gov | Kennedy and Crypto (accessed May 11, 2023).

[67] Id.

[68] Id.

[69] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed May 11, 2023).

Case No.:                                   49
CLASS ACTION COMPLAINT

## II.      SEC v. KIK

153.      In Kik[70], the SEC's complaint[71], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[72]

154.      The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

## III.      SEC v. Telegram

155.      In Telegram,[73] the SEC filed a complaint[74] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

156.      Telegram argued[75] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

---

[70] https://www.sec.gov/news/press-release/2020-262 (accessed May 11, 2023).

[71] https://www.sec.gov/news/press-release/2019-87 (accessed May 11, 2023).

[72] https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed May 11, 2023).

[73] https://www.sec.gov/news/press-release/2020-146 (accessed May 11, 2023).

[74] https://www.sec.gov/news/press-release/2019-212 (accessed May 11, 2023).

[75] https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed May 11, 2023).

Case No.:                                           50
CLASS ACTION COMPLAINT

157.    On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[76] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

158.    Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### IV.    SEC v. BlockFi

159.    In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi[77] with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

160.    BlockFi argued for "increased regulatory clarity" but lost.[78]

161.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

[76] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed May 11, 2023).

[77] https://lnkd.in/d-Xy45ec (accessed May 11, 2023).

[78] https://blockfi.com/pioneering-regulatory-clarity (accessed May 11, 2023).

Case No.:                                51
CLASS ACTION COMPLAINT

## V.    SEC Wells Notice to Coinbase

162.    In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[79] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells Notice,* informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

163.    According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[80]

164.    The two cases that Coinbase claims the SEC cites as support for its *Wells* Notice are *SEC v. Howey* and *Reves v. Ernst & Young. Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

165.    Under the Lend program, Coinbase customers were clearly investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participant in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

166.    Under *Reves*, Lend may have also been a "note" and hence a security. Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

167.    Per the "family resemblance test," a presumption that a note is a security can only be rebutted if the note bears a resemblance to one of the enumerated categories on a judicially developed list

[79] [The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com)](#) (accessed May 11, 2023).

[80] *Id.*

of exceptions, as follows: 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

168.    The "family resemblance" analysis requires:

- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);

- The plan of distribution of the note (e.g. is the product being marketed as an investment?);

- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and

- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

169.    Applying the family resemblance test to Lend reveals the presence of a note. First, Coinbase likened the Lend program to that of a savings account, where the Lend customer is looking for a profitable investment and Coinbase is looking for investors. Second, Coinbase marketed the Lend program as an investment. Third, investors would expect that securities regulation applies. Fourth, Coinbase is not a bank, so their so-called savings account falls under no other regulatory jurisdiction and protection.

170.    Given the clear facts of the case, Coinbase decided to cancel the Lend program.[81]

**VI.    SEC v. Binance**

171.    In Binance, the SEC filed a complaint[82] on June 5, 2023, in the United States District Court for the District of Columbia against several of the Binance entities including Binance.com, U.S.-based affiliates, and the founder Changpeng Zhao. The SEC alleges that Binance.com and the other

---

[81]https://www.theverge.com/2021/9/20/22684169/coinbase-crypto-lend-feature-discontinued-sec-lawsuit-threats (accessed June 27, 2023).

[82]https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-101.pdf.

defendants violated thirteen securities laws, including selling various unregistered securities and a staking-as-a-service program; operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines; covertly controlling Binance.US to evade U.S. securities laws; secretly allowing U.S. high-value traders to remain on the international platform; and commingling billions of U.S. assets with Zhao-owned entities. The SEC seeks a preliminary injunction to, among other relief, freeze and repatriate defendants' U.S. assets. The SEC also seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages.

### VII.   SEC v. Coinbase

172.    In Coinbase, the SEC filed a complaint[83] on June 6, 2023, in the United States District Court for the Southern District of New York against Coinbase and Coinbase Global. The SEC alleges that the Coinbase entities have violated multiple securities laws, including making billions of dollars from selling various unregistered securities and a staking-as-a-service program; and operating an unregistered exchange, broker-dealer, and clearing agency across interstate lines. The SEC seeks to permanently enjoin defendants from directly or indirectly violating the Exchange and Securities Acts, disgorge illegal gains, and award civil damages. "Coinbase was fully aware of the applicability of the federal securities laws to its business activities, but deliberately refused to follow them," stated Gurbir S. Grewal, Director of the SEC's Division of Enforcement.[84]

### I.    FTX's offer and sale of YBAs, which are unregistered securities.

173.     Beginning in 2019, the FTX Group began offering the YBAs to public investors through its Earn program. Plaintiffs and other similarly situated individuals invested in FTX's YBAs.

174.    The details of the Earn program are still listed on the FTX website,[85] and additional information on Earn is described in a declaration submitted in the Voyager Chapter 11 proceedings by Joseph Rotunda, Director of Enforcement of the Texas State Securities Board, on October 14, 2022.[86]

175.    Under the section titled "How can I earn yield on my FTX deposits?" on the FTX website,

---

[83] https://www.sec.gov/litigation/complaints/2023/comp-pr2023-102.pdf.

[84] https://www.sec.gov/news/press-release/2023-102.

[85] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[86] 1175310142280000000134.pdf (stretto.com) (accessed May 11, 2023).

the company describes the Earn program thusly:

> "You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX app! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your assets."[87]

176.    On the same webpage, the company also states:

> The **first $10,000** USD value in your deposit wallets will earn **8%** APY. Amounts held **above $10,000 up to $100,000** USD in value (subject to market fluctuations) will earn **5%** APY.[88]

177.    Nowhere on the website does FTX describe how this yield will be generated; other than that the yield will come from "staking your supported assets in your FTX account" although nowhere does the company describe what staking actually is.

178.    Staking is a technical concept that applies to the blockchain consensus mechanism called Proof of Stake, which some cryptocurrencies utilize.[89] Staking serves a similar function to cryptocurrency mining, in that it is the process by which a network participant gets selected to add the latest batch of transactions to the blockchain and earn some crypto in exchange. While the exact mechanism will vary from project to project, in general, users will put their token on the line (i.e., "stake") for a chance to add a new block onto the blockchain in exchange for a reward. Their staked tokens act as a guarantee of the legitimacy of any new transaction they add to the blockchain. The network chooses validators based on the size of their stake and the length of time they've held it. Thus, the most invested participants are rewarded. If transactions in a new block are discovered to be invalid, users can have a certain amount of their stake burned by the network, in what is known as a slashing event.[90]

179.    Some within the crypto community argue that staking is not a security because it is simply part of the code by which specific cryptocurrencies operate. In other words, some argue that staking programs are different from lending programs because user assets are not actually being "lent" out to third parties. But in September 2022, SEC Chairman Gary Gensler told reporters that "cryptocurrencies

---

[87] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[88] *Id.*

[89] For example, Ethereum, Tezos, Cosmos, Solana, and Cardano all use Proof of Stake.

[90] The staking definition comes from the Coinbase website: What is staking? | Coinbase (accessed May 11, 2023).

Case No.:             55

CLASS ACTION COMPLAINT

and intermediaries that allow holders to 'stake' their coins might pass" the *Howey* Test.[91] According to Gensler, "From the coin's perspective…that's another indicia that under the *Howey* test, the investing public is anticipating profits based on the efforts of others." The *Wall Street Journal* noted that if an intermediary such as a crypto exchange offers staking services to its customers, Mr. Gensler said, it "looks very similar—with some changes of labeling—to lending."[92]

180.    Based upon information – included and not included – on the FTX website, it does not appear that the company is adhering to the technical, commonly understood, definition of staking. The most telling indicator is that the company permits any cryptocurrency listed on their platform to be eligible for staking, even coins that do not use Proof of Stake. *Id.* ¶ 39. The FTX website specifically states that Bitcoin and Dogecoin can generate yield under the Earn program, even though these coins use the Proof of Work consensus mechanism (meaning you CANNOT technically stake Bitcoin or Dogecoin). Therefore, it is not at all clear where the promised yield is coming from.

181.    Applying *Howey* to the FTX Earn program reveals that Earn is an investment contract. An investment contract is present because users are clearly entrusting their funds to FTX. Users have to "opt-in" so that FTX may take possession over user assets and deploy them in a manner that will generate yield. As noted above, it is not clear how that yield is generated, but it is clear that FTX is deploying customer assets in a discretionary manner. Therefore, the efforts of FTX are instrumental in generating the users' yield and of course users have an expectation of profit because FTX is advertising yields of up to 8% APY:

From a securities perspective, the *Howey* Test defines an investment contract as:

a.   An investment of money

   i.   Cryptocurrency is a medium of exchange and way of transferring value in a measurable and quantifiable way. It is increasingly used as a means of payment, although it is more commonly used as a speculative investment at this point in time. Whether or not cryptocurrency can be defined as 'money' is in part a matter of semantics that can vary based on considers the fundamental features of money to be, and what criteria needs to be achieved in order for something to be considered money. Suffice to say,

---

[91] Ether's New 'Staking' Model Could Draw SEC Attention - WSJ (accessed May 11, 2023).

[92] Id.

when examining aspects such as fungibility, durability, portability, divisibility, scarcity, transferability, acting as a medium of exchange, acting as a unit of account, and acting as a store of value, it could be argued that some cryptocurrencies fulfill many of these criterion as good as or even better than fiat currencies.

b. In a common enterprise

i. FTX customer assets are almost always consolidated in wallets operated an controlled by FTX at least initially. These wallets are typically referred to as 'hot wallets' or 'consolidation wallets.' From these wallets, cryptocurrency can be move to other FTX-controlled wallets, or it can be used to pay back other customers performing withdrawals, but FTX can and did send (and loan) out such assets to other entities, including Alameda 'Alameda.' The blockchains data contains an immutable and verifiable record of data that shows that FTX customer deposits went into accounts operated by a common enterprise, namely, FTX.

c. With the expectation of profit

i. FTX customers are promised yield when they participate in the Earn program. And at up to 8% yield, that is a considerable amount that would be considerably in excess to that of a savings account at a bank. But it was also far riskier than investing money in a savings account at a bank. FTX goes out of their way to advertise this yield, and indicate that such earnings are to be calculated on the "investment portfolio" that is stored 'in' the FTX app.[93]

d. To be derived from the efforts of others

i. The FTX Yield-bearing account was portrayed as passive income stream. A customer needs to do nothing more than ensure they are subscribed to the yield program, and that they have deposited assets (of crypto or even fiat) in order to earn the 5% or 8% yield, which they clearly indicate is counted hourly. There is no further work or action needed on the part of the user.

ii. The work that 'others' (namely FTX) would need to do would including, at a baseline, sending transactions. But it would also require FTX to make an effort by leveraging and investing the money elsewhere which could theoretically come about either via giving out loans, employing trading

---

[93] https://help.ftx.com/hc/en-us/articles/10573545824532-FTX-App-Earn (accessed May 11, 2023).

strategies, 'staking,' making other investments, or giving out loans to entities (such as Alameda) that would employ such strategies.

182.     The FTX Earn program was most likely a note per *Reves* as well. First, FTX offered Earn to obtain crypto assets for the general use of its business, namely, to run its activities to pay interest to Earn investors, and users purchased YBAs and were automatically opted-in to Earn to receive interest on their crypto assets. Second, Earn was offered and sold to a broad segment of the general public. Third, FTX promoted Earn as an investment; on their website, FTX notes that Earn users will receive "yield earnings" on their "investment portfolio."[94] Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to Earn. Note that the above analysis mirrors that provided by the SEC in their BlockFi order.[95]

183.     FTX maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

184.     The YBAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. The FTX Group offered variable interest rewards on crypto assets held in the YBAs on the Deceptive FTX Platform, which rates were determined by the FTX Group in their sole discretion. In order to generate revenue to fund the promised interest, the FTX Group pooled the YBA assets to engage in lending and staking activities from which they derived revenue to pay interest on the YBAs. These activities make the YBAs a "security" under state and federal law.

185.     On October 14, 2022, Director of Enforcement of the Texas State Securities Board, Joseph Rotunda, filed a declaration in the Chapter 11 bankruptcy proceedings pending in connection with the collapse of the Voyager Digital cryptocurrency exchange, *In re: Voyager Digital Holdings, Inc., et al.*, Case

---

[94] FTX App Earn – FTX Exchange (accessed May 11, 2023).

[95] https://www.sec.gov/news/press-release/2022-26 (accessed May 11, 2023).

No. 22-10943 (MEW), ECF No. 536 (Bankr. S.D.N.Y. Oct. 14, 2022), in which he explained how the YBAs are in fact "an offering of unregistered securities in the form of yield-bearing accounts to the residents of the United States." *Id.*, at 6. In his declaration, the pertinent portions of which are reproduced in full for ease of reference, Rotunda explains:

> I am also familiar with FTX Trading LTD ("FTX Trading") dba FTX as described herein. As more fully explained throughout this declaration, I am aware that FTX Trading, along with West Realm Shires Services Inc. dba FTX US ("FTX US"), may be offering unregistered securities in the form of yield-bearing accounts to residents of the United States. These products appear similar to the yield-bearing depository accounts offered by Voyager Digital LTD et al., and the Enforcement Division is now investigating FTX Trading, FTX US, and their principals, including Sam Bankman-Fried.

> I understand that FTX Trading is incorporated in Antigua and Barbuda and headquartered in the Bahamas. It was organized and founded in part by Mr. Bankman-Fried, and FTX Trading appears to be restricting operations in the United States. For example, domestic users accessing the webpage for FTX Trading at ftx.com are presented with a pop-up window that contains a disclaimer that reads in part as follows:

>> Did you mean to go to FTX US? FTX US is a US licensed cryptocurrency exchange that welcomes American users.
>> You're accessing FTX from the United States. You won't be able to use any of FTX.com's services, though you're welcome to look around the site.

> FTX US claims to be regulated as a Money Services Business with FinCEN (No. 31000195443783) and as a money transmitter, a seller of payment instruments and in other non-securities capacities in many different states. It is not, however, registered as a money transmitter or in any other capacity with the Texas Department of Banking and it is not registered as a securities dealer with the Texas State Securities Board.

> FTX US owns 75 percent or more of the outstanding equity of FTX Capital Markets (CRD No. 158816) ("FTX Capital"), a firm registered as a broker-dealer with the United States Securities and Exchange Commission, the Financial Industry Regulatory

Case No.:                                                    59
CLASS ACTION COMPLAINT

Authority Inc., and 53 state and territorial securities regulators. FTX Capital's registration as a dealer in Texas became effective on May 7, 2012, and the registration continues to remain in force and effect.

FTX US maintains a website at https://ftx.us that contains a webpage for smartphone applications for FTX (formerly Blockfolio)[96] (the "FTX Trading App") and FTX US Pro. Users appear able to click a link in this webpage to download the FTX Trading App even when they reside in the United States.

On October 14, 2022, I downloaded and installed the FTX Trading App on my smartphone. I created an account with FTX Trading through the FTX Trading App and linked the FTX account to an existing personal bank account. During the process, I provided my full first and last name and entered my residential address in Austin, Texas. I also accessed hyperlinks in the FTX Trading App that redirected to the Privacy Policy and Terms of Service. Although I was from the United States and was using the application tied to FTX Trading, the Privacy Policy and Terms of Service were from FTX US - not FTX Trading.

I thereafter used the FTX Trading App to initiate the transfer of $50.00 from my bank account to the FTX account and then transferred .1 ETH from a 3.0 wallet to the FTX account. The transfer of funds from my bank account to the FTX account will take up to six days to complete but the transfer of ETH was processed within a few minutes.

The FTX Trading App showed that I was eligible to earn a yield on my deposits. It also explained the "Earn program is provided by FTX.US" – not FTX Trading. It also represented that "FTX Earn rewards are available for US users on a promotional basis."

I recall the FTX Trading App's default settings were automatically configured to enable the earning of yield. The application also contained a link for additional information

---

[96] FTX acquired Blockfolio LLC ("Blockfolio") in or around August 2020. At the time, Blockfolio managed a cryptocurrency application. FTX thereafter rebranded Blockfolio and its smartphone application as FTX. Now, users can download the FTX Trading App from Apple's App Store or Google's Google Play Store. Although FTX rebranded Blockfolio, the application listing in Apple's App Store still shows the application developed by Blockfolio.

about yield. I accessed the link and was redirected to a recent article published by "Blockfolio Rebecca" under help.blockfolio.com. The article began as follows:

> You can now earn yield on your crypto purchases and deposits, as well as your fiat balances, in your FTX Trading App! By opting in and participating in staking your supported assets in your FTX account, you'll be eligible to earn up to 8% APY on your staked assets. THIS APY IS ESTIMATED AND NOT GUARANTEED AS DESCRIBED BELOW.

The article also described the payment of yield. It contained a section titled *How do you calculate APY?* Does my balance compound daily? that read, in part, as follows:

> FTX will deposit yield earnings from the staked coins, calculated hourly, on the investment portfolio that is stored in your FTX Trading App. Yield will be compounded on principal and yield you have already earned. Any cryptocurrency that you have deposited on FTX as well as any fiat balance you may have on your account, will earn yield immediately after you have opted into the program.

> The first $10,000 USD value in your deposit wallets will earn 8% APY. Amounts held above $10,000 up to $10MM USD in value (subject to market fluctuations) will earn 5% APY. In this scenario, your yield earned on the coins will look something like the examples below the table.

The article also contained a section titled Is this available in my country? This section explained that "FTX Trading App Earn is available to FTX Trading App customers that are in one of the FTX permitted jurisdictions." It contained a hyperlink to an article titled *Location Restrictions* published by FTX Crypto Derivatives Exchange under help.ftx.com. This article described various restrictions on operations in certain countries and locations and read in part as follows:

> **FTX** does not onboard or provide services to corporate accounts of entities located in, established in, or a resident of the **United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, or North Korea**. FTX also does not onboard corporate accounts located in or a resident of **Antigua or Barbuda**. FTX also does not onboard any users from Ontario, and FTX does not permit non-professional investors from Hong Kong purchasing certain products.

> **FTX does not onboard or provide services to personal accounts of current residents of the United States of America, Cuba, Crimea and Sevastopol, Luhansk People's Republic, Donetsk People's Republic, Iran, Afghanistan, Syria, North Korea, or Antigua and Barbuda**. There may be partial restrictions in other jurisdictions, potentially including Hong Kong, Thailand, Malaysia, India and Canada. In addition, FTX does

not onboard any users from Ontario, does not permit non-professional investors from Hong Kong purchasing certain products, and does not offer derivatives products to users from Brazil.

> FTX serves all Japanese residents via FTX Japan.

(emphasis in original)

Despite the fact I identified myself by name and address, the FTX Trading App now shows that I am earning yield on the ETH. The yield is valued at 8 percent APR.

Based upon my earning of yield and an ongoing investigation by the Enforcement Division of the Texas State Securities Board, the yield program appears to be an investment contract, evidence of indebtedness and note, and as such appears to be regulated as a security in Texas as provided by Section 4001.068 of the Texas Securities Act. At all times material to the opening of this FTX account, FTX Trading and FTX US have not been registered to offer or sell securities in Texas. FTX Trading and FTX US may therefore be violating Section 4004.051 of the Texas Securities Act. Moreover, the yield program described herein has not been registered or permitted for sale in Texas as generally required by Section 4003.001 of the Securities Act, and as such FTX Trading and FTX US may be violation Section 4003.001 by offering unregistered or unpermitted securities for sale in Texas. Finally, FTX Trading and FTX US may not be fully disclosing all known material facts to clients prior to opening accounts and earning yield, thereby possibly engaging in fraud and/or making offers containing statements that are materially misleading or otherwise likely to deceive the public. Certain principals of FTX Trading and FTX US may also be violating these statutes and disclosure requirements. Further investigation is necessary to conclude whether FTX Trading, FTX US and others are violating the Securities Act through the acts and practices described in this declaration.

The Enforcement Division of the Texas State Securities Board understands that FTX US placed the highest bid for assets of Voyager Digital LTD et al., a family of companies variously accused of misconduct in connection with the sale of securities similar to the yield program promoted by FTX Trading and FTX US. FTX US is managed by Sam Bankman-Fried (CEO and Founder), Gary Wang (CTO and Founder) and Nishad

Singh (Head of Engineering). The same principals hold the same positions at FTX Trading, and I was able to access the yield-earning product after following a link to the FTX Trading App from FTX US's website. The FTX Trading App also indicated the Earn program is provided by FTX US. As such, FTX US should not be permitted to purchase the assets of the debtor unless or until the Securities Commissioner has an opportunity to determine whether FTX US is complying with the law and related and/or affiliated companies, including companies commonly controlled by the same management, are complying with the law.

I hereby authorize the Texas Attorney General's Office and any of its representatives to use this declaration in this bankruptcy proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022 in Austin, Texas.

/s Joseph Jason Rotunda

By: Joseph Jason Rotunda

**J.      FTX's offer and sale of FTT Tokens, which are unregistered securities.**

186.    The FTT token that contributed to FTX's demise is also an investment contract per the *Howey* Test. FTT is an exchange token created by FTX that entitles holders to benefits on the FTX exchange. According to crypto news site CoinDesk, "such benefits often include trading fee discounts, rebates and early access to token sales held on the platform."[97] Exchange tokens can be very profitable for their issuers because the exchanges that issue them tend to keep a significant number of tokens for themselves, which they can pump in price through speeches, social media posts, and other announcements. Economically, exchange tokes are akin to equity, although the holders of exchange tokens have no legal rights or interests in the issuer. As the exchange issuer grows in size and prominence, and trading volume increases on the exchange, the value of the exchange token will likely increase. Thus, the value of FTT increased as the FTX exchange became more well-known and utilized.[98]

---

[97] https://www.coindesk.com/learn/what-is-an-exchange-token/ (accessed May 11, 2023).

[98] See FTT price history here: https://coinmarketcap.com/currencies/ftx-token/ (accessed May 11, 2023).

187.     FTT passes the *Howey* Test because the token was controlled by FTX; the company could create or destroy FTT at will. And the value of FTT was based upon the success of FTX, therefore the "efforts" of others prong of the Howey Test is implicated. It is also clear that investors bought FTT because they thought it would go up in price; this is the same reason why most, if not all, investors buy any given cryptocurrency. In fact, Binance CEO Changpeng "CZ" Zhao agreed to accept FTT tokens as part of FTX's buyout of Binance's equity stake in FTX.[99]

**K.     Using the Deceptive FTX Platform itself necessarily required transacting in unregistered securities.**

188.     Another avenue through which FTX users may have been exposed to a securities transaction was through the basic structure of the Deceptive FTX Platform.

189.     Despite cryptocurrency and blockchain's foundational premise being the ability to transmit value peer-to-peer using a trustless and decentralized database that cannot be censured by any third party, cryptocurrency exchanges operate more like traditional banks.

190.     When you buy Bitcoin through a centralized cryptocurrency exchange, there is no corresponding transaction to the Bitcoin blockchain. Rather, the exchange simply maintains its own database that indicates which cryptocurrencies it owes to its customers.

191.     Cryptocurrency exchanges should then be in custody of enough cryptocurrency on the blockchain to cover what it owes customers. Custody can be done using hot or cold digital wallets (hot wallets are connected to the internet, cold wallets are not) with best practice being for exchanges to hold the majority of cryptocurrency (crypto which they are holding on behalf of customers) in multiple cold wallets. Best practice would also dictate that exchanges hold customer assets in separate wallets from exchange assets, and that each customer's assets would be held in a distinct wallet.

192.     According to the first day declaration by John Ray, FTX kept its crypto in a common pool used to fund undisclosed and unreasonably risky investments:

The FTX Group did not keep appropriate books and records, or security controls,

with respect to its digital assets. Mr. Bankman-Fried and [Alameda co-founder

---

[99]     https://www.investors.com/news/binance-to-buy-ftx-international-operations-as-liquidity-crunch-sparks-crypto-selloff/ (accessed May 11, 2023).

Case No.:                                          64

CLASS ACTION COMPLAINT

Gary] Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries). Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases. The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos. The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined. These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.[100]

---

[100] 042020648197.pdf (pacer-documents.s3.amazonaws.com) (accessed May 11, 2023).

193.    In the declaration, Mr. Ray presents several rough balance sheets for the various FTX silos, while noting that he does not have confidence in them, and that "the information therein may not be correct as of the date stated."[101] Most telling is a footnote that appears on the balance sheets for the exchange businesses: "Customer custodial fund assets are comprised of fiat customer deposit balances. Balances of customer crypto assets deposited are not presented."[102] Ray notes that U.S. and overseas exchanges "may have significant liabilities" but that "such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried."[103]

194.    To further complicate matters, recent statements given by Sam Bankman-Fried to the *Wall Street Journal* (WSJ) suggest that about half of the balance owed by Alameda to FTX was from wire transfers that customers made to FTX via Alameda in the early days before FTX had a bank account.[104] This money was intended to fund customers' accounts at FTX. Bankman-Fried claims some customers continued to use that route after FTX had a bank account and that over time, "FTX customers deposited more than $5 billion in those Alameda accounts."[105] The WSJ acknowledged that these funds "could have been recorded in two places—both as FTX customer funds and as part of Alameda's trading positions" and that "such double-counting would have created a huge hole in FTX's and Alameda's balance sheets, with assets that weren't really there."[106]

195.    The relationship between FTX and Alameda was critical to the exchange's eventual collapse. After suffering large losses in the wake of several high profile crypto-firm failures in the spring and summer of 2022 (Alameda most likely was exposed to crypto hedge fund Three Arrows Capital), FTX lent out some of its customer assets that it did control to Alameda.[107] Presumably, the exchange

---

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] https://www.wsj.com/articles/ftx-founder-sam-bankman-fried-says-he-cant-account-for-billions-sent-to-alameda-11670107659?st=g35ia0eu0bjwqzn&reflink=desktopwebshare_permalink   (accessed May 11, 2023).

[105] FTX customers deposited more than $5 billion in those Alameda accounts.

[106] *Id.*

[107] https://newsletter.mollywhite.net/p/the-ftx-collapse-the-latest-revelations (accessed May 11, 2023).

Case No.:                                    66
CLASS ACTION COMPLAINT

benefitted from the interest paid by Alameda for the loaned cryptoassets – although some have suggested that the loans were made for free.[108] Alameda could then use the customer assets as cheap collateral for margined trades with other parties (obtaining collateral from other sources would have been much more expensive).[109]

196.    It appears that Alameda did post collateral to secure the loans of customer cryptoassets that it received, but that collateral took the form of FTT tokens. FTT tokens were the so-called "native token" of the FTX exchange: FTX created FTT and issued it to both institutional and retail investors without registering with any regulator or undergoing any audit or other external due diligence. FTX could create unlimited amounts of FTT if it wished.

197.    In short, there appear to have been two sets of leveraged transactions involved. First, Alameda borrowed assets from FTX's customers, providing FTT tokens as collateral for those loans. Second, Alameda engaged in margin trading, essentially borrowing money to execute risky trading strategies: these trades were secured by the assets Alameda had borrowed from FTX customers' accounts. Leverage makes trades potentially more lucrative, but also makes them more vulnerable to adverse market movements. In an Alameda balance sheet linked to CoinDesk in early November, Alameda's largest asset holdings were listed as being FTT tokens (it is possible that it received these in a kind of bailout from FTX). Other assets listed on that balance sheet included SOL tokens (issued by the Solana blockchain, in which Sam Bankman-Fried was an early investor) and SRM tokens (issued by the Serum exchange that Sam Bankman-Fried co-founded).[110] Alameda had few assets that hadn't been created out of thin air by FTX or FTX-related entities.

L.    FTX Aggressively and Deceptively Marketed its Platform

198.    From its inception, cryptocurrency has been fueled by illicit activity and the crypto sector continues to be rife with frauds and scams. For a detailed breakdown on the illicit use of cryptocurrency,

---

[108] https://www.cnbc.com/2022/11/13/sam-bankman-frieds-alameda-quietly-used-ftx-customer-funds-without-raising-alarm-bells-say-sources.html (accessed May 11, 2023).

[109] For a more general discussion of the conflicts of interest inherent in these relationships, see https://www.coppolacomment.com/2022/11/the-ftx-alameda-nexus.html (accessed May 11, 2023).

[110] https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (accessed May 11, 2023).

Case No.:                                    67
CLASS ACTION COMPLAINT

see the U.S. Department of Justice's report from September 2022 titled: "The Role of Law Enforcement In Detecting, Investigation, And Prosecuting Criminal Activity Related to Digital Assets."[111] The report was issued pursuant to the March 9, 2022 Executive Order on Ensuring Responsible Development of Digital Assets and is the latest report on cryptocurrency released by DoJ dating back to 2018, all of which detail the dire harms caused by cryptocurrency. DoJ notes that "[t]he rise of the Bitcoin network paralleled the development of Silk Road, AlphaBay, and other illegal online marketplaces…" and the department classified digital asset crime into three categories: "(1) cryptocurrency as a means of payment for, or manner of facilitating, criminal activity; (2) the use of digital assets as a means of concealing illicit financial activity; and (3) crimes involving or affecting the digital assets ecosystem." The September report details several high-profile cases involving the illicit use of cryptocurrency. One case is the darknet marketplace Silk Road, which accepted payment only in Bitcoin, and was shut down by the FBI in 2013 after having facilitated sales revenue totaling over 9.5 million Bitcoin, equivalent to roughly $1.2 billion at the time.[112]

199.    Cryptocurrency is increasingly being used by organized crime syndicates and nation states for illicit purposes. In January 2022, the Government Accountability Office (GAO) issued a report finding that "[v]irtual currency is increasingly used illicitly to facilitate human and drug trafficking."[113] Cryptocurrency is also being used by Iran, Russia, and North Korea to bypass U.S. economic and financial sanctions.[114] According to the United Nations, "money raised by North Korea's criminal cyber operations are helping to fund the country's illicit ballistic missile and nuclear programs."[115] North Korea's

[111] https://www.justice.gov/opa/pr/justice-department-announces-report-digital-assets-and-launches-nationwide-network (accessed May 11, 2023).

[112] https://web.archive.org/web/20140220003018/https://www.cs.columbia.edu/~smb/UlbrichtCriminalComplaint.pdf (accessed May 11, 2023).

[113] Virtual Currencies: Additional Information Could Improve Federal Agency Efforts to Counter Human and Drug Trafficking [Reissued with Revisions Feb. 7, 2022] | U.S. GAO (accessed May 11, 2023).

[114] Russia Could Use Cryptocurrency to Mitigate U.S. Sanctions - The New York Times (nytimes.com) (accessed May 11, 2023), Iran Plans Uses Crypto for Imports to Get Around Sanctions (gizmodo.com) (accessed May 11, 2023), This is how North Korea uses cutting-edge crypto money laundering to steal millions | MIT Technology Review(accessed May 11, 2023).

[115] How North Korea became a mastermind of crypto cybercrime | Ars Technica (accessed May 11, 2023).

brazenness was revealed to the public earlier this year when a well-known "Web 3" video game, Axie Infinity, was hacked and $620 million in the cryptocurrency ether was stolen. "Chainalysis estimates that North Korea stole approximately $1 billion in the first nine months of 2022 from decentralized crypto exchanges alone," one of the reasons why Anne Neuberger, US deputy national security adviser for cyber security, said in July 2022 that North Korea "uses cyber to gain …. up to a third of their funds for their missile program."[116]

200.    Cryptocurrency has also fueled a surge in ransomware that has victimized American businesses, health care systems, and state and local governments. In May of 2022, the majority staff on the Homeland Security & Governmental Affairs Committee released a startling report on ransomware.[117] The report notes that in 2021, "ransomware attacks impacted at least 2,323 local governments, schools, and healthcare providers in the United States" and that the FBI "received 3,729 ransomware complaints with adjusted losses of more than $49.2 million." The report acknowledges that these numbers underestimate the true scale of the problem because many ransomware victims do not report to authorities. As evidence, they cite data from blockchain analytics company Chainalysis that found "malign actors received at least $692 million in cryptocurrency extorted as part of ransomware attacks" in 2020. The report notes that "cryptocurrency, typically Bitcoin, has become a near universal form of ransom payment in ransomware attacks, in part, because cryptocurrency enables criminals to extort huge sums of money from victims across diverse sectors with incredible speed." The link between cryptocurrency and ransomware became clear to the public in the wake of the Colonial Pipeline hack in May 2021, which disrupted gasoline supplies in the southeastern U.S. In the wake of that breach, several commentators argued for a ban, or heavy regulation, of cryptocurrency.[118]

201.    Everyday consumers have also fallen victim to various cryptocurrency-related scams. The Consumer Financial Protection Bureau (CFPB) published 2,404 cryptocurrency related consumer complaints in its Consumer Complaint Database during 2021, and more than 1,000 cryptocurrency-

---

[116] Id.

[117] HSGAC Majority Cryptocurrency Ransomware Report.pdf (senate.gov) (accessed May 11, 2023).

[118] Ban Cryptocurrency to Fight Ransomware - WSJ (accessed May 11, 2023).

related complaints during 2022 year-to-date.[119] According to the September DoJ report: "The CFPB has also received hundreds of servicemember complaints involving cryptocurrency assets or exchanges in the last 12 months, approximately one-third of which concerned frauds or scams."[120] In June 2022, the Federal Trade Commission issued a report finding that "since the start of 2021 more than 46,000 people have reported losing over $1 billion in crypto to scams https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze – that's about one out of every four dollars reported lost, more than *any* other payment method."[121] The median individual loss was a staggering $2,600.

202. Another September 2022 report from the Treasury Department, issued pursuant to the Executive Order, also called out the risks and harms to consumers from cryptocurrency:

"Consumers and investors are exposed to improper conduct in the crypto-asset ecosystem for a variety of reasons, including a lack of transparency as well as the fact that crypto-assets have relatively novel and rapidly developing applications. This leads to frequent instances of operational failures, market manipulation, frauds, thefts, and scams. While the data for populations vulnerable to disparate impacts remains limited, available evidence suggests that crypto-asset products may present heightened risks to these groups, and the potential financial inclusion benefits of crypto-assets largely have yet to materialize."[122]

203. There is also a long history of consumer losses associated with centralized exchanges, FTX being the latest. One of the first cryptocurrency exchange failures was Japan-based Mt. Gox in 2014. Mt. Gox was handling over 70% of bitcoin transactions worldwide by the time it ceased operations after the exchange was hacked and the majority of cryptocurrency held by the exchange on behalf of customers was

---

[119] Justice Department Announces Report on Digital Assets and Launches Nationwide Network | OPA | Department of Justice (accessed May 11, 2023).

[120] *Id.*

[121] Reports show scammers cashing in on crypto craze | Federal Trade Commission (ftc.gov) (accessed May 11, 2023).

[122] Crypto-Assets: Implications for Consumers, Investors, and Businesses (treasury.gov) (accessed May 11, 2023).

stolen. Creditors to Mt. Gox are still waiting for their funds, a sign that does not bode well for FTX creditors, to the extent they seek recovery directly from the FTX Group through the bankruptcy proceedings.[123]

204. All of the above-mentioned problems with cryptocurrency are well known and one of the big reasons why consumers are hesitant to purchase or use cryptocurrency. According to Pew Research, 16% of Americans have invested in cryptocurrency while another 71% are not invested although they have heard at least a little about cryptocurrency.[124] For those in the latter group, concerns around fraud and scams are likely playing a role in their resistance to crypto investing.

205. These valid concerns are one reason why crypto firms like FTX turn to celebrity endorsers. The FTX advertising campaign is particularly pernicious because it implicitly acknowledges cryptocurrency's problems while holding FTX out as the "safe" place to invest in cryptocurrency (note statements by O'Leary, Brady, and Curry, below). These statements were untrue, as FTX turned out to be a house of cards that misappropriated customer assets.

206. FTX's paid endorser program was clearly designed to use the positive reputation associated with specific celebrities to convince consumers that FTX was a safe place to buy and sell cryptocurrency.

207. FTX's brand ambassadors and ad campaigns that utilized those brand ambassadors had a critical role in portraying FTX as being 'safe' and 'compliant.':

In Stephen Curry's FTX commercial, FTX's alleged safety is quite blatant stated when he claims:

*"With FTX, I have everything I need to buy, sell, and trade crypto safely"*

Kevin O'Leary, another FTX brand ambassador stated:

*"To find crypto investment opportunities that met my own rigorous standards of compliance, I entered into this relationship with FTX. It has some of the best crypto exchange offerings I've seen on the market. FTX leverages best-in-class tech to provide a quality trading experience with low fees for both professional and retail investors alike, while at the same time providing the reporting platform that serves both internal and*

---

[123] What to Watch in the FTX Bankruptcy as Details Remain Scarce - WSJ

[124] 46% of cryptocurrency investors in US say it did worse than expected | Pew Research Center

*regulatory compliance requirements"*

Given that FTX continually misappropriated customer assets, didn't have appropriate capital controls or reasonable compliance policies in place, these claims weren't just unfounded; they were downright false.

Mr. O'Leary's assertion that FTX was a compliant exchange is even more damaging than that of the typical celebrity, however. This is because Mr. O'Leary is known for being a *Shark* on the TV show *Shark Tank* whereby Shark's make investments in startups. With those investments comes due diligence. Mr. O'Leary's endorsement of FTX certainly makes it seem that he did appropriate due diligence into FTX, when obviously, whatever due diligence that he did was grossly inadequate.

Mr. O'Leary appears to admit that his own due diligence was inadequate, and that he relied on the due diligence of others:

*"I obviously know all the institutional investors in this deal. We all look like idiots. Let's put that on the table. We relied on each other's due diligence, but we also relied on another investment theme that I felt drove a lot of interest in FTX[125]"*

Mr. O'Leary is also a strategic investor in Canada's largest cryptocurrency exchange, 'WonderFi.' The name is derived from Mr. O'Leary's nickname, 'Mr. Wonderful.' Mr. O'Leary's involvement in WonderFi could naturally lead one to believe that he knew how to perform adequate due diligence on exchanges, and that he would do so on FTX before investing and acting as a brand ambassador.

208.    Other organizations and individuals, with presumably more to gain, did find red flags at FTX and turned down FTX and/or Sam Bankman-Fried's money. The nonprofits Our World Data and MITRE declined offered gifts of $7.5 million and $485,000, respectively, from the FTX Future Fund due to undisclosed red flags.[126] In addition, CME Group CEO Terry Duffy allegedly told Sam Bankman-Fried that he was "an absolute fraud" upon having an initial conversation with Mr. Bankman-Fried.[127].

209.    Based upon the information that has been released by FTX's new CEO John Ray as part of the company's bankruptcy filings, it is clear that anyone who bothered to spend 20 minutes reviewing

---

[125]    https://dailyhodl.com/2022/12/09/kevin-oleary-says-ftx-collapse-makes-him-and-other-investors-in-the-crypto-exchange-look-like-idiots/

[126]    https://www.moneyweb.co.za/moneyweb-crypto/sam-bankman-frieds-red-flags-were-seen-in-all-corners-of-his-empire/ (accessed May 11, 2023).

[127]    https://www.cnbc.com/2022/11/23/absolute-fraud-cmes-terry-duffy-says-he-saw-trouble-before-ftx-collapse-.html (accessed May 11, 2023).

Case No.:                                              72
CLASS ACTION COMPLAINT

FTX's operations pre-collapse would have identified significant red flags. In his first day pleading in support of FTX's chapter 11 petitions, Mr. Ray noted:

> "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."[128]

210. Mr. Ray's pleading contains a number of troubling findings, among them: 1.) FTX did not have centralized control of its cash, 2.) FTX had no dedicated human resources department, which has hindered Mr. Ray's team from preparing a complete list of who worked for the FTX Group, 3.) A lack of disbursement controls that resulted in employees submitting payment requests via on-line chat and these requests being approved by managers responding with personalized emojis, 4.) Corporate funds were used to purchase homes and personal items for employees, and 5.) A lack of books and records and the absence of lasting records of decision-making.

211. It is hard to imagine that anyone who has done business with FTX, including paid endorsers, would not have personally witnessed one or more of the deficiencies identified by Mr. Ray. All FTX endorsers have extensive business dealings beyond FTX and surely would be able to identify business practices that are unusually problematic.

212. Instead, many customers relied on the testimonials of paid celebrity endorsers and these celebrities knew why they were being compensated. Indeed, the whole point behind paying celebrities to endorse a product is to increase sales.

213. Thus, celebrities like the Promoter and Digital Creator Defendants have a moral and legal obligation to know that what they are promoting is unlikely to cause physical or financial damage to customers.

---

[128] https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiokr3C_-L7AhWsnGoFHRdBC2kQFnoECBAQAQ&url=https%3A%2F%2Fpacer-documents.s3.amazonaws.com%2F33%2F188450%2F042020648197.pdf&usg=AOvVaw38wQ_JwnmP5fFftiyYkNjSG (accessed May 11, 2023).

Case No.: 73

CLASS ACTION COMPLAINT

214. In addition to the conduct of Defendant Sam Bankman-Fried, as described in this Complaint, some of the biggest names in sports and entertainment have either invested in FTX or been brand ambassadors for the company. A number of them hyped FTX to their social media fans, driving retail consumer adoption of the Deceptive FTX Platform.

215. In March 2021, FTX became the first company in the crypto industry to name an arena. This helped lend credibility and recognition to the FTX brand and gave the massive fanbase of basketball exposure to the Deceptive FTX Platform.

216. FTX's explanation for using stars like Brady, Bunchden, and the other Promoter and Digital Creator Defendants was no secret. "We're the newcomers to the scene," said then-FTX.US President Brett Harrison, referring to the crypto services landscape in the U.S. "The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken," Mr. Harrison said. "We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that," he said.[129]

217. In other words, the FTX Group needed celebrities like Promoter and Digital Creator Defendants to continue funneling investors into the FTX Ponzi scheme, and to promote and substantially assist in the sale of unregistered securities, including the YBAs. Below are representative statements and advertisements the Promoter and Digital Creator Defendants made to drive the offers and/or sales of the YBAs, which Plaintiffs and Class Members will supplement as the case progresses and discovery unfolds.

218. The promotions should not be viewed in isolation, but rather as a part of a wide-ranging conspiracy to promote and sell unregistered securities, and to aid and abet the FTX Group's fraud and conversion perpetrated on Plaintiffs and the Classes.

219. On or around September 10, 2021, FTX tweeted out a list of its promoters who were part of the "You In?" campaign, asking its audience whether they are "in" as well.

---

[129] https://www.wsj.com/articles/tom-brady-and-gisele-bundchen-to-star-in-20-million-campaign-for-crypto-exchange-11631116800?mod=article_inline (accessed May 11, 2023).



## M.     The MDL Defendants' Roles in the Fraud

220.     Each group of MDL Defendants contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way.

221.     The individual role of each MDL Defendant is outlined below, and more fully expounded upon within the individual chapter of the complaint in which they are named.

222.    Samuel Bankman-Fried stole billions of dollars from FTX clients' deposits and used them to cover costs at FTX's sister company, a crypto hedge fund called alameda Research. He did so with the hep of three key people, Caroline Ellison, Gary Wang, and Nishad Singh, who were part of Bankman-Fried's inner circle. Many of them were friends going back years before the creation of FTX. Together, they were the brain trust of FTX and the architects of the FTX fraud, and are referred to herein as the "FTX Insider Defendants."

223.    The public accounting firms of Prager Metis CPAs, LLC and Armanino LLP (the Auditor Defendants), were the auditors of FTX Trading and FTX US, respectively. In those roles, and in violation of the professional standards to which they were subject, Prager Metis and Armanino issued reports in which they opined, respectively, that the financial statements of FTX Trading and FTX US for the years ending 2020 and 2021 were presented in accordance with generally accepted accounting principles (or GAAP) and that they had performed audits of such financial statements in accordance with generally accepted auditing standards (or GAAS). Reports such as the type issued here by the Auditor Defendants are generally referred to as "clean" audit reports. Given the virtual absence of accounting and financial systems and controls, corporate governance structures, and other controls at FTX – things that were so glaring and obvious that Mr. Ray discovered them within just days of being appointed as FTX's CEO in connection with the FTX bankruptcy – the Auditor Defendants never should have issued, and in fact were prohibited by the professional standards to which they were subject, their clean audit reports. Nor should they have allowed, as they did, FTX and SBF to tout that FTX had passed financial statement audits. Finally, in further violation of the professional rules and standards to which they were subject, the Auditor Defendants issued statements of support on the internet and social media of FTX and SBF. The Auditor Defendants played a significant role in the FTX fiasco in that their actions gave legitimacy and credibility to FTX and SBF, which FTX and SBF used to curry favor with customers and investors and give them the sense that FTX could be entrusted with their money.

224.    FTX's campaign to build public and investor trust relied on significant financial and public support from certain venture capital fund Defendants.  Sequoia Capital Operations, LLC ("Sequoia"), Thoma Bravo, LP ("Thoma Bravo"), Paradigm Operations LP ("Paradigm"), SkyBridge Capital II, LLC ("SkyBridge"), Multicoin Capital Management LLC ("Multicoin Capital"), Tiger Global Management,

LLC ("Tiger"), Ribbit Management Company, LLC ("Ribbit Capital"), Altimeter Capital Management, LP ("Altimeter"), and K5 Global Advisor, LLC ("K5 Global") (collectively, the VC Defendants) poured over $800 million into FTX, both financing and directly participating in FTX's public campaign to create an air of legitimacy for the Deceptive FTX Platform. The VC Defendants made numerous deceptive and misleading statements of their own about FTX's business, finances, operations, and prospects for the purpose of inducing customers to invest, trade, and/or deposit assets with FTX. They also vouched for the safety and stability of the Deceptive FTX Platform, advertised FTX's purported attempts to become properly regulated, and otherwise promoted the fabricated integrity of the FTX Group and SBF.

225. Defendants Temasek Holdings (Private) Limited ("Temasek Holdings") is a global commercial investment company owned by the Government of Singapore, with a portfolio valued at nearly $300 billion. Temasek Holdings operates in the United States primarily through its wholly owned subsidiary, Temasek International (USA) LLC ("Temasek USA" and, together with Temasek Holdings, "Temasek"). After undertaking an extensive, 8-month-long due diligence process involving, e.g., FTX's business model, applicable regulations, audited financials, and corporate governance, Temasek invested $275 million in FTX. Temasek "continued to monitor performance and engage management on business strategy, as well as legal, policy and regulatory matters" even post investment, advising FTX with regard to "upgrad[ing] regulatory and legal functions" and to "strengthen [its] leadership." Temasek was in a particularly good position to offer such advice; upon information and belief, its executives, Pradyumna Agrawal and Antony Lewis, served on FTX's advisory board, which held meetings at least through March 2022.

226. Defendant SoftBank Group Corp. ("Softbank Group") is a Japanese multinational investment firm that operates in the United States through is subsidiary Defendant SB Group US, Inc., a Delaware corporation. Softbank Group invested in FTX through its Softbank Vision Fund, which is managed by Defendants SoftBank Investment Advisers (UK) Limited ("Softbank Investment Advisers") and Softbank Global Advisers Limited ("Softbank Global Advisers"), and engaged in the misconduct referenced herein in order to increase the value of those investments. SoftBank Vision Fund is one of the largest technology funds in the world, totaling approximately $56 billion, with its U.S. base in Silicon Valley, California. SoftBank Group has a worldwide reputation for being a "unicorn company . . .

whisperer," and startups such as FTX fortunate enough to count it among its investors gain "a major credibility building moment." SoftBank Group employed its "dedicated review department" to conduct due diligence on FTX's "business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc." prior to making its reported $100 million dollar investment. Upon information and belief, SoftBank Group continued to enjoy unique influence over and insight into FTX following its investment through its executives—CEO Rajeev Misra and Partner Tom Cheung—who served on FTX's advisory board, which held meetings at least through March 2022. It sought to pave the way for FTX to expand into the derivatives clearinghouse arena by lobbying the CFTC to grant FTX the necessary licenses with claims that FTX's proposal would reduce risks to the consumer.

227.    Defendant Sino Global Capital Limited ("Sino Global") is a venture capital firm based in Hong Kong, Kentucky and The Bahamas with hundreds of millions in assets under management. Sino Global "supported the FTX vision" "[f]rom the very beginning" and "worked with [FTX] to make it a reality," including by investing an undisclosed amount in the "mid-seven figures" in FTX. In conjunction with its investment, Sino Global—in the words of its managing partner Matthew Graham—did "a hell of a lot of due diligence" and eventually embarked on a "deep relationship" with FTX. Sino Global's reputation, due diligence representations, ultimate investment, and ongoing relationship lent an air of legitimacy to FTX, as Mr. Graham recognized following one round of funding: "Today, SBF is no longer merely a titan of crypto. He's now a titan of business . . . ." As FTX's value skyrocketed, Sino Global stood to make an enormous return on its investment, but it benefitted from its ties to FTX in more direct ways: Sino Global accepted a $60 million investment from Alameda and yet another investment of an undisclosed amount from SBF, each of which, upon information and belief, having been comprised of Class Member funds. It further partnered with FTX and Alameda as co-general partners in the $200 million Liquid Value I fund, Sino Global's first ever outside venture fund.  Together, Temasek, Softbank, and Sino Global are referred to as the "Multinational VC Defendants."

228.    Defendant Fenwick was FTX's principal outside law firm.  Headquartered in Mountain View, California, Fenwick was ideally located in the heart of Silicon Valley, near to FTX's California operations. Fenwick provided services to the FTX Group entities that went well beyond those a law firm should and usually does provide. When asked by FTX Group executives for counsel, Fenwick lawyers

were eager to craft not only creative, but illegal strategies.  Fenwick helped set up the shadowy entities through which Bankman-Fried and the FTX Insiders operated a fraud, structured acquisitions by the FTX US in ways to circumvent regulatory scrutiny, advised on FTX US's regulatory dodge, more generally, and supplied personnel necessary to execute on the strategies that they proposed.  In this manner, Fenwick conspired with and aided and abetted the fraud, conversion, negligence, and respective breaches of fiduciary duties of the FTX entities.

229.    Defendants Deltec, Moonstone, and Jean Chalopin (together, the Bank Defendants) primarily assisted SBF in trafficking Class Member funds across the U.S. border. Defendant Deltec, at Mr. Chalopin's direction, provided one-of-a-kind digital asset banking services to FTX and, upon information and belief, served as a primary vehicle through which SBF routed Class Member funds offshore, beyond the reach of U.S. regulators and law enforcement. Defendant Moonstone, also at the direction of Mr. Chalopin, provided complementary services, assisting SBF in funneling more than $50 million in Class Member funds to entities he separately owned through accounts at the bank.

230.    Promoters are Defendants who agreed to serve as brand ambassadors, advertised and promoted the sale of the Deceptive FTX Platform, YBAs and/or FTT, and failed to disclose in any of their marketing campaigns or advertisements that they were paid millions of dollars by FTX. All in clear violation of SEC, FTC, and various federal and state regulations.

231.    Digital Creators are YouTube and social media financial influencers who promoted FTX as financial advice and promoted the sale of the Deceptive FTX Platform, YBAs and/or FTT, to their millions of followers.  They include the following individuals and entiti

232.    On or about spring 2021, Tom Brady and Gisele Bündchen partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included but were not limited to posting on social media, making personal appearances, and appearing in television and print advertising. Brady and Bündchen also took equity stakes in FTX Trading Ltd. Bündchen was given the title of Environmental and Social Initiatives Head at FTX. Brady and Bündchen made numerous statements across platforms to induce individuals to invest in the Deceptive FTX Platform, YBAs and/or FTT.

233.    On August 10, 2021, FTX (US and International) announced that it entered a "long-term relationship with entrepreneur, venture capitalist, and Shark Tank investor, Kevin O'Leary." It further explained that "Mr. O'Leary will be taking an equity stake in both FTX Trading Ltd. & West Realm Shires Services Inc. along with being paid in crypto to serve as an ambassador and spokesperson for FTX."[130] The overarching objective of the partnership was for O'Leary, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

234.    On or about June 2021, Udonis Haslem partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included posting on social media, appearing in a commercial, and participating in promotional events.

235.    On or about October 2021, David Ortiz partnered with FTX as a brand ambassador, which included promoting the platform and releasing collections of NFTs through the FTX app.

236.    On or about September 7, 2021, FTX partnered with Steph Curry as a brand ambassador, through his company SC30 Inc., to provide FTX with spokesperson and marketing services. Those services included but were not limited to posting on social media, creating an exclusive NFT collection, and appearing in commercial advertising. The overarching objective of the partnership was for Mr. Curry, through a series of promotions and media campaigns, to help FTX successfully solicit or attempt to solicit investors in FTX's crypto-related securities from Florida and nationwide.

---

[130] https://www.prnewswire.com/news-releases/ftx-and-kevin-oleary-announce-long-term-investment-and-spokesperson-relationship-301352189.html (accessed May 9, 2023).



237.    On or around December 14, 2021, the Warriors and FTX announced a first-of-its-kind cryptocurrency partnership in professional sports, with the unveiling of the FTX logo on the court at the Chase Center. As the Warriors' Official Cryptocurrency Platform and NFT Marketplace, the franchise announced it would drop NFTs on FTX.US, beginning in early 2022. The partnership between the Warriors and FTX was the first international rights partner for the team, granting both the Warriors and FTX a visible market presence, inclusive of logo and likeness, internationally.[131]

238.    On or about June 1, 2022, Defendant Shaquille O'Neal, former professional NBA basketball star, sports analyst, and entrepreneur, unveiled his partnership with FTX, stating in a video

_____

[131] https://www.nba.com/warriors/warriors-ftx-partnership-20211214

Case No.:                                          81
CLASS ACTION COMPLAINT

posted on FTX's Twitter account that "I'm excited to be partnering with FTX to help make crypto accessible for everyone. I'm all in. Are you?"[132]



239.    On or about April 2021, William Trevor Lawrence partnered with FTX—through one of FTX's investment apps Blockfolio[133]—as a brand ambassador, which included posting on social media and appearing in promotional and marketing materials.

---

[132]
https://twitter.com/FTX_Official/status/1532119977381208066?s=20&t=5wTm55FDE6c0cCD9vCndYg (accessed May 11, 2023).

[133] In August 2020, FTX announced the acquisition of Blockfolio, then the market's leading mobile news and portfolio tracking app. Coindesk reported that "the deal is a strategic play for FTX, whose clientele consists largely of quants and professional traders, to attract more retail customers."[133] The app became known as FTX: Blockfolio at the time of the merger, and subsequently transitioned to FTX app. An FTX press release on the name change quotes Bankman-Fried as stating: "The rebrand of FTX: Blockfolio to FTX puts the final cap on our acquisition of Blockfolio, doubling down on our commitment to being the number one crypto trading platform for both retail and institutional users. Rebranding Blockfolio shows our commitment to mobile trading, and is just another step in growing our brand on a global scale and will allow us to bring new features to market and better the user experience."[133]

Case No.:                                    82



240.     On or about November 2021, Shohei Ohtani partnered with FTX to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included appearing in a commercial and as a spokesperson for the brand. Ohtani signed on as a long-term global ambassador with both FTX US and FTX International.[134]

---

[134]     https://kwww.prnewswire.com/news-releases/mlb-superstar-shohei-ohtani-joins-ftx-as-global-ambassador-through-long-term-partnership-301425911.html (accessed May 11, 2023).

Case No.:                                                83



241.    Defendant Naomi Osaka became a brand ambassador for FTX, with the express purpose of "getting more women to start investing in crypto."[135] Ms. Osaka wore the FTX logo on the kit she wore at tournaments, including the 2022 Miami Open.[136] Ms. Osaka and FTX launched a commercial designed to bring cryptocurrency and investing in the FTX Platform, including YBAs, to the masses.

---

[135]    https://coinmarketcap.com/alexandria/article/naomi-osaka-tennis-star-teams-up-with-ftx-and-she-s-getting-paid-in-crypto-too (accessed May 11, 2023).

[136] *Id.*

Case No.:                                            84
CLASS ACTION COMPLAINT



242.    For his part, the legendary comedian and creator of *Seinfeld* and *Curb Your Enthusiasm*, Larry David, created and starred in an ad for the FTX Group called "Don't Miss Out on Crypto," which aired during the 2022 Super Bowl. David and his long-time collaborator "were completely in lockstep with" FTX's idea of using the contrarian comic's well-known wit and persona to advertise the emerging crypto exchange app and reach a wide-pool of potential users. Indeed, embracing David's constructed antagonism for cryptocurrency was part of FTX's broader, manipulative marketing strategy. According to Bankman-Fried, FTX wanted to "meet people where they are—and that means embracing skepticism."

243.    On June 3, 2021, for $210 million paid equally on an annual basis over the course of 10 years, TSM (e-sports) announced that it was changing its name to TSM FTX.[137] This was, at the time, the one of the largest sports deals in existence, made with the most valuable e-sports company in the

---

[137] https://www.nytimes.com/2021/06/04/sports/esports-name-change-tsm-ftx.html (accessed May 11, 2023)

United States, in the middle of the COVID-19 Pandemic and on the heels of FTX's FTX Arena deal.[138] In short, the deal caused FTX Group's popularity to skyrocket, helping to catapult it to the forefront of the nascent crypto exchange industry. As part of its deal with FTX, TSM announced that "TSM FTX will distribute cryptocurrency to each of its players and employees" and would purchase "$1 million worth of FTT, FTX's native token" and distribute cryptocurrency to its players and employees.[139] At that time, the price per FTT hovered as just under $35 – by November 16, 2022, it dropped to under $2.[140]

### N.      Material Ties to Florida

244.    The connections to Florida in this consolidated case are numerous.

245.    According to the Declaration of Dan Friedberg, attached as Exhibit A, FTX maintained an office in Miami, Florida, since early 2021, long before FTX eventually announced the move of its Domestic headquarters to Brickell in late 2022. *Id.*, ¶ 20. Since early 2021, FTX's Miami office was run by Mr. Avinash Dabir, FTX's Vice President of Business Development. *Id.* Friedberg met with Mr. Dabir often and is very familiar with Mr. Dabir and his activities. *Id.*

246.    Mr. Dabir, from the Miami office, focused on formulating and executing FTX's important celebrity partnerships. *Id.*, ¶ 21. Mr. Dabir was the senior FTX executive responsible for creating, consummating, and implementing deals between FTX and other Partners, such as Major League Baseball, the MLB Umpire's Association, TSM, the Mercedes Formula 1 team, Tom Brady, Stephen Curry, the Golden State Warriors, Naomi Osaka, Larry David, and Shohei Ohtani. *Id.*, ¶ 23.

247.    It was Mr. Dabir's idea to expend significant resources on FTX's sports and celebrity-based partnerships. *Id.*, ¶ 22. Mr. Dabir specifically started by suggesting FTX form a Partnership with the Miami Heat and the naming rights to the Miami Arena. *Id.* FTX announced the Partnership in March 2021, and included FTX purchasing the naming rights of the Miami Heat stadium for 19 years in a deal worth approximately $135 million. *Id.*

---

[138] *Id.*; *see also* https://www.forbes.com/sites/christinasettimi/2020/12/05/the-most-valuable-esports-companies-2020/ (accessed May 11, 2023).

[139]       https://www.prnewswire.com/news-releases/tsm-and-ftx-sign-210-million-naming-rights-partnership-largest-in-esports-history-301305740.html (last accessed May 11, 2023)

[140]       https://www.washingtonpost.com/video-games/esports/2022/11/16/tsm-ftx-naming-deal-suspended/ (last accessed May 11, 2023)

248. Mr. Dabir deserves much of the credit for the collaboration with Mr. David that resulted in the award-winning Super Bowl FTX commercial that aired with the Super Bowl in 2022. *Id.*, ¶ 24. Crucially, all FTX employees or agents who were involved in the Larry David Super Bowl commercial ultimately reported to Avi Dabir, who had final approval of all aspects of the commercial from his base of operations in Miami.

249. Released on March 31, 2022, Mr. Dabir appeared on the popular cryptocurrency podcast The Joe Pomp Show, where he was interviewed by Mr. Pompliano for over half an hour on specifically the efforts he undertook and oversaw from his FTX base of operations in Miami, Florida, to create, consummate, and implement, among other things, the FTX arena deal and the Larry David Superbowl commercial. A transcript of the podcast is attached as Exhibit B.

250. Mr. Dabir begins by introducing himself as "Vice President of Business Development at FTX, so I handle a lot of our sports partnerships as well as doing some of the interesting things in real estate as well." Ex. B at 2. He then explains that "the end goal" is really how does FTX "acquire more users." *Id.,* at 9. After first acknowledging and agreeing with Mr. Pompliano that FTX was at that point the "leaders" in the sports partnership category and that "it started with Miami Heat Arena," Mr. Dabir explained that he led the effort to obtain the FTX Arena deal because he "had previously worked at the NBA" and that he identified Miami because it had "a great market," a "multicultural, great team," and the "Crypto Buzz was like growing here in Miami." *Id.*, at 2–3.

251. Mr. Dabir also explained that it was crucial "to get approval from a local government, plus the Heat and the NBA who had their own diligence teams looking into" the FTX Arena deal because it "really sort of validated not only just FTX but the cryptocurrency industry in general." *Id.*, at 4.

252. Mr. Dabir went into detail about his dealings with Tom Brady and Giselle Bündchen and how the individual FTX Brand Ambassador partnership deals worked. *Id.*, 9. Importantly, not only was Mr. Dabir directly involved in negotiating and consummating the individual FTX Brand Ambassador partnership deals from his base in Miami, he also explains that Defendants Brady and Bündchen were instrumental in bringing other FTX Brand Ambassadors into the fold, such as Defendant Curry. *Id.*

253. In addition to coordinating the promoter campaigns from Miami, Florida, FTX announced it was moving its official U.S. headquarters from Chicago to Miami in 2022.[141] This move happened before FTX declared bankruptcy.

254. The promotional campaigns came from the brain trust of FTX in Miami, but many of the promotions also took place in Florida as a cryptocurrency hub.

255. FTX served as a title sponsor for the David Ortiz Golf Classic in Florida on or about November 2021 and pledged to make contributions to Ortiz's charity, David Ortiz's Childrens Fund. Ortiz promoted the sponsorship and golf tournament on Twitter and other online pages, including on his personal website: https://davidortiz.com/red-sox-legend-david-ortiz-signs-multiyear-ftx-deal/ (last visited May 8, 2023).

256. In March of 2022, Defendants O'Leary, Haslem, and Ortiz served as judges for the FTX Charity Hackathon at the crypto summit hosted by FTX in Miami.[142]



257. On March 11, 2022, Mr. O'Leary appeared on NBC 6 South Florida to explain his involvement with FTX and his role in judging the competition.[143] During that appearance, Mr. O'Leary

---

[141] https://www.coindesk.com/business/2022/09/27/crypto-exchange-ftx-is-moving-its-us-headquarters-from-chicago-to-miami/ (accessed July 18, 2023).

[142] https://ftxcharityhackathon.com/ (accessed May 11, 2023).

[143] https://www.nbcmiami.com/entertainment/6-in-the-mix/shark-tank-star-kevin-oleary-taking-part-in-charity-hackathon/2711510/ (accessed May 9, 2023).

praised the company saying "I love the company. I like its mission. I like what they're doing in terms of innovating and financial services around crypto." *Id.*

258.    In March of 2022, Ms. Osaka began her FTX promotion campaign at the 2022 Miami Open tennis tournament. Osaka wore gear with the FTX logo throughout the tournament, including during the presentation and acceptance of her runner-up throw following her loss in the finals.

259.    On April 18, 2022, Mr. Haslem, a star for and captain of the Miami Heat, shared a video on Twitter advertising a promotional effort with FTX that promised a giveaway to Miami area small businesses.



260.    As part of Mr. O'Neal's promotional campaign for FTX, he appears on Episode 114 of "The FTX Podcast," hosted by Tristan Yver, which was released on June 8, 2022.[144] O'Neal recorded the episode with Yver from Miami, Florida, telling Yver on the podcast, "Loosen up brother, loosen up . . . You're in Miami, relax."

---

[144] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4 ("Welcome to episode 114 of the FTX Podcast with special guest Shaquille O'Neal and your host Tristan Yver! Shaquille is a family man, basketball superstar, businessman, TV personality, music artist, crypto project entrepreneur, role model & humanitarian.").

261. Mr. O'Neal also promoted FTX in Miami with his Astrals project, announcing in the official Discord on August 29, 2022, using an emoji of Shaq's face, that they funded an Astrals marketing event at Solana Miami, and "[w]e will be in attendance with the likes of Solana Pay, FTX, Ledger, MagicEden, Phantom and more!".[145]

262. Between July 5 and 6 of 2022, Mr. Ohtani played in two games against Miami in Miami, and between August 22 and 25 of 2022, Mr. Ohtani played four games against Tampa Bay in Tampa.

263. In November of 2022, Mr. Curry played in two NBA games against Florida teams in Florida. On November 1, 2022, Mr. Curry played against Miami in Miami and on November 3, 2022, against Orlando in Orlando.

264. Furthermore, Defendants Brady, Bündchen, O'Leary, Haslem, Lawrence, and Ortiz resided in Florida while working for FTX. Other Defendants including Defendants Curry, Ohtani, and Osaka competed in professional sports while in Florida working for FTX.

265. Additionally, Miami has been the longtime base of operations for LedgerX, LLC d/b/a FTX US Derivatives ("FTX Derivatives"), a critical component to the FTX fraud as a repeatedly touted hallmark of FTX's veneer of regulatory compliance and safety, and Zack Dexter, who severed as the CEO of FTX Derivatives until he succeeded Brett Harrison as the President of FTX US in late summer 2022, is a longtime Miami resident.

**O. The Defendants' Roles in the Fraud**

266. Multinational VCs Defendants contributed both to the perpetration of the fraud, and to the sale of unregistered securities, in a vital way.

---

[145] https://discord.com/channels/928105025392214027/928185412961308792/101387886375058120 (accessed May 15, 2023).

267.    Multinational VC Defendants are some of the largest venture capitalists in the world and wield enormous influence in spurring the development of emerging industries, like crypto, and persuading others to invest in the portfolio companies that they advise and nurture. From these positions of power, Multinational VC Defendants provided critical funding for SBF's fraudulent scheme, pumping billions into FTX's coffers, without which SBF could not have launched the venture nor so extensively expanded its reach through aggressive promotional and marketing campaigns legitimizing its brand to the public, as FTX itself acknowledged in its "End of Year 2021" blog post:

> 2021 was a transformative year for FTX. Going into it we were valued at $1bn with no VC investment, had yet to hit the million user mark, and had never done any marketing or a single advertisement; all of which is somewhat understandable for a company that hadn't even existed for 2 years.
> As we move into 2022, we're valued at $25bn after raising the largest round in the history of crypto from some of the best firms in the world. In addition, we not only cruised past the 1mm user mark, but also 2mm, 3mm, 4mm, and 5mm users; have partnered with many of the biggest names in sports and launched an ad campaign resulting in FTX being named one of the top 10 marketers of the year; became the first crypto-native firm to obtain licensing for crypto derivatives; and we had our second birthday!
>
> We are extremely thankful for the support we have received from the crypto community and our partners which has allowed us to grow to where we are today.
>
> A key component of these promotional efforts was the legitimacy lent by the Multinational VC Defendants as well-known and respected venture capital and private equity firms.  The Multinational VC Defendants not only invested in FTX knowing that these funds would be spent on FTX's and SBF's promotional activities described above, which were all false and misleading, the Multinational VC Defendants often directly touted the purported safety, trustworthiness, and favorable risk profile of the Deceptive FTX Platforms.

268.    The Multinational VC Defendants' investments were not passive investments, and their assistance went much further than underwriting FTX's launch, in part because FTX was soliciting more than just capital from them. As SBF explained at a crypto conference in 2021, FTX was looking for true "partners":

> [Y]ou know we could buy tens of millions of Facebook ads – and I don't know maybe we should at some point, we'll hire a team to look into to whether that that is worth doing – but that's not a thing which is going to really make it the same sort of impact on people, anyone can sort of you know potentially do that, and instead *what we've really been looking for like who are partners that we're really excited about and are really excited about us,*

*and you know, who can help represent us and who we can really work with in a way to build something kind of stronger and more powerful than what we had*.

269.     FTX found those partners in the Multinational VC Defendants, who supplied FTX with hands-on support, partnership, guidance, infrastructure, networks, endorsements, promotion, publicity, cover and other assistance vital to the fraud. Each Multinational VC Defendant worked closely with FTX in providing these services and, in turn, driving up FTX's valuation to the Multinational VC Defendants' direct benefit, all by way of FTX's fraudulent scheme and expanding SBF's reach to victims.

### a.     *The Multinational VC Defendants pumped billions of dollars into FTX, and FTX returned the favor*

270.     In mid-2021, FTX raised more than $1 billion across to rounds of fundraising from a handful of VC firms, including the Multinational VC Defendants, andTemasek's, Softbank's, and Sino Global's names were advertised prominently in FTX's press releases announcing the closings of each fundraise..  It was widely reported at this time that FTX was preparing itself to go public, and the endorsements of the Multinational VC Defendants added weight to this narrative.

271.     On July 20, 2021, Defendants Temasek, SoftBank, and Sino Global, along with other venture capitalists, put up nearly $1 billion in Series B funding for FTX Trading. SBF underscored the tremendous value that the Multinational VC Defendants brought to FTX, remarking that through this round of fundraising, "we've formed a hugely valuable set of partners" in these Multinational VC Defendants. SBF explained after the Series B funding closed that "[t]he primary goal of the raise was to [find] strategic allies who can help FTX grow its brand."

272.     Shortly thereafter, on October 21, 2021, Defendant Temasek, along with other venture capitalists, put up $420.69 million in FTX Trading's Series B-1 funding. In the press release announcing the fundraising, SBF repeated a common refrain, underscoring FTX's safety:

> We are focused on establishing FTX as a trustworthy and innovative exchange by regularly engaging regulators around the world, and constantly seeking opportunities to enhance our offerings to digital asset investors. For this round, we capitalized on those strides and were able to partner with investors that prioritize positioning FTX as the world's most transparent and compliant cryptocurrency exchange.

273. FTX reportedly referred to the Series B-1 fundraising as a "meme-round," referencing the allusions to oral sex and marijuana embedded within the amount raised. This was one of many juvenile references made by FTX regarding core components of its business model. For example, FTX advertised to investors that one of the products unique to the exchange was its "Shitcoin Index Futures," a "funny named" futures product built on "shit" cryptocurrencies.

274. Though FTX Trading claimed that the Series B-1 funding would help it "make strategic investments designed to grow the business and expand [its] regulatory coverage," in October 2021, during the height of its Series B-1 fundraising, FTX instead diverted $300 million—equivalent to nearly 75% of the Series B-1 funding—to SBF in exchange for shares he owned in the company. Pay days of this kind are unusual and indicative that something is amiss. As industry experts explain:

> Generally, venture investors frown on large sales of stock by founders before a company goes public, in part because they dislike the idea of a founder who put little or no money into a business getting rich before investors can cash out. . . . It shows the company's founder thinks there's a better place to invest. . . . Anytime you see a founder selling shares in a secondary offering, you have to really ask them pretty tough questions.

To be sure, not only was SBF's cash out "large by startup-world standards," it also directly contradicted FTX Trading's purported use for the funds. Moreover, it was money that could have—and should have—been paid to satisfy the claims of SBF's victims.

275. Unphased by SBF's $300 million payday, the Multinational VC Defendants put up more money. On January 31, 2022, FTX Trading announced that it had raised $400 million in Series C Funding from investors, many of whom had participated in its Series B and B-1 rounds of fundraising, including Temasek and SoftBank, "demonstrating [their] belief in the Company's vision and their continued support of FTX's explosive growth."

276. Just days earlier, on January 26, 2022, FTX US closed on its $400 million Series A fundraising, securing yet more money from certain Multinational VC Defendants, including Temasek and SoftBank. In publicizing the deal, Brett Harrison, President of FTX US, affirmed FTX's commitment to regulatory compliance, stating that "[w]e're excited to continue working cooperatively with [lawmakers and regulators], and feel confident that FTX US will emerge as the leading US-regulated crypto spot and derivatives exchange."

Case No.: 93

CLASS ACTION COMPLAINT

277.     In announcing each round of funding, the Multinational VC Defendants publicly endorsed FTX and its founder. After fundraising closed, the Multinational VC Defendants continued to valorize SBF and promote FTX to the public, and they did so because the Multinational VC Defendants would directly benefit from the rise in popularity of FTX and the polishing of its brand. As another VC Defendant put it, crypto was once like the "wild west" and "over the years, decades and centuries, **what has mattered the most is what is the value of the brand that people trust**." (emphasis added). Comparing banks with identical balance sheets, same assets, same liabilities, same net worth, more or less same profitability, this VC Defendant explained that "one bank could be worth three times more than the other, why? **Because of the brand.  They trust the brand more**." (emphasis added).

278.     In total, the Multinational VC Defendants, along with other venture capitalists put up a combined $2 billion to expand FTX's reach to SBF's victims. SBF returned the favor in kind, investing in his VC-backers, as they had in him. Sino Global, for example, took in $60 million from Alameda and an amount still unknown from SBF, himself. Upon information and belief, some or all of these investments were paid for with, or collateralized by, Class Member funds.

279.     In garnering investments into their own funds, the Multinational VC Defendants worked closely with SBF. For example, in 2021, Sino Global partnered with FTX as a co-general partner and "anchor" investor in building Sino Global's $200 million Liquid Value I fund.



This was the first time that Sino Global had ever accepted outside capital for its funds, and the first time that FTX had "allocated capital to an outside VC manager."

280.    SBF lauded the partnership, telling the press at the time that "We [FTX] are excited to support the launch of Sino Global Capital's institutional fund. From the very beginning, [CEO] Matthew [Graham] and the Sino Global Capital team supported the FTX vision and then worked with us to make it a reality."

281.    SEC filings reveal that Alameda, too, invested in the Liquid Value I fund. Indeed, Sino Global lists SBF and Alameda as general partners and co-owners of the Liquid Value I fund in filings with the SEC. Through that partnership, Sino Global's managing partner Matthew Graham and SBF worked hand-in-hand to pitch the fund, and touted FTX—including its growing brand recognition through "high profile sponsorships of Miami Heat Areana and star athletes, including Tom Brady, Steph Curry and Lewis Hamilton, as well as funding from Defendant SoftBank and other VC firms—as "Key Advantages" to the fund.



**b.    *The Multinational VC Defendant gained awareness of SBF's fraud in the course of investing in, advising, and promoting FTX.***

282.    The Multinational VC Defendants had knowledge of FTX's misconduct, because, in addition to their close ties to SBF and his affiliates, prior to investing, each Multinational VC Defendant undertook a diligence process to evaluate FTX's offerings and understand its business model and operations. The Multinational VC Defendants were obligated to conduct this diligence, as fiduciaries to their investors. Diligence of this kind occurs in multiple stages, and industry standards require a review of the target's financial statements and projections, identification of the target's basic corporate

governance structures, including formation documents and information concerning the target's directors, officers and internal controls, an understanding of the target's business model (as confirmed by the target's financial statements), in addition to information concerning related party transactions, intercompany agreements, loans, debt instruments and other credit agreements. Venture capital firms also typically conduct an evaluation of the founders' track records and relevant experience. Venture capital firms conduct diligence for a living, and the Multinational VC Defendants are the largest and foremost of those firms. Firms of such stature undertake state-of-the-art diligence on the investments they make, and the Multinational VC Defendants conducted the same top-notch, rigorous diligence on FTX.

283. Temasek, for example, reports that it conducted eight months of diligence, including "significant regulatory and licensing due diligence on the business model of FTX, particularly on financial regulations, licensing, anti-money laundering (AML) / Know Your Customer (KYC) and sanctions across multiple jurisdictions[,] a review of [FTX's] audited financial statements and a cybersecurity review."

284. Moreover, Temasek further reports that "[t]hroughout the multiple rounds of due diligence," Temasek specifically "enquired about the relationship, preferential treatment, and separation between Alameda and FTX," and "gathered qualitative feedback on FTX and [its] management team based on interviews with people familiar with the company, including employees, industry participants, and other investors." Temasek reports that these meetings included face-to-face contact with SBF, himself.

285. Temasek's diligence was ongoing after fundraising closed, and "[p]ost investment, Temasek continued to engage management on business strategy and monitor performance." More specifically, Temasek explained in a series of FAQs regarding FTX's collapse posted to its website:

> As an active investor, we engage the companies in our portfolio and conduct regular internal reviews of our investments. For each investment, the relevant investment team monitors the performance of the company and engages its management team. We have a formal review each quarter to assess all investments individually, and therefore, the performance of our portfolio.

286. SoftBank conducted thorough due diligence, too. At the time it invested in FTX, SoftBank Group reported to its investors that it conducted the following diligence on its investments:

> In the investment decision-making process, SoftBank seeks to appropriately estimate the investment target's equity value and to assess risks related to the target's businesses, finances, corporate governance, compliance, and internal controls, by conducting due diligence on the target's business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc. For this purpose, SoftBank ensures the involvement of, for example, outside financial, legal, and tax advisors, in addition to the relevant internal departments. In addition, an objective review of the adequacy of the due diligence findings is carried out by a dedicated review department.

Upon information and belief, SoftBank Group subjected FTX to this same rigorous diligence process before investing hundreds of millions of dollars in FTX.

287.    Moreover, SoftBank knew that FTX's underlying business—at least it represented to the public—was fraught with risk and amenable to manipulation. For that reason, SoftBank would not, itself, invest in crypto currencies: "We have stayed away from coins," Rajeev Misra told delegates at an October 2021 investment forum in India, "We can't quantify it, we can't put a mathematical model to it." Presumably, with that understanding, SoftBank conducted heightened diligence on FTX, whose primary business was, at least purportedly, to operate as a cryptocurrency exchange.

288.    Like the other VC Defendants, Multinational VC Defendants included, Sino Global also engages in "quality due diligence" before partnering with the companies in which it invests, including FTX. Managing partner Matthew Graham reports that Sino Global "do[es] a hell of a lot of due diligence. People know that if [Sino Global is] going to invest in them, I'm definitely going to be asking around about them. We'll ask people they used to work with what it's like being on the same team with them. . . . I've got to get to know you. It's like we're buying a vacation house together, we're not just going for a quick dinner." Upon information and belief, Sino Global was as rigorous in conducting diligence on FTX and indeed publicly reported that, when it comes to investments through its Liquid Value Fund I, including FTX, Sino Global would be "using our same approach of betting on them and then working with the and supporting entrepreneurs that have similar values of high-trust and long-term approach to the ecosystem."

289.    Moreover, Sino Global would have undertaken some diligence of SBF, FTX, and Alameda, because of the FTX Group's investments and participation in Sino Global's Liquid Value Fund 1. As is standard in the industry, private funds employ "Know Your Customer/Client" (KYC) and anti-money

laundering programs to detect fraud or other illicit activity among the fund's investors. This includes basic diligence to identify the risks associated with any money flowing into the fund, related party transactions, executive overlap and relationships, as well as monitoring thereafter to identify suspicious activity among its investors.

290.    To be sure, the slide deck that Sino Global prepared to pitch its Liquid Value Fund 1—the fund for which FTX served as Sino Global's co-general partner and anchor investor—highlight the knowledge that Sino Global acquired in the course of its relationship with SBF and his companies. For example, the slide deck demonstrates that Sino Global knew that SBF owned and controlled both FTX and Alameda:



And the slide decks demonstrate that Sino Global knew what each of FTX Trading, FTX.US, and Alameda purported to do:

From employing in-depth diligence standard in the industry, the Multinational VC Defendants knew that SBF was misappropriating Class Member funds, contrary to FTX's public representations and by way of the omissions set forth in Paragraph 107. In particular, the Multinational VC Defendants could see that (1) FTX was closely interconnected with Alameda, though SBF separately owned each entity, and SBF engaged in self-dealing by way of FTX and Alameda; (2) FTX granted Alameda exemptions and other special treatment that allowed Alameda to engage in margin trading and other risky activity on the FTX platform, exposing Class Members to Alameda's risk of loss; (3) FTX's projections were unsubstantiated and its financial statements, nothing more than "homespun excel files;" and (4) FTX lacked critical internal controls, such as separate accounts for Class Member funds, an independent board of directors, or even a chief financial officer.

291.    These issues were readily apparent to other investors solicited by FTX. For example, a November 15, 2022 article published by *Insider*, describes how Bankman-Fried pitched investing in FTX to CEO and founder of venture capital company Social Capital, Chamath Palihapitiya, during the same investment round in which many of the Multinational VC Defendants participated. But, "[a]fter a Zoom meeting with Bankman-Fried, Palihapitiya said [Bankman-Fried] didn't 'make much sense,' so his team at Social Capital worked on a two-page deck of recommendations for next steps for FTX if the investment talks were to proceed." Social Capital made three recommendations to FTX: (1) form a board; (2) create a dual-class stock; and (3) provide investors with "'some reps and warranties around affiliated transactions and related party transactions'" and, in doing so, quickly identified many of the glaring

Case No.:                                              99
CLASS ACTION COMPLAINT

deficiencies in governance and controls that Mr. Ray uncovered days after FTX's bankruptcy. Palihapitiya explained that after making these recommendations "'[t]he person that worked there called us back and literally, I'm not kidding you, said, 'go fuck yourself.'" The Multinational VCs profess to have undertaken even more rigorous diligence of FTX and from that diligence would have seen the same issues that immediately gave Social Capital pause.

292. The questionable entanglement of FTX and Alameda was likewise readily apparent to those investors considering a stake in FTX. Investor presentations (now available to the public for the first time, but available to the Multinational VC Defendants years ago)highlighted financial statementsin which "some of the same assets appeared simultaneously on the balance sheets of FTX and of [SBF's] trading firm, Alameda Research[,] despite claims by FTX that Alameda operated independently." Specifically, for example, "each time FTX was seeking to raise funding, [SBF] sent a spreadsheet to potential investors displaying items like revenue, profit and losses, daily users, and expenses for FTX," and these spreadsheets showed overlap between FTX and Alameda. Other investor materials note that "FTX is a spinout of Alameda Research" and that one of the risk factors presented by FTX was its relationship with Alameda, and specifically that FTX and Alameda would engage in self-dealing by "[t]rading on their own exchange," elaborating that:

> An exchange needs a market maker to get it off the ground and Alameda will be the initial market [maker] for FTX itself. The team intends to bring on more market makers over time however this is a major risk. We have talked to other quantitative hedge funds who are hesitant to trade on FTX for this reason"

293. The incestuous relationship between FTX and Alameda was certainly apparent to other investors conducting diligence on the companies. Alex Pack, a venture capitalist focused on cryptocurrency investments, reported after FTX's collapse that in December 2018, he considered investing in Alameda and, after a month long due diligence period (i.e., 1/8th of the diligence conducted by Temasek), discovered that "Alameda and FTX were tied at the hip," and that SBF planned to use Mr. Pack's investment in Alameda to fund the operations of FTX. For those reasons, Mr. Pack declined to invest in SBF's enterprise. After conducting the rigorous diligence that the Multinational VC Defendants

claim to have completed on FTX, the Multinational VC Defendants would have likewise identified the concerning overlap between FTX and Alameda, just as Mr. Pack so quickly discerned.

294.    In addition to exposing the overlap between Alameda and FTX, the pitchbooks that FTX used to solicit funds from the Multinational VC Defendants reportedly featured projections that FTX could not substantiate with viable assumptions or calculations. For example, in financials that FTX provided to investors, FTX's projected revenue figures for fiscal years 2021 and 2022 that did not reconcile with projected volumes or fees. More generally, these financials were not of the caliber expected of a $32 billion multinational corporation and instead, where "homespun Excel files," which were "very unorganized," at times "inaccurate" and "confusing." In piecing FTX together after the fraud's collapse, Mr. Ray quickly discovered that FTX used Quickbooks for its financials, which he found obviously incongruous: "[A] multi-billion-dollar company using Quickbooks. Nothing against Quickbooks, very nice tool, just not for a multi-billion-dollar company."

295.    Even FTX's audited financials, which Temasek claims to have reviewed and which would have been standard for Softbank and Sino Global to review, immediately highlight suspicious activity at FTX.

296.    First, the audited financials for FTX Trading and FTX US were commissioned by two different audit firms:  Defendant Prager Metis LLP signed the audit report for FTX Trading and Defendant Armanino LLP signed the audit report for FTX US. As *Coindesk* reported, "[A]nyone receiving these reports should have seen is that there were two different audit firms producing them.  Why hire two different firms rather than one to produce an opinion on consolidated results?"  And then further both Prager Metis and Armanino had "a poor recent track record with the PCAOB."

297.    Moreover, neither the Armanino nor the Prager Metis audit reports for 2021 provides an opinion on internal controls by FTX Trading or FTX US over accounting and financial reporting. According to *Coindesk* "the year-end 2021 financial statements should have screamed to any auditor or reader of the reports: There were no controls."

298.    Further, *Coindesk* reported "despite a combination of enormous siphoning off of firm assets by related parties and favorable tax planning, neither FTX Trading nor FTX US paid any federal income taxes, although they both appeared to be profitable."

Case No.:                                           101
CLASS ACTION COMPLAINT

299.    Lastly, *CoinDesk* reported, the audited financials contained a "number of complex, roundtrip and utterly confounding related-party transactions documented in just these two years. The related-party transactions at FTX Trading are so numerous that it is difficult to know where to begin to analyze them." *CoinDesk* went on to list several key issues it notices, including numerous related-party transactions, the use of FTT on balance sheets, FTT being used as currency for acquisitions, and questionable loans to related parties.

300.    Additionally, basic due diligence, including a cursory review of FTX's balance sheets, would have shown that those balance sheets were largely backed by FTT, a cryptocurrency that FTX contrived from thin air and issued to Alameda at no cost. FTX represented that, as "the backbone of the FTX ecosystem," FTT was widely distributed, but contrary to that representation, most FTT tokens issued were held by FTX or Alameda. As of June 30, 2022, Alameda's largest assets were tied to FTT, including "unlocked FTT" totaling $3.66 billion, and "FTT collateral" totaling $2.16 billion. Using customer funds and to the benefit of Alameda, SBF and his cohorts manipulated the value of FTT by implementing a "rolling program of buying back and burning [FTT] tokens," a process which consumed a third of FTX's revenue.

301.    Finally with even the most basic diligence the Multinational VC Defendants would have uncovered that FTX was commingling and misappropriating Class Member assets in violation of FTX's fiduciary duty to its depositors, Class Members included. As sophisticated players in the crypto-industry, the Multinational VC Defendants would have appreciated that FTX held customer deposits as a custodian in trust. To be sure, a quick review of FTX's terms of service would have confirmed the custodial nature of FTX's role. FTX US represented to customers in its terms of service that:

    a.  "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit";

    b.  "[t]itle to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US"; and

    c.  that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US."

302.    Similarly, FTX Trading represented to its customers in its terms of service that:

    d. "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading";

    e. "[n]one of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading"; and

    f. "FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

Upon conducting the diligence outlined above, the Multinational VC Defendants could see that FTX was violating these terms of service in breach of FTX"s fiduciary obligation to hold those assets as a custodian in trust.

303.    In short, the Multinational VC Defendants could see, *years* before Mr. Ray could see (and was able to uncover in a matter of days), that the information presented in FTX's financial statements presented "substantial concerns;" that FTX lacked fundamental internal controls, including a chief financial officer or a board of independent directors; that FTX did not segregate Class Member funds from operations; that FTX was hemorrhaging money to Alameda and other of affiliates of SBF or entities under his control; and that control of FTX was concentrated in the hands of unsophisticated twenty-somethings who played League of Legends throughout meetings at which billions of dollars in venture capital were at stake. None of this material information was disclosed to Class Members, due primarily to the public image fostered by the Multinational VC Defendants, and SBF's fraud relied on the Multinational VC Defendants assistance in keeping the fraud in motion, and these critical omissions concealed.

304.    In fact, at least one VC investor (perhaps even one of the Multinational VC Defendants) *did* see, years before Mr. Ray could see, that any investment in FTX should be declined. In a story following FTX's collapse, the *Financial Times* quoted one "top investor" of FTX, on the basis of anonymity, explaining that he advised his firm *against* the investment, following the firm's diligence, but the firm invested anyway :

We were seduced," said a top investor that piled large sums into FTX…. The investor said he had some reservations during initial calls with Bankman-Fried, including the way the entrepreneur "comported himself" and a sense that he believed everyone else in the

financial world "were idiots". "**I wouldn't have touched him,**" he added, but it was not his ultimate decision [to go ahead and invest]. (emphasis added).

305.    Regulatory action taken in the wake of FTX's collapse further confirm that the most basic diligence—available to the Multinational VC Defendants, but not to Class Members—would have revealed the FTX fraud. On December 13, 2022, after FTX filed for bankruptcy, CFTC Chair Rostin Benham lambasted the fact that "FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds," after the CFTC filed its own complaint related to the collapse of FTX, stating in pertinent part as follows:

> **FTX held itself out as 'the safest and easiest way to buy and sell crypto' and represented that customers' assets, including both fiat and digital assets including bitcoin and ether, were held in 'custody' by FTX and segregated from FTX's own assets.  To the contrary, FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds**.  Alameda, Bankman-Fried, and others also appropriated customer funds for their own operations and activities, including luxury real estate purchases, political contributions, and high-risk, illiquid digital asset industry investments.  The complaint further alleges that, at Bankman-Fried's direction, FTX employees created features in the FTX code that favored Alameda and allowed it to execute transactions even when it did not have sufficient funds available, including an 'allow negative flag' and effectively limitless line of credit that allowed Alameda to withdraw billions of dollars in customer assets from FTX.  These features were not disclosed to the public. (emphasis added).

> c.    *The Multinational VC Defendants provided critical assistance in furtherance of the FTX fraud, despite knowing that SBF was misappropriating Class Member funds.*

306.    Still, the Multinational VC Defendants jumped at the opportunity to pour hundreds of millions each into FTX's repositories, without which FTX could not have gotten off the ground, much less enjoyed such expansive reach. Reportedly, FTX raised:

- $275 million from Defendant Temasek;

- $100 million from Defendant SoftBank; and

- an amount in the "mid-seven figures" from Sino Global.

307.    This funding, along with funding from other venture capitalists, was critical to FTX's growth. FTX needed money, and it needed money from the Multinational VC Defendants, specifically, for reasons laid bare by another venture capitalist in a glowing profile of SBF:

FTX did need money, after all. **And it needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers.**

Without the credibility and influence attached to the enormous sums of money that the Multinational VC Defendants put into FTX, SBF could never have crafted the veneer of legitimacy, trustworthiness, and safety critical to FTX's meteoric growth.

308.    To that end, each Multinational VC Defendant widely, vociferously, and repeatedly, promoted the legitimacy of FTX and endorsed SBF's integrity and character. Sino Global, for example, heaped on the praise for FTX and its founder. Upon closing FTX Trading's Series B funding, Sino Global managing partner Matthew Graham tweeted:



309.    Temasek, too, publicly promoted its investments and partnership with FTX:



**Pradyumna Agrawal** • 3rd+
Venture Building | Investing
1yr • 🌐

**Temasek** is privileged to extend partnership with **FTX** and **FTX US Derivatives**. Look forward to supporting continued growth of the business!

**Sam Bankman-Fried Ramnik Arora Brett Harrison Antony Lewis Sijia C.**

**#crypto**

**FTX**
59,482 followers
1yr • 🌐

**+ Follow**

FTX US is excited to announce that we have completed our Series A raise, totaling $400 million!

According to FTX US President **Brett Harrison**, "This raise will allow us to focus heavily on user acquisition, bolster our derivatives business, seek out strategic acquisitions, and hire the best talent."

Learn more: **https://bloom.bg/3FZJacx**

**#crypto #cryptocurrencynews**

310.    Endorsements from the Multinational VC Defendants carry monumental weight, as the Multinational VC Defendants were considered "powerful and well-known" by the public.



Investors Who Put $2 Billion Into **FTX** Face Scrutiny, Too
nytimes.com · Subscription may be required

311.     Temasek, for example, is Singapore's state-owned investment company with a net portfolio of $287 billion and is one of the most reputable investment funds in the world. In a podcast hosted by McKinsey & Company, the high-powered consulting group described Temasek as "one of the world's leading investment firms dedicated to bringing sustainability and accessibility of new technologies to the entire world." At the time of its investments in FTX, the *Financial Times* described Temasek as one of FTX's "blue chip investors" who "prioritise[s] positioning FTX as the world's most transparent and compliant cryptocurrency exchange" and whose investment "shows the increasing appetite from traditional investors to back crypto companies despite intensifying regulatory scrutiny into the sector." FTX posted a link to the story on its website, channeling potential customers to read the story reporting Temasek's investment in FTX:

→ FINANCIAL TIMES                                    READ

FTX lures blue-chip investors in funding round, valuing crypto group at $25bn

by Harriet Agnew

312.    On information and belief, Temasek and its executives would frequently meet with SBF and other high-level personnel to discuss Temasek's investment in FTX and their partnership. Indeed, Temasek admitted in statements after FTX's collapse that Temasek had numerous "interactions" with SBF and others in the FTX ecosphere.

313.    SoftBank, for its part, is "well-known for being in the spotlight," and investments by the SoftBank Vision Fund make headlines. As one veteran of the tech start-up industry observed:

> SoftBank is a little bit like working with the Kardashianas. They're famous for being famous....They're in the news all the time, even for minor stuff. An investment goes up, they're in the news. An investment goes down, they're in the news. They get a disproportionate share of attention, **which I think they love**, to be frank. (emphasis added).

Funding from SoftBank—a so-called "unicorn company [i.e., start-ups valued at $1 billion or more] whisperer"--provides more than notoriety. "SoftBank's backing can elevate the media profiles of startups and help pave the way for expansion abroad, particularly in Asia where SoftBank has its roots." As the

Case No.: _____                    108
CLASS ACTION COMPLAINT

CEO of one of SoftBank's portfolio companies recognized, "It's one thing to be a unicorn, it's another thing to be backed by a firm with the global footprint and wherewithal of SoftBank…. On a global basis, it's a major credibility building moment for a company [starting up]."

314.    Sino Global, too, recognizes the influence that its reputation carries, and the impact endorsements by Sino Global can have on any potential investment; in fact, Sino Global touts that influence in pitching fund investors:



Sino Global is right that its reputation was important to legitimizing FTX not only to customers, but to other investors, whose investments FTX would need to continue its fraudulent scheme. Anthony Scaramucci, the founder and managing partner of Defendant Skybridge, claims that, at the time Skybridge invested in FTX (which investment occurred *after* the investments by Multinational VC Defendants), it relied on the endorsements by other VC firms, such as the Multinational VC Defendants, in deciding to invest in FTX:

> I guess I was naïve to it because of what we saw. **We saw a very pristine data room.  We saw audited financials.  We saw, and again I won't mention the names, but there were 25 other luminary venture capital investors, hedge fund billionaires, all of which were investors in Sam's company – remember he was giving me the money**.

315.    In this way, the Multinational VC Defendants' commendations and endorsements were critical to the perpetuation of SBF's fraud. In summarizing FTX's success to *The New York Times*, FTX's president, Brett Harrison, explained:

We're the newcomers to the [cryptocurrency] scene…The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken….We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that.

316.     Multinational VC Defendants readily stepped in, lending their credibility to launder FTX's reputation.  FTX flouted the its "End of Year 2021" blog post, FTX flouted its fundraising from "notable investors" and "illustrious partners" "like Temasek [and] Softbank," and in every press release following the Series B, B-1 and C fundraising rounds for FTX Trading and the Series A fundraising round for FTX US, FTX highlighted the participation of, and featured statements endorsing FTX by, the Multinational VC Defendants:

317.     Regulators have taken note of the assistance provided to the FTX fraud by venture capitalists, including Multinational VC Defendants, in pumping FTX with cash and repeatedly endorsing the exchange and its founder. In a keynote address to The Warton School and the University of Pennsylvania Carey Law School on January 18, 2023, Christy Goldsmith Romero, Commissioner of the CFTC, remarked:

> FTX had financial support for its campaign to build trust. Some venture capital firms (and other investors) knowingly funded this trust campaign. . . . **FTX appears to have used [venture capital firms, for example,] as a credibility and trust enhancer, and it used Sequoia's money to embark on a campaign to gain public trust and distinguish itself as the most trusted brand in crypto.....**

However, there are serious questions and allegations about whether this public-relations "war chest" was funded not only by venture capital money but also customer property. If those allegations prove to be true, this could be one of the most significant breaches of trust in financial history.

**The multi-dimensional public relations campaign was meant to build the public's trust in FTX.** And I have not discussed all elements of that campaign. There were rumored efforts to influence charities and policy advocacy groups. There were efforts relating to FTX's extensive legal and political spending; and even an alleged investment in a crypto news site. All of this appears to be part of a branding campaign designed to make FTX appear trustworthy.

318.    In short, FTX told customers that what set it apart was its safety and its trustworthiness, and the Multinational VC Defendants hawked these purported features of the exchange again and again, despite knowing that what they were telling the public about FTX and about SBF was unsubstantiated. The Multinational VC Defendants succeeded in generating the illusion of FTX's credibility as a legitimate exchange. As commentators in the industry describe, "[w]ith the help of a marquee investor roster, SBF was able to build FTX into a massively popular exchange…and successfully promote himself as one of the most trusted founders in all of crypto."

319.    The Multinational VC Defendants' enthusiastic endorsements of FTX paid off. Between the Series B and B-1 fundraising rounds, FTX's user base increased 48%, its average daily trade volume surpassed $14 billion, and its valuation jumped from $18 billion to $25 billion. At the close of the Series C fundraising round, FTX's user base grew another 60% and its valuation ballooned to $32 billion. The Multinational VC Defendants who put up money in the Series B round therefore saw the value of their stakes in FTX grow by 40% in the three months intervening the Series B and Series B-1 fundraising rounds and nearly 90% in the six months intervening the Series B and Series C rounds.

320.    The Multinational VC Defendants' assistance in furtherance of the FTX fraud extended beyond their fundraising for and promotion of FTX, in line with SBF's "two main goals" in fundraising from the Multinational VC Defendants. In addition to raising necessary capital, SBF also sought to "form[] a lot of partnerships with people who are really excited about and who we think can help grow our business and make a lot of connections for us." These "partnerships" were critical to FTX's rise, as

SBF himself recognized, telling the Financial Times on July 4, 2021, just prior to the close of FTX's $900 million Series B: "The biggest thing is not the funds themselves," he said, "[t]he biggest thing is the partnerships."   Again, the Multinational VC Defendants pulled through.

321.   Each Multinational VC Defendant provided to FTX a self-professed "hands-on" investment strategy, which involved "partnering" with FTX and offering it guidance, infrastructure and expertise. For example, Defendant Sino Global is led by managing partner Matthew Graham, a veritable "kingmaker" in the digital assets space, whom "[m]any founders ... swear by" and  whose "vision and drive ... helps companies and products grow" brings  "same long-term, roll-up-your-sleeves, and deep relationship approach that [Sino Global] bring[s] to portfolio companies like FTX."  Sino Global worked particularly close with FTX, and the two shared "a great working relationship" in part because FTX's "processes, values and agency aligned with [Sino Global's]." Indeed, "From the very beginning, Matthew and the Sino Global Capital team supported the FTX vision and then worked with us to help make it a reality." In turn, from its partnership with FTX, Sino Global reports that it derived "enormous strategic value."

322.   Similarly, SoftBank explains that, in investing in startups like FTX, its "role is to provide the operational expertise, global network, and patient capital" and recognizes that "[t]here are few organizations with the vision and resources to back difficult and ambitious global projects." SoftBank Group is careful to note that it is more than a passive investor, explaining that "[a]s important as capital is, [SoftBank] enables something even more powerful[:]  building a unique network of portfolio companies that will collaborate and learn from each other to unlock further opportunities." Moreover, once SoftBank invests in a company, SoftBank has available to it immense influence over its investments, as commentators rightly note:

> SoftBank can also shift how these businesses are run and upend entire markets. Nowhere is this more evident than with Uber. After a year full of internal chaos and PR crises, Uber agreed to make a series of corporate governance changes in part to pave the way for the SoftBank deal. Call it the allure of SoftBank cutting a big check -- or the threat of that check going to a competitor. SoftBank had said it might invest in either Uber or Lyft.

323.   Temasek also is an "active investor and shareholder" in the companies in which it invests and prides itself "[a]s an engaged shareholder in "promot[ing] sound corporate governance in [its]

portfolio companies, including FTX. Specifically, "[p]ost investment, [Temasek] continued to monitor performance and engage management on business strategy, as well as legal, policy and regulatory matters. [Temasek] also encouraged FTX to improve and upgrade their regulatory and legal functions, as well as to appoint experienced executives to strengthen their leadership team in these areas…. This is similar to how [Temasek] engage[s] other early stage investments as an active investor and shareholder."

324.    The Multinational VC Defendants did not deviate from their standard "hands on" approach when partnering with FTX. Indeed, upon information and belief, executives of Defendants Temasek and SoftBank served on FTX's Advisory Board, which held meetings at least through March 2022. The Advisory Board was comprised of several other Co-Defendants and FTX executives from across the United States and The Bahamas, including, upon information and belief:

- Co-Defendant VC Sequoia, based in Menlo Park, California;

- Co-Defendant VC Paradigm, based in San Francisco, California;

- Co-Defendant VC Thoma Bravo, based in San Francisco, California, Miami, Florida, and Chicago, Illinois;

- Co-Defendant VC Altimeter, based in Menlo Park, California and Boston, Massachusetts;

- Co-Defendant VC Ribbit Capital, based in Palo Alto, California;

- Co-Defendant VC Multicoin, based in Austin, Texas;

- Co-Defendant VC K5 Global, based in Miami, Florida;

- Brett Harrison, CEO of FTX US, based in Chicago, Illinois;

- Dan Friedberg, General Counsel and Chief Compliance Officer of FTX Trading *and* General Counsel to Alameda, based in Seattle, Washington;

- Zach Dexter, CEO of FTX Derivatives US and, later, President of FTX US, based in Miami, Florida; and

- Constance Wang, who held multiple executive roles at FTX, including Chief Operating Officer of FTX Trading and Chief Executive Officer of FTX Digital Markets, FTX's Bahamian subsidiary, based in The Bahamas.

325.     FTX's Advisory Board met quarterly and had unique inside information and access into FTX, holding regularly scheduled virtual meetings with PowerPoint presentations at each.   Their participation in FTX's business was in a contract titled "Letter Agreement Re: FTX Advisory Board" dated August 24, 2021, with Sequoia's being titled "Advisory Board Letter" and dated the same.   These Advisory Board members specifically discussed issues such as the CFTC's potential request to increase FTX's default insurance fund in connection with its application to clear derivatives in the U.S., FTX's correspondence with the SEC, the celebrity-fueled marketing campaign engineered by K5 Global (detailed in the Domestic VC Administrative Complaint) and various other executive-level board issues until at least September 2022.

326.     Temasek was represented on the Advisory Board by Pradyumna Agrawal, Temasek's Managing Director for Blockchain Investments and Antony Lewis, a Director in the firm's Crypto & Blockchain Venture Building & Investing group. Mr. Lewis was a featured speaker at the Crypto Bahamas April 2022 conference, "[a]n exclusive gathering of the leading investors and buildings in the blockchain, digital assets and web3 space. SBF, along with nearly a dozen FTX executives, including Brett Harrison and Zach Dexter were featured at the conference.

327.     Temasek's participation in the FTX-sponsored Crypto Bahamas event helped to amplify SBF's reach. *CoinDesk* described the affair as "a four-day flex of FTX's expanding empire – with a new era of "corporate crypto" firmly on display," and the *New York Times* reported, "Bankman-Fried was presiding over the first edition of the Crypto Bahamas conference, a showcase for FTX and a vivid demonstration of his growing celebrity and influence.  Everywhere he went, crypto entrepreneurs offered handshakes and fist bumps, patting him on the back as they pitched projects or presented him with branded swag."

328.     Temasek's contributions at Crypto Bahamas also fueled the normalization of FTX's cryptocurrency exchange "from the early days of 'shadowy super-coders' hearkening the end of banks." On the FTX Stage, Mr. Lewis presented on behalf of Temasek in a panel discussion on "Institutional Crypto Adoption: From FAAMG to Sovereign Wealth." Many news outlets reported on the growing acceptance of crypto on display at the Temasek panel and more broadly at Crypto Bahamas.  For example, *Yahoo! Finance* reported how the story of Crypto Bahamas was "traditional investors and crypto native

firms." And *Forbes* reported how the panels "discussed how digital assets fit into modern investment portfolios and the broader maturation of the asset class."

329.   SoftBank also held two seats on the FTX Advisory Board and it filled those seats with its most senior executives: Rajeev Misra, CEO of both SoftBank Investment Advisers, which manages SoftBank's Visions Fund 1, and SoftBank Global Advisers, which manages SoftBank's Vision Fund 2; and Tom Cheung, a San Francisco-based Partner of SoftBank Investment Advisers. Mr. Misra is not without a checkered history of questionable professional conduct. *The Wall Street Journal* reports that Mr. Misra "used [a] campaign of sabotage to hobble [his] internal rivals," invoking tactics such as "planting negative news stories about them concocting a shareholder campaign to pressure SoftBank to fire them and even attempting to lure them into a 'honey trap' of sexual blackmail," all so that Mr. Misra could become the "right hand of [SoftBank CEO] Japanese billionaire Masayoshi Son."[146] Notably, Mr. Misra was demoted in July 2022, and Mr. Cheung laid off in late September 2022, mere weeks before the FTX fraud was revealed and the exchange collapsed.

330.   SoftBank assisted in other ways, too, including by submitting a letter in support of FTX Derivatives' application to the CFTC for license to operate as a derivatives clearinghouse. Under the proposal, FTX Derivatives would trade directly with investors using algorithms rather than traditional financial intermediaries such as brokers. Brett Harrison, President of FTX.US acknowledged that this application was "unprecedented, not just for crypto derivatives, but for traditional exchange-traded derivatives more generally," and the proposal was not without controversy, with opponents asserting that the application would "come at the expense of risk management best practices, market integrity and ultimately, financial stability." Still, SoftBank threw in its support, by way of a formal comment that:

> Given our knowledge of the digital asset ecosystem, we are uniquely positioned to comment on the nascent but rapidly growing digital asset market as the U.S. government seeks to calibrate its regulatory framework for digital assets…. We believe the FTX proposal will provide broader access to commodity products and increased financial participation in digital markets by retail investors, while protecting and reducing risk for the users of digital assets, financial intermediaries, and the financial system.

In the letter, SoftBank again touted the safety of the FTX exchange, this time to the U.S. federal

---

[146]   https://www.wsj.com/articles/softbanks-rajeev-misra-used-campaign-of-sabotage-to-hobble-internal-rivals-11582743294 (last accessed July 31, 2023).

government:

> Risk mitigation in the digital asset marketplace is a key pillar of the FTX proposal. The digital asset marketplace is fundamentally different from traditional securities and commodities markets. Because digital asset marketplaces do not close, traditional ways of clearing, including end of day clearing, do not fully mitigate risks associated with a 24/7 marketplace. FTX's proposal for 24/7 clearing allows for margin calculation in real time rather than end of day, removing gap risk from the system.

> Furthermore, FTX's automated system for liquidating collateral when it falls below the maintenance margin level, calculated every 30 seconds, is an important innovation that enables FTX to safely offer margin without the imposition of futures commission merchants into the payment flow. The frequent collateral assessments and ability to rapidly liquidate collateral safely eliminate the need for intermediation and mutualization of losses. In unusual circumstances in which the liquidation of collateral is not sufficient to cover position losses, FTX will have arrangements with backstop liquidity providers who will assume positions needing to be liquidated along with the remaining margin. As an additional layer of protection, FTX will fund a guaranty fund with $250 million.

In "strongly support[ing] FTX's application" to the CFTC and in "urg[ing] the Commission to grant its approval," SoftBank provided to FTX much needed credibility and assistance in expanding FTX's reach, by allowing FTX to portray itself as at the forefront of investor protection and as the only regulatory-compliant cryptocurrency exchange. In 2021, FTX released a press release with "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," claiming "the protection of investors and the public as a top priority." SoftBank's lobbying efforts with the CFTC heavily helped shape FTX's regulatory narrative and helped present FTX as a legitimate exchange to customers.

331. Meanwhile, Matthew Graham, CEO of Defendant Sino Global, pictured below with SBF, remained a "close confidante" of SBF throughout perpetuation of the FTX scheme:

Case No.: 117

CLASS ACTION COMPLAINT



332.    Further, Matthew Graham praised FTX and touted the rigorous due diligence that Sino Global undertakes. For example, Graham appeared on an episode of the FTX Podcast, where Graham said "where we don't compromise is on the type of people we invest in." He also said "we spend a lot of time doing dd [i.e., due diligence] such that we feel comfortable that it's an extremely high trust relationship where we really ask ourselves if this is someone we want to be hanging out with literally for years." Graham described Sino Global's internal "thesis" for investment which is to look for what Sino Globla refers to internally "superfans," and SBF was a "superfan."

333.    Upon information and belief, Mr. Graham met with SBF frequently, including at SALT New York 2022, a crypto conference hosted by VC Defendant SkyBridge in New York City. Sino Global was also a sponsor of the Crypto Bahamas event that launched FTX and SBF into notoriety for their

purported commitment to building a crypto exchange with unmatched safety and a commitment to serving their customers' best interests.

334. Mr. Graham touted his and Sino Global's relationship with SBF and FTX publicly. For instance, Mr. Graham appeared on "The Pomp Podcast," a podcast disseminated by Apple from California,[147] in which he touted his relationship with SBF, claiming, among other things:

- He had a "deep relationship, particularly with Sam."

- He and SBF "made the decision to work together after 5 minutes."

- He cold called SBF when they had 3 people at FTX.

- He believed SBF was "the smartest person in the world."

- He wanted to go "down the path" with FTX.

- He thought SBF was smarter than competition and outhustling them.

- that FTX was "all fucking studs"

- He knew FTX only had 5 engineers but claimed they were smart, not that they were understaffed.

- Sino Global had two employees in the United States.

335. The close ties between Sino Global and FTX extend to Constance Wang, who joined FTX in 2019 and held multiple executive roles included Chief Operating Officer of FTX Trading and Chief Executive Officer of FTX Digital Markets, FTX's Bahamian subsidiary. Often described as SBF's "right-hand man," Ms. Wang reportedly lived in SBF's luxury "10-person crash-pad" in The Bahamas, from where she led FTX's global business expansion and oversight of its token listings, as well as its public relations and marketing. Upon information and belief, Ms. Wang regularly attended meetings of the advisory board, on which Temasek and SoftBank sat. In addition, she reportedly oversaw "much of the company's star-studded marketing and hosted almost-weekly parties at her Nassau villa."

---

[147] https://podcasts.apple.com/in/podcast/707-launching-a-%24200m-fund-backed-by-ftx-w-matthew-graham/id1434060078?i=1000540269403

336.     Like many of FTX's executives, Ms. Wang was significantly lacking in experience necessary to run a multi-billion-dollar company. She graduated from college in 2015, and in the short time leading up to her taking the helm at FTX in 2019, she acquired just over two years of experience in risk management and business development. Despite her inexperience, and though presiding as a chief executive over the largest frauds in recent history is her most prominent professional accomplishment to date, Sino Global recently hired Ms. Wang, one of only "a half dozen" remaining SBF-loyalists, as its head of investments in gaming, a move that seemingly conflicts with Sino Global's public apologies following the FTX collapse and subsequent attempts at distancing itself from FTX. To be sure, it is a move that Sino Global did not take lightly, as Sino Global is, apparently, a closely knit group and is very careful in expanding its personnel. With Ms. Wang, Sino Global will comprise only 11 people.

### d. The Multinational VC Defendants sought to keep the fraud concealed, and therefore afloat, until FTX could effect an IPO or a private sale.

337.     In performing extensive due diligence before investing in FTX and then working with SBF to grow the Deceptive FTX Platform to its exponential scale, the Multinational VC Defendants obtained knowledge of SBF's misappropriation of Class Member funds, the undisclosed relationship between Alameda and FTX, along with FTX's attendant misrepresentations and omissions. But despite this knowledge, the Multinational VC Defendants continued to provide capital, infrastructure for and guidance on the company's trajectory, with any eye towards an IPO or private sale, the end game for venture capitalists like the Multinational VC Defendants:

> Venture money is not long-term money. The idea is to invest in a company's balance sheet and infrastructure until it reaches a sufficient size and credibility so that it can be sold to a corporation or so that the institutional public-equity markets can step in and provide liquidity. In essence, the venture capitalist buys a stake in an entrepreneur's idea, nurtures it for a short period of time, and then exits with the help of an investment banker.

For the Multinational VC Defendants, FTX was no different. In fact, in closing FTX Trading's Series B funding, SBF announced that FTX was "trying to get [itself] in a position where we could go public relatively quickly if we wanted to." Multinational VC Defendants stood to profit enormously from FTX's public or private sale, as long as Multinational VC Defendants could help keep the fraud afloat until FTX went on the selling block.

338. By January 2022, an IPO or private sale was increasingly imminent. FTX Trading's valuation reached $32 billion—one of the largest valuations in recent history, greater than the market cap of both Nasdaq and Twitter—while FTX US's valuation topped $8 billion. The Multinational VC Defendants' relentless efforts to promote the FTX exchange as reliable and trustworthy predominantly drove FTX's unprecedented valuations, all to increase the returns on the Multinational VC Defendants' respective investments. In announcing the valuations, SBF stated that he and others at FTX "look forward to working alongside our investors [*i.e.*, the Multinational VC Defendants] to achieve our mission and continue our tremendous growth throughout 2022 and beyond." These multi-billion dollars valuations arose directly from the fundraising by venture capitalists, including Multinational VC Defendants; FTX could not have achieved these appraisals without the nearly $2 billion in fundraising from Multinational VC Defendants and other investors.

339. Just two months later, in March 2022, SBF met with David Solomon, CEO of Goldman Sachs, to discuss, among other things, FTX's IPO. With the prospect of an IPO imminent, Multinational VC Defendants could cash out with massive returns on their equity stakes and leave Class Members to bear the losses resulting from SBF's fraud, if they could help keep customer deposits flowing into FTX accounts, and SBF's fraud concealed, until after the sale.

340. But at this time, cryptocurrencies had entered into a period of prolonged pricing declines, which has become known as the "Crypto Winter." Just a few months later, in May 2022, a series of highly publicized cryptocurrency collapses occurred, including Luna and Terra USD, which had the effect of wiping out Three Arrows Capital, then Voyager Digital and Celsius Network collapsed in July 2022. With the crypto industry beginning to falter, SBF's spree to buy up failing crypto companies (so to keep his fraud concealed from Class Members) took off, and for as long as FTX could shore of the crypto industry, FTX's fraudulent scheme would remain concealed, and the Multinational VC Defendants' investments, protected.

341. Thus, by now, Multinational Defendants' interest in keeping SBF's fraud concealed—and, in turn, FTX afloat—had broadened, as Multinational Defendants had stakes not only in FTX, but in crypto currencies and companies throughout the industry. For example, Sino Global held a portfolio of digital tokens totaling in excess of $129 million, many of which were directly associated with SBF or

FTX, including, for example, Solana's native SOL tokens, in addition to serum (SRM), maps (MAPS), oxygen (OXY) and jet protocol (JET). The collapse of FTX led to price decreases of 80% or more for each of these tokens.

342.    For as long as Multinational VC Defendants could keep FTX's fraud hidden from public eye, FTX could in turn shore up vulnerable stakes in crypto coins and tokens, as well as in struggling players in the crypto industry (like it did BlockFi), including those in which Multinational VC Defendants had an interest. In the alternative, the collapse of FTX—then the second-largest cryptocurrency exchange on the market—could potentially result in a total crash of the cryptocurrency market. Despite that turmoil, at a time, when investors were worried about the stability of players in the crypto markets, the Multinational VC Defendants continued to promote FTX as stable and fostered the narrative that SBF was the "savior" of crypto.

343.    By mid-summer 2022, SBF had burned through the assets accessible to FTX (including Class Member funds) and was in need of an immediate capital injection of $1 billion. Multinational VC Defendants declined to invest again, yet made no mention of FTX's flatlining to the public. So SBF traveled to the Middle East in a desperate effort to get his hands on more cash. This was not known publicly at the time as FTX's public image fostered by the VC Defendants was that it held ample cash having raised over $2.2 billion within the prior year and customer assets were fully covered dollar per dollar.

344.    Throughout the summer of 2022, with FTX spiraling into a liquidity crisis and the crypto industry faltering writ large, the Multinational VC Defendants disclosed none of it With their eyes on an IPO or private sale, and determined to extricate crypto industry-wide, the Multinational VC Defendants conspired with FTX to keep Class Member funds flowing in and the fraud hidden. For as long as Multinational VC Defendants could lure users to the FTX exchanges, their stakes in FTX would continue to skyrocket in value, and Defendants' fees in managing the investments, would continue to grow.[148]

---

[148] A typical fee structure for these types of funds are "2 and 20," or an annual 2% management fee and 20% of any profits (*i.e.*, carried interest). The Multinational VC Defendants' management fees would therefore be based on the invested amount and the committed amount. On top of these guaranteed fees, these Multinational VC Defendants would reap 20% of any profits from the investments in FTX.

*e.   Multinational VC Defendants emerged from the fraud relatively unscathed, while Class Members lost everything.*

345.    Multinational VC Defendants nearly succeeded in cashing out on SBF's fraudulent crypto exchange and they reaped substantial management fees and carried interest in their respective funds throughout the duration of the fraud. However, journalists broke the news of the fraud in early November, and SBF's fraud swiftly imploded. Though many Class Members lost their entire savings to SBF's fraud, Multinational VC Defendants emerged largely unscathed. For example:

- SoftBank reported that, though they marked down their projections of returns from its stake in FTX, FTX's collapse "is very not material for us."

- Sino Global was similarly unphased by the fraud. Sino Global described the minimal impact of FTX's collapse, explaining that Sino Global "is functioning as normal and continues to invest as a fund," in part because "fund investments have been balanced across ecosystems."

- Temasek reported that the total cost of its investment in FTX was 0.09% of its net portfolio value of $403 billion SGD (about $293 billion USD) and, like the other Multinational VC Defendants, wrote the investment off following the fraud's collapse.

346.    These relatively minimal losses underscore the win/win scenario that the Multinational VC Defendants enjoyed at the expense of Class Members, including Plaintiffs.   Provided the Multinational VC Defendants could keep SBF's merry-go-round running until FTX went on the selling block or the volatile crypto market returned to ascendancy, the Multinational VC Defendants would go down in history as some of the largest rainmakers in the tech industry. Conversely, as they now admit, if the fraud collapsed before FTX reached a sale, the Multinational VC Defendants would suffer only non-material losses, losses which the Multinational VC Defendants could in fact harvest for hefty tax deductions. All told, the Multinational VC Defendants had nothing to lose in propping up SBF's fraud; they instead had everything to gain. And so the Multinational VC Defendants assisted the FTX fraud; they did so knowingly; and they did so at Class Members' expense.

347.    As detailed herein, the Multinational VC Defendants represented to Plaintiffs and the Classes that they had performed adequate due diligence supporting their substantial FTX investments;

that FTX's products and services were safe, trustworthy, and reliable; that SBF was a visionary crypto founder whose sole focus was on the greater good rather than profiting at the expense of others; that FTX was being competently run with extraordinary execution; and that FTX and SBF had strictly complied with all legal and regulatory requirements to safeguard their customers' assets, which included ensuring that funds deposited by FTX platform users would be segregated for safekeeping.

348.    The Multinational VC Defendants knew, or should have known, that these representations were materially false and misleading when made. The due diligence activities that the Multinational VC Defendants claimed to have performed with respect to FTX would have revealed the wanton fraud and self-dealing, the related party transactions and relationships with Alameda, and the total lack of internal controls and competency present at FTX. The Multinational VC Defendants had knowledge that FTX was not operating in the manner that VC Defendants had represented to consumers and the market as a result of their experience and relationship with FTX, and their statements to the contrary during the relevant period omitted material facts regarding FTX and Alameda and made other statements did not have a reasonable factual basis given this insider knowledge.

349.    Still, the Multinational VC Defendants tirelessly promoted FTX through both financial funding and issuing promotional statements that would reach investors, and provided FTX with platforms – through the conferences and online shows – to present itself amongst other key players in the cryptocurrency industry. The Multinational VC Defendants' unfair and deceptive statements described herein are likely to mislead – and clearly have misled – consumers and investors acting reasonably in the circumstances into depositing funds and/or cryptocurrency into FTX.

350.    The Multinational VC Defendants' unfair and deceptive statements described herein were likely to have misled – and indeed did mislead – consumers acting reasonably under the circumstances in purchasing, transacting, or depositing fiat current or crypto assets in accounts with FTX during the relevant period.

351.    In addition, the Multinational VC Defendants gave hundreds of millions of dollars in funding to FTX knowing, or reckless in not knowing, that those funds would be used to promote FTX to more customers, inducing them to trade and keep their assets with FTX. Immediately after funds were provided, FTX plowed those funds into expensive advertising campaigns, hiring celebrities, naming

stadiums, and conducting many other public promotional activities. The due diligence activities that the Multinational VC Defendants claimed to have performed with respect to FTX would have revealed that FTX was not safeguarding, not segregating, not properly accounting for, and simply not protecting customer assets, again evidenced by the fact that other investors (*e.g.*, Social Capital and Alexander Pack, and the anonymous employee of one of the VC firm that did invest in FTX) so quickly identified these deficiencies. The Multinational VC Defendants also knew that FTX was comingling and misusing assets, yet turned a blind eye, did not warn customers, conspired with FTX and in fact gave hundreds of millions of dollars more to aid and abet, and materially assists in the fraud.

352. FTX would not have been able to deceive customers to purchase, deposit, or transact in fiat currency or digital assets on its exchange if it were not for VC Defendants' public platforms, promotion, and active participation in the wrongful acts described herein. The Multinational VC Defendants' conduct has caused Class Members to suffer billions of dollars in losses, as SBF burned through Class Member funds for his own enrichment, leading FTX to collapsed. .FTX and Alameda remain embroiled in bankruptcy proceedings, where their assets continue to be consumed by a variety of costs. Billions of dollars' worth of assets have yet to be returned to customers, while each of the Multinational VC Defendants has escaped the collapse of FTX relatively unscathed and continues to operate without any major disruptions to their respective investment portfolios.

## CLASS ACTION ALLEGATIONS

353. As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.    Class Definitions

354. Plaintiffs Kavuri, Rupprecht, Vozza and Winter seek to represent the following International Classes and Plaintiff and Chernyavsky seek to represent the following Nationwide Classes:

(1) **International Class I:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

**(2) International Class II:** All persons or entities residing outside the United States who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.

**(3) Nationwide Class I:** All persons or entities in the United States who, within the applicable limitations period, purchased or held legal title to any fiat or cryptocurrency deposited or invested through an FTX Platform.

**(4) Nationwide Class II:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a YBA or purchased FTT.

Excluded from the Classes are Multinational VC Defendants and their officers, directors, affiliates, legal representatives, and employees, the FTX Group and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

355. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Classes in part because all offers of the Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs and the Class Members (in which Multinational VC Defendants each materially assisted, substantially participated, and/or personally participated) were made by FTX from their principal place of business in Miami, Florida, and thus every single offer to sell cryptocurrency, the Deceptive FTX Platform, YBAs and/or FTT stems from a transactional occurrence that emanated from the State of Florida.

**B.    Numerosity**

356. The Classes are comprised of thousands, if not millions, of consumers globally, to whom FTX offered and/or sold cryptocurrency, the Deceptive FTX Platform, YBAs and/or FTT. Moreover, thousands, if not millions, of consumers worldwide have executed trades on the FTX Platform within the applicable limitations period. Membership in the Classes are thus so numerous that joinder of all members

Case No.:                                              126

is impracticable. The precise number of Class Members is currently unknown to Plaintiffs but is easily identifiable through other means, such as through FTX's corporate records or self-identification.

### C.     Commonality/Predominance

357.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, the following:

      (a)  whether Bankman-Fried, the FTX Insiders, and/or FTX committed fraud;

      (b)  whether the Multinational VC Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud;

      (c)  whether the Multinational VC Defendants had the requisite degree of knowledge of Bankman-Fried's, the FTX Insiders', and/or FTX's fraud;

      (d)  whether the Deceptive FTX Platform, YBAs and/or FTT were unregistered securities under federal, Florida, California, or other law;

      (e)  whether the Multinational VC Defendants' participation and/or actions in FTX's offerings and sales of the Deceptive FTX Platform, YBAs and/or FTT violate the provisions of applicable securities law.

      (f)  the type and measure of damages suffered by Plaintiffs and the Class.

      (a)  whether the Multinational VC Defendants' practices violate the FDUTPA, the California Unfair Competition Law, or other state consumer-protection statutes;

      (b)  whether Plaintiffs and Class Members have sustained monetary loss and the proper measure of that loss;

      (c)  whether Plaintiffs and Class Members are entitled to injunctive relief;

      (d)  whether Plaintiffs and Class Members are entitled to declaratory relief; and

      (e)  whether Plaintiffs and Class Members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of the Multinational VC Defendants' conduct.

**D.      Typicality**

358.      Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all Class Members were offered and/or sold FTX's Deceptive FTX Platform, YBAs and/or FTT because of the Multinational VC Defendants' actions and/or participation in the offering and sale of these unregistered securities, that the Multinational VC Defendants aided and abetted the fraud and conversion perpetrated by Bankman-Fried, the FTX Insiders, and/or FTX, or that the Multinational VC Defendants agreed with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to any Multinational VC Defendant that are unique to Plaintiffs.

**E.      Adequacy of Representation**

359.      Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in complex consumer and securities class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.      Requirements of Fed. R. Civ. P. 23(b)(3)**

360.      The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by the Multinational VC Defendants (1) in marketing, offering, and/or selling the Deceptive FTX Platform, YBAs and/or FTT, which are unregistered securities, (2) in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, (3) in aiding and abetting fraud and/or conversion by Bankman-Fried, FTX and the FTX Insiders, and/or (4) in agreeing with Bankman-Fried, the FTX Insiders, and/or FTX to commit fraud.

361. The common course of conduct by the Multinational VC Defendants includes, but is not limited to their promotion, offer, sale, solicitation, material assistance, substantial participation in, and/or personal participation in the offer or sale of the Deceptive FTX Platform, YBAs, and/or FTT, and/or their aiding and abetting of the FTX Group's Ponzi scheme, fraud, and/or conversion of billions of dollars of customer assets.

362. Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

363. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**G. Superiority**

364. A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

> (a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;
>
> (b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and
>
> (f) The action is manageable as a class action.

**H. Requirements of Fed. R. Civ. P. 23(b)(2)**

365. The Multinational VC Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of aiding and abetting the offering

and/or selling of the Deceptive FTX Platform, YBAs and/or FTT, which are unregistered securities, and violating state consumer-protection laws, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

366. The Multinational VC Defendants have acted and refused to act on grounds generally applicable to the Classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.      Requirements of Fed. R. Civ. P. 23(c)(4)**

367. As it is clear that one of the predominant issues regarding the Multinational VC Defendants' liability is whether the Deceptive FTX Platform, YBAs and/or FTT that FTX offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Class for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

368. As it is clear that another predominant issue regarding the Multinational VC Defendants' liability is whether they have violated the consumer protection and securities laws of Florida in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive FTX Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive FTX Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.      Nature of Notice to the Proposed Class.**

369. The names and addresses of all Class Members are contained in the business records maintained by FTX and are readily available to FTX. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

<u>CAUSES OF ACTION</u>

COUNT I

**Sale of Unregistered Securities in Violation of Florida Law**

370. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–333 above, as if fully set forth herein.

371. Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

372. Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

373. The Deceptive FTX Platform, YBAs and/or FTT are each a security pursuant to Fla. Stat. § 517.021(22)(a).

374. The Deceptive FTX Platform, YBAs and/or FTT sold and offered for sale to Plaintiffs and Class members were not:

a. exempt from registration under Fla. Stat. § 517.051;

b. a federal covered security;

c. registered with the Office of Financial Regulations (OFR); or

d. sold in a transaction exempt under Fla. Stat. § 517.061.

375. The FTX Group sold and offered to sell the unregistered Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs and the members of the Class.

376. The Multinational VC Defendants are directors, officers, partners and/or agents of or for the FTX Group pursuant to Fla. Stat. § 517.211.

377. The FTX Group, with the Multinational VC Defendants' material assistance and personal participation, offered and sold the unregistered Deceptive FTX Platform, YBAs and/or FTT to Plaintiffs

Case No.: 131

CLASS ACTION COMPLAINT

and the members of the Class. As a result of this assistance, the Multinational VC Defendants violated Fla. Stat. § 517.07 et seq. and Plaintiffs and members of the Class sustained damages as herein described.

## COUNT II

### Securities Fraud in Violation of Florida Law

378. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–333 above, as if fully set forth herein.

379. Fla. Stat. Ann. § 517.301 prohibits any person "in connection with the offer, sale, or purchase of any investment or security" from "directly or indirectly" (1) employing "any device, scheme, or artifice to defraud"; (2) obtaining "money or property by means of an untrue statement or a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"; or (3) engaging in "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person."

380. Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

381. The Deceptive FTX Platform, the YBAs and/or FTT Tokens are securities under Florida law.

382. In offering or selling the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities to Plaintiffs and Class Members, FTX and/or SBF made the following material omissions:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

383.    Plaintiffs and Class Members were in strict privity with FTX.

384.    The Multinational VC Defendants are directors, officers, partners and/or agents of or for the FTX Group pursuant to Fla. Stat. § 517.211.

385.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

386.    Nevertheless, by way of the conduct described above, the Multinational VC Defendants directly participated in the FTX Group's offer and sale of the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities in Florida while perpetuating the above-listed omissions in violation of section 517.301.

387.    The Multinational VC Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under section 517.211.

388. Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section § 517.211.

## COUNT III

### Sale of Unqualified Securities in Violation of California Law

389. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–333 above, as if fully set forth herein.

390. Section 25110 of the California Securities Law ("CSL") prohibits the offer or sale by any person in California of securities that are not qualified through registration. CSL section 25503 affords a statutory cause of action to victimized investors for violations of section 25110. Additionally, section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of section 25110 and makes them jointly and severally liable with any other person liable under section 25503.

391. By way of the conduct described above, the Multinational VC Defendants materially assisted and/or personally participated with the FTX Group in the offering and selling of the Deceptive FTX Platform, the YBAs and/or FTT Token securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator in violation of section 25503.[149]

392. Based on their knowledge of securities laws and regulations, the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations and intentions obtained through diligence, ongoing monitoring and/or their hands-on partnership with FTX and/or SBF, the Multinational VC Defendants understood that the Deceptive FTX Platform, the YBAs and/or FTT Tokens were securities not properly qualified or registered under California law, and materially assisted in their issuance and sale.

---

[149] Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of a violation pursuant to section 25503 does not require proof that The Multinational VC Defendants intended "to deceive or defraud." They had to know they were assisting in the sale of unqualified securities. However, Plaintiffs in the alternative contend that even if so, The Multinational VC Defendants' allegations demonstrate knowledge of and participation in FTX Group's non-compliance with the CSL establishes their intent to deceive investors regarding the Deceptive FTX Platform, the YBAs and/or FTT Tokens.

Case No.: 134

CLASS ACTION COMPLAINT

393.    Moreover, CSL section 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents. To the extent the Multinational VCs in addition to providing capital for the scheme to sell unregistered, unqualified securities, also promoted and invested in these unregistered, unqualified securities to induce their purchase by Plaintiffs, the Multinational VC Defendants are liable under CSL sections 25504.1 and 25210.

394.    The Multinational VC Defendants breached section 25210(b) by, on behalf of FTX, inducing or attempting to induce the purchase and sale of unregistered securities in the State of California and by facilitating and encouraging the FTX Group to offer and sell the Deceptive FTX Platform, YBAs and/or FTT Tokens securitiesdespite those securities not being registered or qualified under the California securities law.

395.    Additionally, CSL section 25501.5 affords a statutory cause of action to victimized investors for violations of section 25210(b).

396.    The Multinational VC Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under section 25504.1.

397.    Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section 25503.

## COUNT IV

### Securities Fraud in Violation of California Law

398.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–333 above, as if fully set forth herein.

399.    Section 25401 of the California Securities Law ("CSL") makes it "unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Section 25501 provides a private right of action to purchasers of securities injured by violation of section 25401.

Case No.:                                                135
CLASS ACTION COMPLAINT

400.    Additionally, section 25504.1 extends liability under Section 25501 to any person who materially assists in a violation of section 25401 and makes them jointly and severally liable with any other person liable under section 25501.

401.    The Deceptive FTX Platform, the YBAs and/or FTT Tokens are securities under California law. The Multinational VC Defendants materially assisted FTX and SBF's scheme to sell securities through utilizing material omissions.

402.    In offering or selling the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities to Plaintiffs and Class Members, FTX and/or SBF made the following material omissions:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise that engaged in a material, undisclosed related party transactions;

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

Case No.:                                                   136
CLASS ACTION COMPLAINT

403.    Plaintiffs and Class Members were in strict privity with FTX and purchased securities issued by FTX.

404.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's omissions, rlated party transactions and relationships, and other untruthful conduct and misappropriation of Class Member funds.

405.    Nevertheless, by way of the conduct described above, the Multinational VC Defendants materially assisted with the FTX Group in the offering and selling of the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities in California while perpetuating the above-listed omissions in violation of section 25501. The Multinational VC Defendants so assisted or participated with the intent to deceive or defraud Plaintiffs and Class Members; Plaintiff sand Class Members' deposits increased the value of FTX and, by extension, the Multinational VC Defendants' investments.

406.    The Multinational VC Defendants materially assisted the scheme to sell unregistered securities via material omissions to citizens of California. All of the Multinational VC defendants had knowledge of the omitted related party transactions and relationship  between FTX and Alameda orchestrated by SBF, including, as alleged, through providing SBF the capital for the fraudulent scheme, providing their reputations and false assurances of due diligence to garner trust in SBF, FTX and these securities, and by even partnering with SBF and both FTX and Alameda in investment entities that churned these fraudulent, unregistered securities while SBF looted FTX.

407.    The Multinational VC Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under section 25504.1.

408.    Plaintiffs hereby conditionally tender their FTX Group Securities in accordance with section 25503.

**COUNT V**

**Securities Market Manipulation in Violation of California Law**

409.	Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–333 above, as if fully set forth herein.

410.	Section 25400 of the CSL makes it unlawful for any person, directly or indirectly, to make any statement in the offer or sale of a security, "which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading" in order to "induce the purchase or sale of such security." Under Section 25500, "[a]ny person who willfully participates in any act or transaction in violation of Section 25400 [i.e., market manipulation] shall be liable to any person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter."

411.	The Deceptive FTX Platform, the YBAs and/or FTT Tokens are securities under California law.

412.	In offering or selling the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities to Plaintiffs and Class Members, FTX and/or SBF made the following material omissions:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

Case No.:	138
CLASS ACTION COMPLAINT

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

413. FTX made these omissions of material fact despite having represented that it would hold its customers' funds for their benefit after taking custody of such funds.

414. FTX made the foregoing omissions in order to induce the purchase or sale of the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities. Such omissions affected the value of the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities.

415. Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring, control, their positions on advisory committees and/or hands-on partnership, The Multinational VC Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

416. Nevertheless, by way of the conduct described above, the Multinational VC Defendants willfully participated in the FTX Group's offers and sales of the Deceptive FTX Platform, the YBAs and/or FTT Tokens Securities in California while perpetuating the above-listed omissions in violation of section 25500.

417. The Multinational VC Defendants are accordingly joint and severally liable to Plaintiffs for damages under section § 25500.

## COUNT VI

### Control Person Liability for Violation of California Securities Law

418. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–333 above, as if fully set forth herein.

419. Section 25504 of the CSL extends liability under Section 25501 (which provides a private right of action for violations of section 25401) to control persons of any person or entity liable under section 25501, including "every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person[s] liable under section 25501.

420. Here Defendants Temasek and SoftBank were control persons of FTX and FTX US as significant equity owners of FTX and FTX US who had representatives who sat on an advisory board committee at FTX. Those Defendants wielded their power, control, and deep pockets, to launch FTX's house of cards to its multi-billion dollar scale. Along with the other Defendant VCs, Temasek and SoftBank invested nearly $2 billion in FTX. Temasek and SoftBank were more well than passive investors in the control positions. Indeed, Temasek and SoftBank provided critical groundwork for the FTX fraud, when serving on FTX's advisory board and providing guidance to the fraud, and promoting FTX despite knowing that SBF was misappropriating Class Member funds.

## COUNT VII

### Civil Conspiracy

421. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 333 as if fully set forth herein.

422. There was an express or implied agreement between at least one of SBF and/or other agents of FTX and each of the Multinational VC Defendants to deceive Class Members, and to commit the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to Class Members, and conversion of Class Members' property, which wrongful conduct is described herein.

423. Moreover, Temasek Holdings and Temasek USA expressly or impliedly agreed to act in furtherance of the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to

Class Members, and conversion of Class Members' property, which wrongful conduct is described more fully herein.

424. SoftBank Group, SoftBank US, and SoftBank Advisers likewise expressly or impliedly agreed to act in furtherance of the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to Class Members, and conversion of Class Members' property, which wrongful conduct is described more fully herein.

425. Through the course of their due diligence and hands-on partnerships with FTX, and in providing guidance to FTX and its founder, SBF, the Multinational VC Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Members' funds. Despite this knowledge, each Multinational VC Defendant stood to gain financially from FTX's misconduct, and each Multinational VC Defendant agreed, at least impliedly, to assist that unlawful conduct.

426. The Multinational VC Defendants agreed, at least impliedly, with SBF and/or one or more of his co-conspirators to commit the overt acts alleged herein, each in furtherance of SBF's fraud, breach of fiduciary duty, and conversion of Class Members' property, including (1) propping up SBF's fraud—and expanding its reach—by injecting more than $500 million of necessary capital into the scheme; (2) generating for FTX the appearance of legitimate operations, strong financial condition, and other credibility, which permitted the scheme to grow in scale and persist in duration; (3) advising FTX on ways to continue its growth, thereby attracting new victims and thrusting the scheme forward; and (4) concealing the fraud when the cryptocurrency industry began to falter, with the purpose of keeping the fraud afloat until Defendants could cash out in a public or private sale or once the crypto market recovered.

## COUNT VIII

### Common Law Aiding and Abetting Fraud

427. Plaintiffs hereby incorporate the allegations in Paragraphs 1 through 333 as if fully set forth herein.

428. FTX, and its founder SBF, defrauded Class Members by, among other things, making the following material omissions in soliciting their deposits:

Case No.:                                    141
CLASS ACTION COMPLAINT

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- FTX directed that Class Member funds be wired directly into accounts held by North Dimension, a subsidiary of Alameda;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

429. Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

430. Notwithstanding this knowledge, and by reason of the conduct described above, the Multinational VC Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

431.     The Multinational VC Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, the Multinational VC Defendants are jointly and severally liable with the FTX Group and the FTX Insiders for aiding and abetting his fraudulent scheme.

## COUNT IX

### Common Law Aiding and Abetting Fiduciary Breach

432.     Plaintiffs hereby incorporate the allegations in Paragraphs 1 through 333 as if fully set forth herein.

433.     FTX took custody of the Class Member funds. As alleged herein, FTX promised Class Members funds were safe in its hands, and that FTX customer funds were "held by FTX for [their] benefit." As a custodian of Class Member funds, and by virtue of the promises FTX made to safeguard their funds, FTX owed a fiduciary duty to Class Members, and FTX was obligated to discharge that duty in good faith, with the care that a fiduciary in a similar position would exercise and in a manner reasonably believed to be in the best financial interests of Class Members.

434.     Rather than safeguarding Class Member funds, FTX misappropriated their funds in breach of the fiduciary duty owed to Class Members. These breaches include, but are not limited to: (1) transferring funds belonging to Class Members to Alameda and other of SBF's separately owned entities; (2) transferring funds belonging to Class Members to SBF and his co-conspirators; (3) using funds belonging to Class Members to engage in self-dealing, including non-arms' length transactions among SBF's affiliated entities.

435.     Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's fiduciary duty to Class Members and breaches thereof.

436.      Notwithstanding this knowledge, and by reason of the conduct described above, the Multinational VC Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

437.    The Multinational VC Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, the Multinational VC Defendants are jointly and severally liable with the FTX Group and the FTX Insiders for participating in the breach of FTX's fiduciary duty.

## COUNT X

### Common Law Aiding and Abetting Conversion

438.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 333 as if fully set forth herein.

439.    The funds deposited by Class Members into YBAs on the FTX exchange were personal property of Class Members. SBF and his co-conspirators wrongfully exercised dominion or control over such property, misappropriating Class Member funds entrusted to FTX.

440.    Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, the Multinational VC Defendants acquired knowledge of FTX's conversion of Class Member funds.

441.    Notwithstanding this knowledge, and by reason of the conduct described above, the Multinational VC Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in conversion of funds belonging to Class Members, including by the actions set forth above.

442.    The Multinational VC Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable with the FTX Group and the FTX Insiders for participating in the breach of FTX's conversion of Class Member funds.

## COUNT XI

### Violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §17200, *et seq.*)

443.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 333 as if fully set forth herein.

444.    The California Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

Case No.:                                144

CLASS ACTION COMPLAINT

445.    The Multinational VC Defendants' unfair and deceptive practices described herein were likely to mislead – and in fact did mislead – consumers acting reasonably in the circumstances into purchasing, depositing, and/or transacting in fiat currency and digital assets with accounts with FTX.

446.    **Unlawful**: During the relevant period, the Multinational VC Defendants advertised and otherwise promoted FTX using false and/or misleading claims, such that the Multinational VC Defendants' actions as alleged herein violate at least the following laws:

(a)  The False Advertising Law, Cal. Bus. & Prof. Code §17500, *et seq.*; and

(b)  Cal. Corp. Code §25504.1.

447.    **Fraudulent**: A practice is "fraudulent" under the UCL if members of the general public were or are likely to be deceived.  As detailed herein, the Multinational VC Defendants' statements regarding, *inter alia*, the safety and viability of FTX and their due diligence activities having confirmed such safety and viability were deceptive to or likely to deceive the public. In the alternative, the Multinational VC Defendants deceived the public in suggesting that they conducted extensive due diligence regarding FTX when they in fact did not and nevertheless touted FTX's safety and viability.

448.    **Unfair**: The UCL gives courts maximum discretion to address improper business practices that are "unfair."  The Multinational VC Defendants' collective conduct with respect to the marketing and promotion of FTX is unfair because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to purchase, transact, and/or deposit fiat currency and digital assets with accounts with FTX and the utility of the Multinational VC Defendants' conduct, if any, does not remotely outweigh the gravity of the harm to their victims. Plaintiffs and the Class would not have purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX at the prices paid or at all had they known that the statements were misrepresentations and deceptive.

449.    The Multinational VC Defendants' conduct with respect to the promotion of FTX is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers can reasonably avoid.

450.    The harm suffered by Plaintiffs and the Class was directly and proximately caused by the deceptive and unfair practices of Defendants related to the promotion and marketing of FTX, as described herein.

451.    In accordance with Cal. Bus. & Prof. Code §17203, Plaintiffs seek an order enjoining the Multinational VC Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign.  On behalf of the Class, Plaintiffs also seek an order for the restitution of all monies made from the Multinational VC Defendants' investments in or other business dealings with FTX, which were made resulting from acts of fraudulent, unfair, or unlawful competition as detailed herein.

## COUNT XII

**Violation of California's False Advertising Law (Cal. Bus. & Prof. Code §17500, *et seq.*)**

452.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 333 as if fully set forth herein.

453.    California's False Advertising Law prohibits any statement in connection with the sale of goods or services "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

454.    As set forth herein, the Multinational VC Defendants made statements regarding FTX and their own due diligence activities that were untrue or misleading.  They publicly represented, *inter alia*, that FTX was a viable and safe way to invest in crypto and that their due diligence efforts had confirmed such representations, statements designed to deceive consumers into investing with FTX. In the alternative, the Multinational VC Defendants deceived the public in suggesting that they conducted extensive due diligence regarding FTX when they in fact did not and nevertheless touted FTX's safety and viability.

455.    The Multinational VC Defendants' claims that FTX was, *inter alia*, viable and safe for investing in crypto and that their robust due diligence efforts had verified these representations were untrue and manifestly false and misleading for the reasons detailed herein.  For example, when FTX imploded in late 2022, it was revealed that FTX had failed to employ the most basic safeguards and siphoned billions of dollars' worth of customer assets for their own nefarious purposes during the relevant period.

456.    The Multinational VC Defendants knew, or reasonably should have known, that their claims relating to, *inter alia*, the viability and safety of FTX and the results of their own due diligence activities were untrue or misleading. In the alternative, if the Multinational VC Defendants did not carry out the robust due diligence efforts they advertised, then the Multinational VC Defendants knew, or reasonably should have known, that their claims relating to their due diligence were untrue or misleading. The Multinational VC Defendants failed to adequately inform Plaintiffs and the Class of the true nature of FTX.

457.    When the true nature of FTX became publicly known at the end of the relevant period, the immediate public outrage, bankruptcy proceedings, and government investigation reflected the degree to which consumers and the public at large felt they were deceived by the Multinational VC Defendants and FTX's business practices.

458.    By reason of the above conduct, the Multinational VCs Defendants are liable pursuant to Cal. Bus. & Prof. Code §17500.

## COUNT XIII

### Violation of Florida's Deceptive and Unfair Trade Practices Act

### (§501.201, Florida Statutes, et seq.)

459.    Plaintiffs hereby incorporate the allegations in Paragraphs 1 through 333 as if fully set forth herein.

460.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 *et seq*. ("FDUPTA") "protect[s] the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." §501.202(2) Fla. Stat.

461.    Plaintiffs and Class Members are consumers as defined by §501.203, Fla. Stat. The Multinational VC Defendants' actions as described herein occurred while engaging in "[t]rade or commerce" as defined by the FDUTPA. Fla. Stat. §501.203(8).

462.    The Multinational VC Defendants' conduct, as described herein, constitutes "[u]nfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of any trade or commerce" and is unlawful under the FDUTPA. §501.204(1) Fla. Stat.

463. The Multinational VC Defendants' unfair and deceptive practices, as described herein were objectively likely to mislead – and in fact did mislead – consumers acting reasonably in the circumstances into purchasing, depositing, and/or transacting in fiat currency and digital assets with accounts with FTX.

464. The Multinational VC Defendants violated FDUPTA by engaging in such unfair and deceptive practices, as described herein, which offend public policies, are immoral, unethical, unscrupulous and injurious to consumers.

465. During the relevant period, the Multinational VC Defendants engaged in unfair and deceptive practices by advertising and otherwise promoting FTX using false and/or misleading claims to attract and lure Plaintiffs and Class Members into paying into the Deceptive FTX Platform.

466. A practice is deceptive or "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." As detailed herein, the Multinational VC Defendants' statements regarding, *inter alia*, the safety, and viability of FTX and the results of their own due diligence activities were deceptive to the public. In the alternative, the Multinational VC Defendants deceived the public in suggesting that they conducted extensive due diligence regarding FTX when they in fact did not and nevertheless touted FTX's safety and viability.

467. In interpreting unfair or deceptive acts or practices FDUTPA gives deference to the interpretations of the Federal Trade Commission and the federal courts relating to §5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. §45(a)(1), §501.204(2) Fla. Stat. The Multinational VC Defendants' collective conduct with respect to the marketing and promotion of FTX is unfair because the Multinational VC Defendants' induced Plaintiffs and consumers to purchase, transact, and/or deposit fiat currency and digital assets with accounts with FTX which resulted in injuries that (1) were substantial to the consumers; (2) were not outweighed by benefits to the consumers, and (3) could not have reasonably been avoided by the consumers.

468. Plaintiffs and the Class would not have purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX at the prices paid or even at all had they known that the Multinational VC Defendants' statements were misrepresentations and deceptive.

Case No.: 148
CLASS ACTION COMPLAINT

469.     The Multinational VC Defendants' deceptive promotion and misleading marketing of FTX, as described herein, directly, and proximately caused the harm suffered by Plaintiffs and the Class.

470.     The Multinational VC Defendants still utilize many of the deceptive acts and practices described herein. Plaintiffs and the other members of the Classes have suffered and will continue to suffer irreparable harm if the Multinational VC Defendants continue to engage in such deceptive, unfair, and unconscionable practices.

471.     As a direct and proximate cause of Defendants' unfair and deceptive acts, Plaintiffs and Class Members paid into the deceptive FTX Platform and were aggrieved and damaged by the Multinational VC Defendants in the amount of their lost investments.

472.     Further to the amounts of their lost investments, Plaintiffs and consumers in the Classes make claims for actual damages, attorneys' fees and costs pursuant to §§501.211(2) and 501.2105, Fla. Stat.

473.     Section 501.211(1), Fla. Stat., also entitles Plaintiffs and the Classes to obtain both declaratory and injunctive relief . §501.211(1) Fla. Stat.  As such, Plaintiffs seek an order enjoining these the Multinational VC Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and providing declaratory relief requiring Defendants to commence a corrective advertising campaign.

## COUNT XIV

### Negligent Misrepresentation

474.     Plaintiffs hereby incorporate the allegations in Paragraphs 1 through 333 as if fully set forth herein.

475.     Plaintiffs allege this cause of action in the alternative in the event that the Multinational VC Defendants did not conduct the robust due diligence that they advertised.

476.     As detailed herein, the Multinational VC Defendants negligently misrepresented certain material facts, including, *inter alia*, regarding the safety and viability of FTX and their own due diligence activities in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of the Multinational VC Defendants' investments in FTX.

477. The Multinational VC Defendants made these material misrepresentations without reasonable grounds for believing the misrepresented facts to be true.

478. The representations made by the Multinational VC Defendants in connection with FTX were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with FTX.

479. Plaintiffs and the Class justifiably relied on the Multinational VC Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms. Plaintiffs and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by the Multinational VC Defendants.

480. As a result, Plaintiffs and members of the Class were directly and proximately injured by the Multinational Defendants' negligence in failing to inform Plaintiffs and members of the Class of the true nature of the operations of the FTX platforms.

481. As a result of the Multinational Defendants' negligent misrepresentation during the relevant period, Plaintiffs and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

## COUNT XV

### Intentional Misrepresentation

482. Plaintiffs hereby incorporate the allegations in Paragraphs 1 through 333 as if fully set forth herein.

483. As detailed herein, the Multinational VC Defendants knowingly misrepresented certain material facts, including, *inter alia*, regarding the safety and viability of FTX and that their own due diligence confirmed such safety and viability in order to induce confidence in the FTX platforms and convince consumers to commit fiat currency and digital assets to the FTX platforms, thereby increasing the value of these Defendants' investments in FTX.

Case No.:                                    150
CLASS ACTION COMPLAINT

484. The Multinational VC Defendants made these misrepresentations with knowledge that their statements were materially misleading.

485. The Multinational VC Defendants' misrepresentations in connection with FTX were material and would have been considered by a reasonable consumer in making decisions to engage in any transactions with FTX.

486. Plaintiffs and the Class actually and justifiably relied on Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms. Plaintiffs and the members of the Class opened accounts and purchased, transacted, and/or deposited fiat currency and digital assets into accounts with the FTX entities believing that the FTX platforms would be operated in accordance with the representations made by the Multinational VC Defendants.

487. As a result, Plaintiffs and members of the Class were directly and proximately injured by Defendants' intentional misrepresentations in failing to inform Plaintiffs and members of the Class of the true nature of the operations of the FTX platforms.

488. As a result of the Multinational VC Defendants' intentional misrepresentations during the relevant period, Plaintiffs and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

## COUNT XVI

### Fraudulent Inducement

489. Plaintiffs hereby incorporate the allegations in Paragraphs 1 through 333 as if fully set forth herein.

490. As detailed herein, the Multinational VC Defendants materially misrepresented and omitted existing facts about the FTX entities when they failed to disclose information regarding the true nature of FTX and the results of their own due diligence efforts that were known to them. In the alternative, Defendants materially misrepresented and omitted existing facts about the extent of their own due diligence efforts that were known to them.

Case No.:                                              151

CLASS ACTION COMPLAINT

491.    The omission is material because Plaintiffs and the Class would not have transacted with FTX had they known the true nature of FTX.

492.    The Multinational VC Defendants marketed and promoted FTX to Plaintiffs and the Class despite having knowledge of the true nature of FTX that were contrary to their public misrepresentations.

493.    The Multinational VC Defendants intended that consumers and purchasers would rely on these Defendants' statements regarding, *inter alia*, the safety and viability of FTX and the results of their own due diligence activities so as to increase the user base for FTX and thereby increase the value of their investments in FTX. In the alternative, the Multinational VC Defendants intended that their statements regarding the extent of their due diligence activities would lend an air of legitimacy to FTX that would increase the user base for FTX and thereby increase the value of their investments in FTX.

494.    Plaintiffs and the Class were not aware of the true nature and safety of FTX's platform and could not reasonably have discovered those true characteristics. Plaintiffs and the Class were not aware of the results of or the extent of the Multinational VC Defendants' due diligence efforts and could not reasonably have discovered those true characteristics.

495.    Plaintiffs and the Class justifiably relied on the Multinational VC Defendants' statements in that they purchased, deposited, and/or transacted in fiat currency and digital assets with accounts with FTX, which they would not have done at the prices paid or at all had they known the true nature of the FTX platforms.

496.    As a result of the Multinational VC Defendants' fraudulent inducement of Plaintiffs and the Class onto the FTX platforms, Plaintiffs and the Class suffered damages, including because they cannot retrieve their fiat currency or digital assets currently in accounts with the FTX platforms as a result of the insolvency of FTX.

## COUNT XVII

### Declaratory Judgment (28 U.S.C. §2201)

497.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 333 as if fully set forth herein.

498.    Plaintiffs seek declaratory relief based upon the violations of the UCL and the California False Advertising Law as alleged herein.

499. There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained, or ascertainable state of facts and a present controversy as to the state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

500. Plaintiffs and the Class have an obvious and significant interest in the outcome of this lawsuit.

501. Plaintiffs and the Class purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX in reliance on the Multinational VC Defendants' false and misleading statements.

502. If Plaintiffs and the Class knew the true facts surrounding FTX, Plaintiffs and the Class would not have purchased, transacted, or deposited fiat currency and digital assets with FTX at the prices paid or at all.

503. Thus, there is a justiciable controversy over whether the Multinational VC Defendants illegally solicited their purchases, deposits, and other transactions from Plaintiffs and the Class.

504. Plaintiffs and the Class seek an order declaring that the Multinational VC Defendants committed the violations of law alleged herein; enjoining Defendants from continuing such legal violations; ordering that the Multinational VC Defendants engage in appropriate and equitable remedial measures, such as issuing public announcements to correct their misrepresentations of material fact regarding FTX and their own due diligence activities; and ordering that each of these Multinational VC Defendants that received financial benefits from their wrongful acts detailed herein provide appropriate and equitable restitution to Plaintiffs and members of the Class.

## COUNT XVIII

### Declaratory Judgment (28 U.S.C. §2201)

505. Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 333 as if fully set forth herein.

Case No.:                                    153

506.    Plaintiffs seek declaratory relief based upon the Multinational VC Defendants' role in the selling or offering of the YBAs, Deceptive FTX Network, and FTT, which are unregistered securities under applicable law, as well as the Multinational VC Defendants' misrepresentations regarding FTX and the results of their due diligence or due diligence more generally.

507.    There is a bona fide, actual, and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained, or ascertainable state of facts and a present controversy as to the state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

508.    Plaintiffs and the Class have an obvious and significant interest in the outcome of this lawsuit.

509.    Plaintiffs and the Class purchased, transacted, and/or deposited fiat currency and digital assets with accounts with FTX in justifiable reliance on the Multinational VC Defendants' misrepresentations and omissions as described hereinabove.

510.    If Plaintiffs and the Class had known the true facts surrounding FTX, including but not limited to the fact that YBAs are unregistered securities and that the Multinational VC Defendants' representations to Plaintiffs and consumers regarding FTX and Bankman-Fried were false, then Plaintiffs and the Class would not have purchased, transacted, or deposited fiat currency and digital assets with FTX at the prices paid or at all.

511.    Thus, there is a justiciable controversy over whether the YBAs were sold illegally and whether the Multinational VC Defendants illegally solicited the purchases, deposits, and other transactions made by Plaintiffs and the Class.

512.    Plaintiffs and the Class seek an order declaring that Defendants committed the violations of law alleged herein; enjoining Defendants from continuing such legal violations; ordering that the Multinational VC Defendants engage in appropriate and equitable remedial measures, such as issuing public announcements to correct their misrepresentations of material fact regarding FTX and Bankman-Fried and the results of their own due diligence activities; and ordering that each of these Defendants that

Case No.:                           154
CLASS ACTION COMPLAINT

received financial benefits from its wrongful acts as detailed herein provide appropriate and equitable restitution to Plaintiffs and the Class.

## COUNT XIX

### Punitive Damages

513.    Plaintiffs hereby repeat and rea-allege the allegations in paragraphs 1 through 333 as if fully set forth herein.

514.    When the Multinational VC Defendants conspired with and aided and abetted FTX and its founder, SBF, in their violations of applicable securities laws, fraud, breaches of fiduciary duty, and conversion, the Multinational VC Defendants acted with oppression, fraud, malice, and/or gross negligence.

515.    The Multinational VC Defendants knew of FTX and SBF's omissions and untruthful conduct and misappropriation of Class Members' funds and nevertheless perpetuated their fraud, breaches of fiduciary duty, and conversion by propping up FTX and SBF with funding and encouraging Class Members' investments by bolstering the reputations of FTX and SBF while concealing FTX and SBF's underlying misconduct.

516.    The Multinational VC Defendants' conduct reflects a willful and conscious disregard or total indifference to Class Members' rights and property.

517.    As a result of this conduct, the Multinational VC Defendants are jointly and severally liable for punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.      Certifying the Class as requested herein;

b.      Awarding actual, direct and compensatory damages;

c.      Awarding restitution and disgorgement of revenues;

d.      Awarding declaratory relief as permitted by law or equity, including declaring the Multinational VC Defendants' practices as set forth herein to be unlawful;

e.      Awarding injunctive relief as permitted by law or equity, including enjoining the Multinational VC Defendants from continuing those unlawful practices as set forth herein,

and directing the Multinational VC Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.      Awarding statutory and multiple damages, as appropriate;

g.      Awarding attorneys' fees and costs; and

h.      Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: August 7, 2023                    JOSEPH SAVERI LAW FIRM, LLP

By:      /s/ Joseph R. Saveri
              Joseph R. Saveri

Joseph R. Saveri (SBN 130064)
Steven N. Williams (SBN 175489)
Christopher K.L. Young (SBN 318371)
Louis A. Kessler (SBN 243703)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swillliams@saverilawfirm.com
cyoung@saverilawfirm.com
lkessler@saverilawfirm.com

Case No.:                    156
CLASS ACTION COMPLAINT

James R. Swanson (LA. SBN 18455)*
Kerry J. Miller (LA. SBN 24562)*
Benjamin D. Reichard (LA. SBN. 31933)*
C. Hogan Paschal (LA. SBN 38495)*
Monica Bergeron (LA. SBN 39124)*
**FISHMAN HAYGOOD L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
jswanson@fishmanhaygood.com
kmiller@fishmanhaygood.com
breichard@fishmanhaygood.com
hpaschal@fishmanhaygood.com
mbergeron@fishmanhaygood.com

Robert L. Lieff (CA SBN 037568)
P.O. Drawer A
Rutherford, California 94573
rlieff@lieff.com

*Motion to Appear Pro Hac Vice to be Filed*

*Attorneys for Individual and Representative Plaintiffs*

David Boies (NY REG NO. 2296333)
Alexander Boies (NY REG NO. 5418579)
Brooke Alexander (NY REG NO. 4678900)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
dboies@bsfllp.com
aboies@bsfllp.com
balexander@bsfllp.com

Adam M. Moskowitz (FL SBN 984280)
Joseph M. Kaye (FL SBN 117520)
**THE MOSKOWITZ LAW FIRM, PLLC**
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Telephone: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com

*Plaintiffs' Co-Lead Counsel for MDL No. 3076*